## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TECH 7 SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.: 1:08-cv-00436-JDB** |
| | ) | |
| **VACATION ACQUISITION, LLC,** | ) | |
| **d/b/a Vacation Express** | ) | |
| | ) | |
| **Defendant.** | ) | |

### TECH 7 SYSTEM, INC.'S OPPOSITION TO
### MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Tech 7 Systems, Inc. (Tech 7) hereby opposes the motion for summary judgment filed by Vacation Acquisitions, LLC d/b/a Vacation Express[1] and the related request for stay of discovery. The motion's seeks to label hotly contested facts as "uncontested" and to assert legal issues of laches, waiver, and estoppel, which are dependent on disputed factual issues. The Defendant's motion and its supporting briefs and affidavits fail to provide any example of a legal decision where summary judgment has been granted on any similar set of facts. As discussed herein, the Defendant's motion for summary judgment should be denied and no stay should be granted to interrupt discovery.

---

[1]    To avoid confusion and to emphasize that Vacation Acquisition, LLC is not the same entity as the now defunct Vacation Express, Inc., this Brief will refer to Vacation Acquisition, LLC as "Vacation Acquisition" and Vacation Express, Inc. will be referred to by use of its full, legal name. Vacation Acquisition's Brief routinely confuses Vacation Acquisition with another legal entity called Vacation Express, Inc. Vacation Acquisition did in fact buy the right to use the name "Vacation Express," but that doesn't mean that it is Vacation Express, Inc. or has succeeded to any rights that may have been contracted to Vacation Express, Inc. 18 years ago.

## STANDARDS FOR SUMMARY JUDGMENT

The Supreme Court has issued three key opinions that clarify the standards governing motions for summary judgment under Fed. R. Civ. P. 56. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex* at 322; *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995); *Molerio v. FBI*, 749 F.2d 815, 823 (D.C. Cir. 1984).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and summary judgment is appropriate against only those parties "who fail[] to make a showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Once the moving party has met its burden, the non-movant may not rest on mere allegations, but must proffer specific facts showing that a genuine issue exists for trial. *Matsushita*, 475 U.S. at 586. Fed. R. Civ. P. 56 requires the party opposing summary judgment go beyond the pleadings, and by affidavits, depositions, answers to interrogatories or admissions set forth "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Banks v. C & P Tel. Co.*, 802 F.2d 1416 (D.C. Cir. 1986). The Plaintiff has submitted an affidavit and sworn interrogatory responses to meet its burden of showing that genuine issues of material fact exist.

Affording substantial deference to the nonmoving party, the summary judgment standard mandates that "all inferences must be viewed in a light most favorable to the non-moving party." *McCready v. Nicholson*, 465 F.3d 1, 7 (D.C. Cir. 2006). Case law specifies that an award of summary judgment is an extraordinary remedy. Such remedy is even more extraordinary when it seeks to dispose of the case before discovery is completed – particularly when the issues raised in the motion are all factual issues. Once these standards are applied to the Defendant's motion for summary judgment, the only reasonable conclusion is that the motion must be denied.

## STATEMENT OF GENUINE ISSUES

The facts which the Defendant asserts are undisputed are either irrelevant and immaterial or in fact hotly disputed. A genuine issue of material fact is one that could change the outcome of the litigation. *Anderson, supra a*t p. 247. The facts listed as undisputed by the Defendant fail to meet that test. The Declaration of Tech 7's President Richard M. Dickieson establishes that the key assertions of the Defendant cannot be accepted as undisputed and/or material, much less as true. The facts asserted as disputed are reviewed in the Richard Dickieson Declaration and in the Statement of Genuine Issues submitted concurrently with this Brief.

3

**DISCUSSION**

I.    **VACATION ACQUISITION'S ADMISSION THAT IT IS AN INFRINGING USER PRECLUDES SUMMARY JUDGMENT IN ITS FAVOR AND CREATES ISSUES OF FACT.**

Vacation Acquisition has provided responses to interrogatories, responses to requests to produce documents and deposition testimony which confirm that it did not request nor did it receive any license rights to the Tech 7 software when it purchased "some"[2] of the assets of FS Tours, Inc, a subsidiary of FlightServ, Inc. *See* Response to Interrogatory Nos. 3 and 6 (Exhibit 1). See also Response to Request to Produce Documents Nos. 3, 11, and 12 (Exhibit 2).[3]   In the absence of any basis for the licensed use of the Tech 7 software, Vacation Acquisition has acknowledged in deposition testimony by its corporate designee that its use of the Tech 7 software is not based on the License Agreement from 1990 (Exhibit 1 to the Complaint). Dickieson Declaration, Paragraph 5(a).   Instead, Vacation Acquisitions' argument is that its infringing use has been so public that Tech 7 should have been aware of the wrongful conduct and taken action against Vacation Acquisition. This argument is not supported by the facts and it is clearly not an argument that this Court can resolve at the summary judgment stage.

Vacation Acquisition wants this Court to rule as a matter of law that Tech 7 knew of Vacation Acquisition's wrongful conduct and slept on its rights and waived any right to enforce its rights against Vacation Acquisition.   Vacation Acquisition makes this argument without reference to any documents from its own file, but only by interpretation of a few ambiguous e-mails from former employees of Tech 7 about events long before Vacation Acquisition began to infringe.   The corporate designee for Tech 7 denies that it had knowledge of Vacation

---

[2]      See Defendant's Response to Interrogatory No. 6. (Attached hereto as Exhibit 1)

[3]      Vacation Acquisition admits that it has no documents in its possession that grant it any rights under any license to use the Tech 7 system.  Response to Request to Produce No. 11. (Attached hereto as Exhibit 2)

Acquisition's infringing use until shortly before the demand letter was sent to Vacation Acquisition to cease and desist from infringing use in January 2008 (Complaint Exhibit 2). See Dickieson Declaration, Paragraph 5(b). The concurrently-filed Declaration of Tech 7's President Richard Dickieson provides an alternative interpretation of those communications. Since any inference must be resolved in favor of the non-moving party, *McCready, supra.* Mr. Dickieson's interpretation of the communications are controlling for purposes of this motion.

Disovery in this case confirms that Vacation Acquisition never let Tech 7 know that it was using the Tech 7 software. It never sought permission to use Tech 7 and its employees and officers had no discussions with Tech 7 during the entire existence of Vacation Acquisition. See Dickieson Declaration, Paragraph 5(c). Defendant also responded that it had no documents authorizing it to use the Tech 7 software. See Exhibit 2, Response 11. Given these undisputed facts, a finding, as a matter of law, of an intentional and knowing waiver by Tech 7 in favor of Vacation Acquisition is not possible.

Vacation Acquisition's claim to have been infringing on Tech 7's software rights for over a decade is factually inaccurate. Vacation Acquisition was formed in late 2004 to purchase some of the assets of a company called FS Tours, Inc.[4] Vacation Acquisition could not possibly have been infringing on Tech 7's intellectual property for a decade because it has not existed for even four years. Moreover, there is no evidence provided by Vacation Acquisition showing that it purchased any asset of FS Tours, Inc. that would allow it to claim that FS Tours, Inc. was passing any rights on to Vacation Acquisition allowing the use of Tech 7 software. (See Exhibit 2, Response 2 and Exhibit 4, Disclosure Schedules to Asset Purchase Agreement). Dickieson Declaration, Paragraph 5(d). It appears that Vacation Acquisition failed to contract for the

---

[4]    See Exhibit 3, Asset Purchase Agreement.

purchase of the Tech 7 software system that was on the computer hardware that it received from FS Tours. Despite receiving numerous, repeated, and omnipresent screen statements built into the software stating that the software system was the "exclusive" property of Tech 7 (See Exhibit 5, a screen shot of the operations menu), Vacation Acquisition failed to notify Tech 7 that it was using the software, failed to pay for the software, and in fact chose to retain consultants to modify and service the software without letting Tech 7 know that the software was being used. See Dickieson Declaration, Paragraph 5(e).

Vacation Acquisition was asked to provide evidence to support its claims of waiver and estoppel, but Vacation Acquisition affirmed under oath that it had no evidence in its files and it knew of no specific evidence from its own files or the files of any previous user of the Tech 7 software. Exhibit 1, Response 17. Instead, Vacation Acquisition took the software - an asset to which they had no rights, did not purchase, and which was not mentioned or attributed any book value in the asset purchase agreement (Exhibits 3 and 4) – and began to use the Tech 7 software. Vacation Acquisition then began to list on its accounting records that the Tech 7 software had a book value of $150,000.[5]

> "Tech 7 software is carried on the books of Vacation Acquisition, LLC at a value of $150,000 and has been so carried over the last 36 months. **The book value placed on the software when it was transferred to Vacation Acquisition, LLC was $0.00.** Vacation Express has no information regarding how the Tech 7 software system was carried on the books of NALG, FlightServ, Inc. or Vacation Express, LLC." (Emphasis added.) [Exhibit 1, Response to Interrogatory 2.]

---

[5]     At the deposition of Vacation Acquisition's corporate designee, the designee corrected this interrogatory response, stating that although the book value for the Tech 7 system was initially listed as $0 after Vacation Acquisition purchased some of the assets of FS Tours, Inc., the book value has increased to some number less than $150,000 as the cost for modifications of the Tech 7 system accumulated. Although the designee asserted that the sworn interrogatory response was inaccurate, he reaffirmed that the Tech 7 system was given no book value at the time of the asset purchase. No documents transferring the Tech 7 software to Vacation Acquisition were produced and Vacation Acquisition asserted that no such documents exist.

II.    **VACATION ACQUISITION'S SECRET USE OF THE TECH 7 SOFTWARE CANNOT FORM THE PREDICATE FOR WAIVER, ESTOPPEL OR LACHES.**

Most of the relevant issues involved in Vacation Acquisition's motion are factual questions – some of those issues involve discerning the knowledge and intent of Tech 7. For example, just one issue underlying the Defendant's motion for summary judgment has two embedded unresolved factual questions: Was there an *intentional* waiver of a *known* legal right? The issue of what Tech 7 knew and intended are disputed factual questions precluding summary judgment on this point. Certainly, this Court cannot declare as a matter of law what Tech 7 knew or intended, based on disputed interpretations of a few ancient e-mail messages taken out of context by Vacation Acquisition. This Court may find, however, based on the undisputed testimony of each of the Vacation Acquisition witnesses, including the Defendant's designated representative, that no one at Vacation Acquisition had any communication with anyone at Tech 7 from the time of its creation in 2004 until the cease and desist letter was sent by counsel for Tech 7 in January 2004. Given the complete absence of communication and the total failure by Vacation Acquisition to alert Tech 7 to its infringing use, no claim of waiver, estoppel or laches can be supported.

### A. No waiver has been proven.

Vacation Acquisition devotes only two paragraphs to its claim that Tech 7 has waived its claims. Vacation Acquisition acknowledges that waiver requires an intentional relinquishment of a known right – established by showing the intent of Tech 7 and an overt act demonstrating that intent. Here again, Vacation Acquisition is seeking summary judgment on an issue concerning the intent of the non-moving party. Such issues of intent are disfavored grounds for

7

summary judgment.[6]  Vacation Acquisition.  This Court cannot make a determination that judgment is warranted as a matter of law based on Vacation Acquisition's disputed and out of context interpretation of what some technical correspondence between other parties means.

The alleged evidence of a waiver of rights cited by Vacation Acquisition does not lead to the conclusion claimed by the Defendant.  Vacation Acquisition claims that "the 1998 emails and 1999 letter demonstrate that Tech 7 acknowledged and ratified its customers' access to SpeedRes source code to perform modifications, maintenance and support." Def. Brief, p. 13.  However, no language of ratification appears in the 1999 letter.  In fact, the 1999 letter is actually a narrow focused letter addressing the Tech 7 Y2K enhancement to avoid any problems which might occur on January 1, 2000.  The letter included a warning that other venders were also marketing Y2K patches and thus the letter included a short statement to avoid such third party patches, as one of the consequences would be the termination of the warranty.  There was no statement that this termination of warranty was the only consequence that would occur.  In fact, the letter contains the specific statement that "We remind you that nothing in this communication or in other communications regarding SPEEDRES' and TECH 7's Year 2000 readiness constitutes an addition or modification to existing warranties nor modifies any warranty limitation or waivers." See Defendant's Exhibit, April 19, 1999 Letter, p. 3.  Despite this express disclaimer that the letter did not constitute a waiver, Vacation Acquisition presents a tortured summation of the letter to support its argument that the letter, as a matter of law, waives Tech 7's right to protect its interests in the entire software. [See Dickieson Declaration, Paragraph 4(14, 16)].

---

[6]      See e.g., *Hardin v. Pitney-Bowes Incorp.* , 451 U.S. 1008 (1981) Justice Rehnquist dissenting: "It has long been established that it is inappropriate to resolve issues of credibility, motive, and intent on motions for summary judgment. It is equally clear that where such issues are presented, the submission of affidavits or depositions is insufficient to support a motion for summary judgment."

In another misguided effort to provide further proof of waiver, estoppel and laches, Vacation Acquisition puts its spin on the November 8, 2000 e-mail messages between Rhoda Harwood, a sales person at Tech 7, and Gantt Cookson, an employee at VE Holdings, Inc. The e-mail mentions Data Plus and indicates that everything was transferred to the Data Plus product. Because the name Data Plus is invoked, Vacation Acquisition states that Tech 7 was put on notice that Data Plus was servicing the Tech 7 product and that Tech 7 somehow waived any contract rights because it failed to take action in 2000 when it had this knowledge. But the e-mails do not conclusively lead to this interpretation. First, the fact that Tech 7 may have authorized Data Plus to service the Tech 7 software owned by another company (VE Holdings) does not give a subsequent unlicensed user (Vacation Acquisition) the right to have anyone service and modify the Tech 7 software. Second, the e-mails make it clear that Gantt Cookson is telling the Tech 7 salesperson that VE Holdings, Inc. is using a Data Plus product. The Tech 7 salesperson is trying to convince VE Holdings, Inc. to review a proposal for getting back to the Tech 7 products and service. [See Dickieson Declaration, Paragraph 4(15, 16)]

Contrary to the assertions of Vacation Acquisition, there is no proof of permanent waiver of Tech 7's contract and proprietary rights and certainly no proof of Tech 7 waiving any subsequent control of its software for any person who uses the software without permission. [Dickieson Declaration, Paragraph 5(f)].

**B.  No estoppel has been proven.**

Vacation Acquisition also devotes only two paragraphs to its estoppel argument. Vacation Acquisition cites *General Electric Capital Corp. v. Eva Armadora, S.A.*, 37 F. 3d 41, 45 (2d. Cir. 1994) for the four criteria necessary for an estoppel argument. Each criterion is a separate factual finding.  Vacation Acquisition fails to tie the four criteria to the facts in this

9

case. There is no undisputed fact even alleged that would make Tech 7 a "wrongdoer" or a party making a false statement or misrepresentation. Vacation Acquisition asserts that it "has spent hundreds of thousands of dollars to make repairs and modifications" to the Tech 7 system, but there is no evidence that Vacation Acquisition has spent any such sums. The Declaration of Vice President Cookson states that the funds were spent in the late 1990's – but this timetable is well before Vacation Acquisition was in existence. Nowhere does Vacation Acquisition provide any legal or factual arguments that could lead to a finding as a matter of law that Vacation Acquisition spent such sums in reliance on any act of Tech 7. Nor is there any legal authority cited to justify that Vacation Acquisition may "tack" the spending of other non-parties to its own claim of prejudice. On the other hand, it is undisputed that Vacation Acquisition has not been financially prejudiced by any act of Tech 7 since Vacation Acquisition acquired the Tech 7 system for nothing.[7]

Tech 7 has a very precise Licensing Agreement that it uses with any entity that it authorizes to use the Tech 7 software system. That Licensing Agreement, attached to the Complaint as Exhibit 1, provides control of the software system, so that Tech 7 knows who is using the system, controls whether the system can be transferred to third parties, and prevents unauthorized users from changing the proprietary code built into the software. Dickieson Declaration, Paragraph 5(g). Vacation Acquisition argues that Tech 7 knew of and approved the transfer of the software system from Vacation Express, Inc. to the North American Leisure Group (NALG) in 1998. Even if we assume for the sake of argument that such transfer of the software was approved, that approval did not free the software from its proprietary restraints and allow any subsequent user to ignore the ownership rights of Tech 7. Vacation Acquisition

---

[7]     See Defendant's Response to Interrogatory 2 (Exhibit 1).

appears to argue, without authority, that once Tech 7 allows any other entity to transfer the software once, that Tech 7 is permanently estopped from any subsequent control of the proprietary rights to the software. The facts discovered to date appear to indicate that the software was sold once[8] by Vacation Express with the knowledge and consent of Tech 7, but subsequently, the software system was sold two more times without any notice to or approval received from Tech 7.[9] It is not enough for Vacation Acquisition to point to the approved transfer in 1998, but it must show that its own use beginning in December 2004 has been approved by Tech 7. That it cannot do [*see* Exhibits 3 and 4], nor does it even attempt to do, since its theory of the case is that it has deliberately been infringing on the Tech 7 rights.

### C. Laches cannot be imposed as a matter of law.

Tech 7 disputes the assertion that it inexcusably slept on its rights thereby opening the door to a claim of laches. Tech 7's President Richard Dickieson has testified concerning the diligent steps the company took to identify infringers of the Tech 7 software and to assert Tech

---

[8] Vacation Acquisition's Gantt Cookson also testified that there might have been a second sale of the Vacation Express business from Vacation Express, Inc. to Vacation Express, LLC, but Mr. Cookson was unaware of whether that was merely a name change, a stock sale, or a sale of assets.

[9] Vacation Acquisition admits in its Interrogatory Responses that it did not request permission for the transfer of Tech 7 software for its own use:

"With respect to the transfer of assets from Vacation Express, Inc. to MyTravel PLC and its subsidiary NALG and the transfer from NALG to FlightServ, Inc., Vacation Express is unaware whether any of each such transfer of rights was approved in writing by Tech 7 and that any approval from Tech 7 was ever sought. Vacation Express states further that documentary evidence produced by Tech 7 in this litigation demonstrates that Tech 7 considered the Sale and Licensing Agreement had transferred from Vacation Express, Inc. to NALG. Vacation Express states further that with respect to the transfer from FlightServ, Inc. to Vacation Acquisition, LLC d/b/a Vacation Express, Vacation Express did not request any approval from Tech 7 for the transfer of the license." [Interrogatory Response No. 3]

11

7's rights against those infringers like Vacation Acquisition. Dickieson Declaration, Paragraphs 5(h, i).    The doctrine of laches applies after a detailed factual inquiry as to whether there is inexcusable delay in instituting suit AND prejudice to the defendant as a result of such delay.    As discussed below, relevant legal authority states that the analysis of a laches claim is intertwined with a statute of limitations analysis.

As discussed later in this brief, Tech 7 has filed suit within the statute of limitations under Oregon contract law (6 years) and under United States Copyright law (3 years from the time of discovery).    The fact that Tech 7 has acted within the statute of limitations is presumptively sufficient to defeat any equitable defense of laches, as explained in the recent case of *Peter Letterese And Associates, Inc. v. World Institute Of Scientology*, ---F.3d----,2008 WL 2652291 (11th Cir (Fla.) 2008):

> "In answering the question of whether the defense of laches may be interposed in a copyright infringement suit, therefore, we cannot agree with the conclusion of the Fourth Circuit, which is an unqualified "no." *See Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 798 (4th Cir.2001). *Prather* recognized the applicability of general equitable doctrines, and like tolling, laches falls into that category. *Cf. Teamsters & Employers Welfare Trust of Ill. v. Gorman Bros. Ready Mix*, 283 F.3d 877, 882 (7th Cir.2002) ("What is sauce for the goose (the plaintiff seeking to extend the statute of limitations) is sauce for the gander (the defendant seeking to contract it)."). However, we remain mindful of the Fourth Circuit's invocation of separation of powers principles which counsel against the use of "the judicially created doctrine of laches to bar a federal statutory claim that has been timely filed under an express statute of limitations." *Lyons P'ship*, 243 F.3d at 798. We therefore answer this question with a presumptive "no"; there is a strong presumption that a plaintiff's suit is timely if it is filed before the statute of limitations has run. Only in the most extraordinary circumstances will laches be recognized as a defense. *Cf. Chirco v. Crosswinds Communities, Inc.*, 474 F.3d 227, 234 (6th Cir.2007) (noting the limited applicability of laches to copyright cases in "what can best be described as unusual circumstances"); *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 951 (10th Cir.2002) ("Although it is possible, in rare cases, that a statute of limitations can be cut short by the doctrine of laches, we see no reason to supplant the statute of limitations in this case." (internal quotation marks and citation omitted)).

Even where such extraordinary circumstances exist, however, laches serves as a bar only to the recovery of retrospective damages, not to prospective relief. (*Id.*)

A finding that this case involves such extraordinary circumstances to overcome the presumption that satisfying the statute of limitations also defeats a laches defense is a factual determination not a determination at law. Consequently, this Court may not find as a matter of law, that Tech 7's claims are barred by the equitable defenses of waiver, estoppel and laches.


**III.    VACATION EXPRESS' THEORIES OF LACHES, WAIVER AND ESTOPPEL FAIL TO ADDRESS FACTUAL DEFENSES TO SUCH EQUITABLE REMEDIES.**

The assertion of equitable doctrines such as waiver, estoppel and laches cannot be separated from equitable defenses, such as "unclean hands." See *e.g.*, *Conan Properties v. Conan's Pizza*, 752 F. 2d 145, 150 (5th Cir. 1985). By admitting that Vacation Acquisition has engaged in unauthorized and secret infringement as an element of its claim for summary judgment, Vacation Acquisition cannot overcome the defense of unclean hands. A party seeking equitable relief must come to court with clean hands. The issue of whether Vacation Acquisition has clean hands is a factual issue that is unaddressed by the motion for summary judgment. Indeed, it is doubtful that Vacation Acquisition can even make a serious claim of clean hands after asserting that it has engaged in infringing conduct for years and failed to communicate such conduct to the Plaintiff. Likewise, waiver and laches are two equitable remedies that can also be negated by the defense of unclean hands. These are all factual questions which are not ripe for summary judgment.

**IV.    VACATION ACQUISTION HAS NOT BEEN PREJUDICED BY TECH 7'S ACTIONS OR INACTIONS.**

To prevail in this summary judgment proceeding on its equitable claims of waiver, estoppel and laches, Vacation Acquisition must prove by undisputed evidence that it has been prejudiced by Tech 7's delay in enforcing its proprietary rights to the software. Vacation Acquisition asserts that it has been prejudiced by the loss of files and information about witnesses that "existed before Vacation Acquisitions purchased Vacation Express in December 2004." Vacation Acquisition's Brief, p. 12. First, Vacation Acquisition purchased the files and records of the previous Vacation Express business (Exhibit 3), yet it has failed to produce any records of the prior business. Prior to the purchase of some of the assets of the prior Vacation Express business, it could have determined for itself what rights the previous business had to the Tech 7 software and adjusted its purchase price accordingly. In fact, Vacation Acquisition placed no value on the Tech 7 software (Defendant's Interrogatory Response No. 2 – Exhibit 1), so it cannot be said to have been prejudiced when that software is determined to not have any value in Vacation Acquisition's hands. In sum, Vacation Acquisition cannot assert that it has been prejudiced because the company that sold it the hardware with the Tech 7 software system on it spent money modifying the Tech 7 system. Vacation Acquisition admits that it did not pay one cent for the software in the asset purchase, nor did it do any due diligence to determine what rights, if any, it was purchasing or to obtain consent for the license transfer. [See Ex. 3 and 4]

Vacation Acquisition did not obtain any documentation that it was entitled to use the Tech 7 software when it acquired the assets in 2004. Vacation Acquisition cannot now complain that it has been prejudiced by the loss of documents in 1995, when it never had those documents at any time and never requested that such documents be transferred to it. Vacation Acquisition also points to the death of a single witness, Bob Martin, who had experience with the Tech 7

14

system in the period 1990 through 1995, without indicating what that witness would have contributed to the case. These facts do not prove prejudice, nor do these facts entitle Vacation Acquisition to summary judgment as a matter of law.

## V.    THE APPLICABLE STATUTES OF LIMITATIONS HAVE NOT EXPIRED

Vacation Acquisition also asserts that its breach of contract occurred outside of the six year period of limitations under Oregon contract law. This argument is flawed in several aspects. First, the determination of what statute of limitations applies is another factual determination. Breach of contract is not the only claim asserted. In fact, the breach of contract claim is an alternative claim applicable after a factual finding that a contract exists between the parties. Vacation Acquisition's current position appears to be that its use of the Tech 7 system was not pursuant to any contract or license, but discovery into Vacation Acquisition's position has revealed that its position on this issue is muddled.

Tech 7's Complaint provided the Sales and License Agreement (SLA) showing that the original license holder was a company called Vacation Express, Inc. The license agreement required the consent of Tech 7 to any transfers of the SLA. (Article I, Paragraph 5). At best, the Defendant has argued without showing the actual transfer documents that the first transfer of the SLA from Vacation Express, Inc. to VE Holdings, Inc in 1998 was consented to by Tech 7. Defendant has failed to show that either of the subsequent transfers in 2003 and 2004 or any of the subsequent modifications were consented to by Tech 7. The corporate designee of Vacation Acquisition states that he is not aware of any contract that entitles Vacation Acquisition to use the Tech 7 software. Vacation Acquisition has simply misappropriated the software without paying for it.

No such contract between Vacation Acquisition and Tech 7 has been produced in discovery.[10] Even if we assume that Vacation Acquisition ratified the license agreement with Tech 7 when it purchased the some of the FS Tours assets in 2004 and immediately started to breach that license agreement, then the six year statute of limitations under Oregon law could not have expired as of the date the suit was filed in 2008 is substantially less than the 6 year statute of limitation. Consequently, either Vacation Acquisition is an unlicensed misappropriator of the Tech 7 software, or it is somehow a licensed user of the software who first breached the license sometime after its formation in December 2004.

If this Court determines that Vacation Acquisition is a misappropriator, then the cause of action for misappropriation is governed by the Copyright Act. See *Roger Miller Music, Inc. v. Sony/ATV Publishing, LLC,*, 477 F.3d 383 (6th Cir.2007). Under the Copyright Act, a claim for copyright infringement or ownership has a three-year statute of limitations. 17 U.S.C. § 507(b). A claim for copyright infringement can accrue more than once because each infringement is a distinct harm. *Bridgeport Music, Inc. v. Rhyme Syndicate Music,* 376 F.3d 615, 621 (6th Cir.2004). In *Ritchie,* the Sixth Circuit noted that "each new infringing act causes a new three year statutory period to begin." *Ritchie v. Williams,* 395 F.3d 283, 288 n. 5 (6th Cir.2005) . See also *Computer Data Systems, Inc. v. Kleinberg*, 759 F. Supp. 10 (D.D.C., 1990) holding that

---

[10]     Tech 7's Breach of Contract Count is an alternative argument in the event that this Court finds that Vacation Acquisition acquired the contract or license to use Tech 7 software.  The answer to this question involves questions of fact and nothing in the Declarations submitted by Vacation Acquisition sheds any light on whether Vacation Acquisition gained approval for the transfer of the contract or license from Vacation Express in 2005.  However, the more recently provided Interrogatory Responses state that the Tech 7 software system or the Software Licensing Agreement were not listed as assets purchased by Vacation Acquisition in the asset purchase agreement.   If this Court makes the finding that Vacation Acquisition has not succeeded to the contract obligations of the licensing agreement, then Vacation Acquisition's misuse of the software system is not a breach of contract, but simply the basis for the more serious tort cause of action of misappropriation.

under the "continuing tort" doctrine, a party "can recover for **all** damages resulting from **all** of defendant's wrongful conduct, **provided any of it** occurred within the statutory period," citing *Filloramo v. Johnston, Lemon & Co.,* 700 F.Supp. 572, 575 (D.D.C.1988) (Emphasis added.)

The three year limit is also tolled during a period where the infringing use is not known to the plaintiff. A copyright infringement claim "accrues when a plaintiff knows of the potential violation or is chargeable with such knowledge." *Bridgeport Music, Inc.,* 376 F.3d at 621. This, too, is another factual determination. In *Bridgeport Music,* the court explained that "[b]ecause each act of infringement is a distinct harm, the statute of limitations bars infringement claims that accrued more than three years before suit was filed, but does not preclude infringement claims that accrued within the statutory period." *Id.* See also *Cambridge Literary **Properties, Ltd**. v. W. Goebel Porzellanfabrik G.m.b.,* 510 F.3d 77 (1st Cir. (Mass.) 2007). Under the Copyright Act, the cause of action accrues when a plaintiff "knows or has reason to know of the act which is the basis of the claim." *Santa-Rosa v. Combo Records,* 471 F.3d 224, 227 (1st Cir.2006), *cert. denied,* --- U.S. ----, 127 S.Ct. 2265, 167 L.Ed.2d 1094 (2007) (internal quotation omitted).

The Declaration of Tech 7's President, Richard Dickieson, verifies that the infringing use was not discovered until December 2007 and that there was no reason to know of the infringing use prior to that date. Dickieson Declaration, Paragraph 5(h). Consequently, the applicable statutes of limitations do not bar the claims asserted by Tech 7.

## VI.   INJUNCTIVE RELIEF IS AVAILABLE TO STOP THE MISUSE OF THE SOFTWARE SYSTEM.

Vacation Acquisition asserts that Tech 7's claim for injunctive relief is also amenable to summary judgment. An analysis of the injunction issues demonstrate that this issue is also not

ripe for a decision. A key factual issue - whether Vacation Acquisition is acting pursuant to a license or acting as a simple misappropriator of the software – must be resolved before the claim for injunctive relief can be determined. Other factual issues also prevent a dispositive ruling on the injunction request. The copyright issues to be resolved before this Court may dispose of even a portion of the injunction request are set forth in *Peter Letterese And Associates, Inc. v. World Institute Of Scientology*, --- F.3d ----, 2008 WL 2652291, (11th Cir. (Fla.), 2008):

> To obtain a permanent injunction in a copyright infringement case, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. 17 U.S.C.A. § 502(a).

The Tech 7 License Agreement also provides unambiguous rights to injunctive relief to the Licensor if the Licensee is in breach. Even if Vacation Acquisition takes the position that its use of the Tech 7 software is not pursuant to a license agreement, Tech 7 still retains the right to an injunctive relief to protect is intellectual property from an infringing use. This Court has already authorized affirmative injunctive relief allowing Tech 7 access to the software system. No coherent reason is given by Vacation Acquisition as to why that right of access should be curtailed.

If this Court determines that the relationship between the parties is to be governed by the License Agreement, then the terms of the License Agreement should be honored and an injunction may be granted. If, on the other hand, this Court determines after a full factual investigation that the parties did not enter into a contract for the use of the software by Vacation Acquisition, then the issue of any contract remedies is moot and Tech 7 is entitled to its common

18

law and federal copyright law rights to an injunction to protect its intellectual property from misuse by parties with no right to use the software.

## VII.    THE DEFENDANT'S REQUEST FOR STAY IS NOT WARRANTED.

The Defendant has requested that this Court impose a stay on discovery until this motion for summary judgment is resolved. That request is largely moot as discovery into the facts of the case was completed while the Defendant's motion was being briefed by the parties. Expert discovery remains on the schedule. For the reasons stated previously in this brief, the motion for summary judgment does not merit a stay of discovery in this case, as it is clear from a quick review that too many factual issues exist to allow for a dispositive decision by the Court as a matter of law. Staying the case will only delay the ultimate disposition and cause additional expense to the parties.

## CONCLUSION

For the reasons stated herein, the Plaintiff, Tech 7 Systems, Inc., respectfully requests that the motion for summary judgment be denied on the grounds that:

1. Material facts are disputed.
2. The equitable defenses of waiver, estoppel and laches are not available to the Defendant or applicable to the given facts.
3. The relevant statute of limitations for the causes of action against Vacation Acquisition have not expired.
4. Injunctive relief is available to prevent an infringer from using or possessing the Tech 7 software.

August 23, 2008                                  Respectfully submitted,

                                                 SCHERTLER & ONORATO, LLP
                                                       /s/
                                                 _____
                                                 David H. Dickieson, D.C. Bar #321778
                                                 601 Pennsylvania Avenue, NW
                                                 North Building, 9th Floor
                                                 Washington, DC 20004
                                                 Telephone: (202) 628-4199
                                                 *Counsel for Tech 7 Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Opposition to Motion for Summary Judgment was, this 23rd day of August, 2008, served via electronic means upon the following counsel:

Jeffrey I. Zuckerman
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1200 New Hampshire Avenue, NW, Suite 430
Washington, DC  20036
Telephone: (202) 452-7373
Facsimile:  (202) 452-7333
jzuckerman@curtis.com
jzuckesq@mail.com

Gary L. Cutler
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
Telephone:  (212) 696-6069
Facsimile:  (212) 697-1559
gcutler@curtis.com

Priya Swaminathan, Esq.
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
Telephone:  (212) 696-8873
Facsimile:  (917) 368-8873
pswaminathan@curtis.com


_____/s/_____
David H. Dickieson

Exhibit 1

Sworn Interrogatory Responses from
Vacation Acquisition, LLC

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TECH 7 SYSTEMS, INC.,** | ) | |
| 840 Courtland Avenue | ) | |
| Park Ridge, IL 60068 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Civil Case No.  08-0436-JDB** |
| | ) | |
| **VACATION ACQUISITION, LLC, d/b/a** | ) | |
| **VACATION EXPRESS** | ) | |
| 301 Perimeter Center North, Suite 500 | ) | |
| Atlanta, GA 30346 | ) | |
| **Resident Agent:** | ) | |
| Corporate Service Company | ) | |
| 2711 Centerville Road, Suite 400 | ) | |
| Wilmington, DE 19808 | ) | |
| | ) | |
| Defendant. | ) | |

### RESPONSES AND OBJECTIONS OF
### VACATION ACQUISITION, LLC D/B/A VACATION EXPRESS
### TO PLAINTIFF'S FIRST SET OF INTERROGATORIES TO DEFENDANT

In accordance with Rules 26 and 33 of the Federal Rules of Civil Procedure,

defendant Vacation Acquisition, LLC d/b/a Vacation Express ("Vacation Express"), by its

counsel Curtis, Mallet-Prevost, Colt & Mosle LLP, hereby responds and objects to Plaintiff's

First Set of Interrogatories To Defendant.  Vacation Express reserves the right to supplement

these Responses and Objections up to the time of trial particularly so because the pleadings are

not closed, the action is in early stages of discovery and, consequently, it may not be possible to

provide complete answers at this time.

## GENERAL OBJECTIONS

1.      Vacation Express objects to each and every Interrogatory to the extent that they seek to impose obligations greater than those imposed by the Federal Rules of Civil Procedure or the Rules of the United States District Court for the District of Columbia.

2.      Vacation Express objects to each and every Interrogatory to the extent that they are ambiguous, vague or otherwise incomprehensible.

3.      Vacation Express objects to each and every Interrogatory on the grounds that they are overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.  To the extent any Interrogatory seeks detailed and extensive information, such information is more efficiently and effectively provided through other discovery devices.

4.      Vacation Express objects to each and every Interrogatory on the grounds that they are not sufficiently limited as to time.  Plaintiff's request for information from 1990 to the present is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence.

5.      Vacation Express objects to each and every Interrogatory to the extent that they seek information or documents protected by the attorney-client privilege, the attorney work product doctrine, the accountant-client privilege, the joint defense privilege, the party communication privilege, the consulting expert privilege, the self-critical analysis privilege, or any other applicable privilege or immunity from discovery  By providing information or producing documents, Vacation Express does not waive any claim to privilege, work product, or other applicable privileges or protections as to any such documents or information or as to any subject matter related to any such documents or information.

6.    Vacation Express objects to each and every Interrogatory to the extent that they ask for information that is publicly available or to which Plaintiff or Plaintiff's counsel have equal access or which Plaintiff or Plaintiff's counsel could obtain by equal effort or which are available from other, more convenient sources.

7.    Vacation Express objects to each and every Interrogatory to the extent that they ask for information that is not in Vacation Express's possession, custody or control.

8.    Vacation Express objects to each and every Interrogatory to the extent that they seek trade secrets or proprietary or confidential or sensitive business information.  No such information will be provided except to the extent and as allowed by the entry of a protective order agreed to by counsel or directed by the Court pursuant to Rule 26(c).

9.    Vacation Express objects to each and every Interrogatory to the extent that they seek sensitive personal information, without an explanation of how these materials could potentially be relevant or why there is good cause to provide them.  Vacation Express further objects to each and every Interrogatory to the extent that they impinge upon constitutional, statutory or common law, and/or protected rights of privacy.

10.    Vacation Express objects to the definition of "you" and "yours" on the basis that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

11.    Vacation Express objects to the definition of "document" on the basis that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

-3-

12.     Vacation Express objects to the definition of "Vacation Express" on the basis that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

13.     Vacation Express objects to the definition of "non-natural person or organization" on the basis that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

14.     By responding, Vacation Express does not concede the relevancy or materiality of any of the Interrogatories or of the subject to which any such Interrogatory refers. Vacation Express's responses to any of the Interrogatories is made expressly subject to, and without in any way waiving or intending to waive, any questions or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the responses given herein, or of the subject matter thereof, in any proceeding (including the trial of this action or in any subsequent proceeding).

15.     Each of these General Objections is incorporated without further reference in the specific response made by Vacation Express to the specific Interrogatory propounded by Plaintiff, even though the General Objections may not be specifically set forth within the response. Further, by making answers or objections to any particular Interrogatory, Vacation Express does not waive any of these General Objections. Rather, Vacation Express preserves its rights to contest the reasonableness and validity of the Interrogatory.

## INTERROGATORY RESPONSES

### Interrogatory No. 1.

*Describe in detail the event(s) or transaction(s) that you believe transferred ownership and/or any rights in the Tech 7 software from Tech 7 (or any predecessor) to the Defendant Vacation Acquisition, LLC d/b/a Vacation Express? Identify any person who has personal knowledge of the event(s) or transaction(s), including any representative of Tech 7 who consented to the transfer.*

### Response to Interrogatory No. 1.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis the Interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time.

Subject to, and without waiver of, these objections and the General Objections set forth above, Vacation Express states that in 1990, Vacation Express, Inc. purchased a perpetual license to Tech 7 Systems, Inc. software with the signing of the Sale and Licensing Agreement ("SLA"). In or about 1998, Vacation Express was purchased by My Travel, PLC and made a part of MyTravel subsidiary North American Leisure Group ("NALG"). In the period 1998 through 2000, Tech 7 was aware of and ratified NALG's use of the Tech 7 software. In fact, in an October 6, 2000 "Analysis/Consultation Proposal," Tech 7 considered the SLA as having transferred to NALG. Additionally, in this same period Tech 7 was aware of and ratified Vacation Express's use of an outside vendor to maintain, modify and repair Tech 7 software. During the period 1998 until the beginning of 2008, Tech 7 never objected to Vacation Express's use of the Tech 7 software. Tech 7's ratification of NALG's use of the Tech 7 software in the period 1998 through 2000, bars Tech 7's claims in this lawsuit under the doctrines of laches, waiver and equitable estoppel.

Vacation Express states further that among the Vacation Express personnel who were aware of the events or transactions requested in Interrogatory No. 1 include: Gantt Cookson; Kevin Hernandez, Bryan Blenkin of NALG and Marlene Robinson of NALG.

Vacation Express states further that among the Data Plus personnel who were aware of the events or transactions requested in Interrogatory No. 1 include: Darrell Barton.

Vacation Express states further that among the Tech 7 personnel who were aware of and ratified the use of Tech 7 software and the use of an outside vendor to maintain, modify and repair the software include: Jeff Kruse, Deanna Bernett, Rhoda Harwood, Masood Saidi-Nejat, Joyce Ramsay, a person with the email address christophe@tech7.com, and a person with the email address kacle@tech7.com.

**Interrogatory No. 2.**

*Describe in detail how the Tech 7 software system is carried (i.e., valued) on the books and records of Vacation Express, including what book value was placed on the software when it was transferred to Vacation Express and in the years since the transfer?*

**Response to Interrogatory No. 2.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. Subject to and without waiving these objections and the General Objections, Vacation Express states that the Tech 7 software is carried on the books of Vacation Acquisition, LLC at a value of $150,000 and has been so carried over the last 36 months. The book value placed on the software when it was transferred to Vacation Acquisition, LLC was $0.00. Vacation Express has no information regarding how the Tech 7 software system was carried on the books of NALG, FlightServ, Inc. or Vacation Express, LLC.

**Interrogatory No. 3.**

*Describe in detail the particulars of each transfer of the license or ownership rights of the Tech 7 software from the original licensing to Vacation Express, Inc., including, but not limited to the transfer from Vacation Express, Inc. to MyTravel (North American Leisure Group), the subsequent transfer to FlightServ, Inc. and the subsequent transfer to Vacation Acquisition, LLC? Specify whether each such transfer of rights was approved in writing by Tech 7 and/or if any approval was ever sought.*

**Response to Interrogatory No. 3.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Vacation Express objects to the extent that the information requested is protected by privilege or immunity from discovery. Vacation Express objects further that the words "describe the particulars of each transfer of the license or ownership rights" is ambiguous, vague or otherwise incomprehensible. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time.

Subject to and without waiving these objections and the General Objections, Vacation Express states that to the extent the interrogatory seeks information regarding the transfer of assets from Vacation Express, Inc. to MyTravel PLC and its subsidiary NALG and the transfer from NALG to FlightServ, Inc., the interrogatory calls for or would be more completely answered by reference to documents or information in the possession, custody and control of those entities. With respect to the transfer of assets from Vacation Express, Inc. to

MyTravel PLC and its subsidiary NALG and the transfer from NALG to FlightServ, Inc. and from FlightServ, Inc. to Vacation Acquisitions, LLC d/b/a Vacation Express, each of these sales was an asset sale and the complete business was transferred.

With respect to the transfer of assets from Vacation Express, Inc. to MyTravel PLC and its subsidiary NALG and the transfer from NALG to FlightServ, Inc., Vacation Express is unaware whether any of each such transfer of rights was approved in writing by Tech 7 and that any approval from Tech 7 was ever sought. Vacation Express states further that documentary evidence produced by Tech 7 in this litigation demonstrates that Tech 7 considered that the Sale and Licensing Agreement had transferred from Vacation Express, Inc. to NALG. Vacation Express states further that with respect to the transfer from FlightServ, Inc. to Vacation Acquisitions, LLC d/b/a Vacation Express, Vacation Express did not request any approval from Tech 7 for the transfer of the license.

**Interrogatory No. 4.**

*Describe the terms and conditions of the transaction whereby the license or ownership of the Tech 7 software was transferred from Vacation Express, Inc. to North American Leisure Group?*

**Response to Interrogatory No. 4**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Vacation Express objects to the extent that the information requested is protected by privilege or immunity from discovery. Vacation Express objects further that the words "describe the terms and conditions of the transaction" is ambiguous, vague or otherwise incomprehensible.

Subject to and without waiving these objections and the General Objections, Vacation Express states that MyTravelPLC and its subsidiary, NALG, bought the assets of Vacation Express, Inc. To the extent the interrogatory seeks additional information regarding the transfer of assets from Vacation Express, Inc. to MyTravel PLC and its subsidiary NALG, the interrogatory calls for or would be more completely answered by reference to documents or information in the possession, custody and control of those entities and Tech 7. Vacation Express states further that documentary evidence produced by Tech 7 in this litigation demonstrates that Tech 7 considered that the Sale and Licensing Agreement had transferred from Vacation Express, Inc. to NALG.

**Interrogatory No. 5.**

*Describe the terms and conditions of the transaction whereby the license or ownership of the Tech 7 software was transferred from North American Leisure Group to FlightServ Inc. (d/b/a One Travel Holdings)?*

### Response to Interrogatory No. 5.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Vacation Express objects to the extent that the information requested is protected by privilege or immunity from discovery. Vacation Express objects further that the words "describe the terms and conditions of the transaction" is ambiguous, vague or otherwise incomprehensible.

Subject to and without waiving these objections and the General Objections, Vacation Express states that FlightServ, Inc. bought certain assets of NALG. To the extent the interrogatory seeks additional information regarding the transfer of assets from NALG to Flight Serv, Inc., the interrogatory calls for or would be more completely answered by reference to documents or information in the possession, custody and control of those entities and Tech 7.

### Interrogatory No. 6.

*Describe the terms and conditions of the transaction whereby the license or ownership of the Tech 7 software was transferred from FlightServ to Vacation Acquisition LLC?*

### Response to Interrogatory No. 6.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Additionally, Vacation Express objects to the extent that the information requested is protected by privilege or immunity from discovery. Vacation Express objects further that the words "describe the terms and conditions of the transaction" is ambiguous, vague or otherwise incomprehensible.

Subject to and without waiving these objections and the General Objections, Vacation Express states that it bought some of the assets of FS Tours, Inc., a subsidiary of FlightServ, Inc.

### Interrogatory No. 7.

*List and provide a detailed description of all communications between representatives of Vacation Express and Tech 7 in which Vacation Express informed Tech 7 of their dissatisfaction with the software and/or their proposed remedy of taking ownership of the software. Include times, dates and participants of each conversation/communication as well as a synopsis of what transpired.*

### Response to Interrogatory No. 7.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of

admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. Vacation Express also objects on the basis that it would be impossible to know and identify each communication requested in this Interrogatory, but that relevant communications may be reflected in the books and records of Vacation Express, Inc., NALG and Tech 7.

Subject to and without waiving these objections and the General Objections, Vacation Express states that among the communications between representatives of Vacation Express and Tech 7 in which Vacation Express informed Tech 7 of its dissatisfaction with the software include:

1) An April 21, 1995 memo from Gantt Cookson of Vacation Express to Amnon Gibly of Tech 7, in which Mr. Cookson expressed his "unhappiness" with Tech 7's Worldspan Toursource product. The memo was produced by Tech 7 from its company files.

2) A November 15, 1995 memo from Gantt Cookson of Vacation Express to Pamela Luan-Zaehler of Tech 7, in which Mr. Cookson registered a complaint concerning Tech 7's product, "Charter Load." The memo was produced by Tech 7 from its company files.

3) A July 10, 1996 memo from Gantt Cookson of Vacation Express to Lyle Hobbs of Tech 7, in which Mr. Cookson requested a refund for the Toursource product. The memo was produced by Tech 7 from its company files.

4) Discussions between Rhoda Harwood and Gantt Cookson in an approximate four year period beginning in 1998 or 1999 and extending to 2002 or 2003.

## Interrogatory No. 8.

*What are the names, addresses and telephone numbers of all people and businesses who have modified the Tech 7 software in the possession of Vacation Express?*

## Response to Interrogatory No. 8.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time.

Subject to and without waiving these objections and the General Objections, Vacation Express states that the following persons have modified Tech 7 software for Vacation Express: Rick Stock, Eric Steinhardt and possibly Tracy Kriz. All three may be reached c/o

-9-

Vacation Express's attorney, Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 park Avenue, New York, NY 10178, Attn: Gary L. Cutler, (212) 696-6069.

Additionally, Data Plus made modifications but is no longer in business.

**Interrogatory No. 9.**

*Describe in detail the agreements entered into and the requirements imposed by Vacation Express with any people or businesses who worked on the Tech 7 software to protect the integrity of the software and the proprietary interests of the owner of the software? Please provide a copy of all these agreements.*

**Response to Interrogatory No. 9.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time.

Subject to and without waiving these objections and the General Objections, Vacation Express states that its agreements with Rick Stock, Eric Steinhardt and Tracy Kriz are oral. Additionally, Vacation Express had no contract with Data Plus.

**Interrogatory No. 10.**

*Identify and provide the names, addresses and phone numbers of all people who are employees of Vacation Express who have or had access to the Tech 7 system during the period 1998 to 2008, specifying whether such access was for the purpose of using the system or for the purpose of servicing, modifying and/or repairing the system?*

**Response to Interrogatory No. 10**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that the employees who had access to Tech 7 include the programmers who are the functional equivalent of employees. They are Traci Kriz, Rick Stock and Eric Steinhardt. Vacation Express states further that other numerous employees had access to the

Tech 7 system from 1998 to 2008 such that it would be unduly burdensome to identify them in the manner requested in the Interrogatory.

### Interrogatory No. 11.

*Identify and provide the names, addresses and phone numbers of all people who are not employees of Vacation Express who have or had access to the Tech 7 system, specifying whether each such non-employees gained access by permission from Vacation Express or without any such permission?*

### Response to Interrogatory No. 11.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that, given the nature of its business, the non-employees who have been given access to Vacation Express's Tech 7 system from the 1990s to the present include contract employees, SpeedRes support, parent companies, contracted airline services, contracted airline support, contracted destination offices and U.S. origin airport stations. Included within these categories are the following:

Vacation Express SpeedRes Support:
Data Plus - Inactive

Vacation Express Parent Companies:
NALG/My Travel - Inactive
Flightserv - Inactive

Contracted Airline Services:
Pace - Inactive
TransMeridian - Inactive
SkyKing - Inactive
XTRA Airways -- Inactive

Contracted Airline Support:
Aviation Advantage - Inactive

Vacation Express Contracted Destination Offices:
Cancun - Royale Tours - Inactive

Cancun – Elite Tours - Active
Liberia – Swiss Travel/NALG  Inactive
Liberia – HotelBeds  Active
Punta Cana – CoCo Tours - Active
Puerto Plata – CoCo Tours - Active
Aruba – Depalm/NALG  - Active
Puerto Vallarta – Royale Tours – Active
Montego Bay – JTL/NALG – Inactive
St. Maartin – NALG - Inactive

Vacation Express US Origin Airport Stations:
Atlanta – Airlines Management - Inactive
Orlando/Sanford – Pre-Flight - Inactive
Charlotte – Signature Flight Support - Inactive
Cincinnati – Delta Air Lines - Inactive
Louisville – Delta Air Lines - Inactive
Memphis – Flight Support - Inactive
Washington/Dulles – Inactive
Baltimore Washington- Signature Flight Support– Inactive
Las Vegas – Inactive
Gary – Inactive
Orlando International – Inactive
St. Petersburg - Inactive

### Interrogatory No. 12.

*Has Vacation Express copyrighted any of the modifications it has made to the Tech 7 software?
If so please state the date of the copyright and when it was registered.*

### Response to Interrogatory No. 12.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that it has not copyrighted any of its modifications.

-12-

**Interrogatory No. 13.**

*Identify any other tour operator enterprise systems that Vacation Express and its predecessors considered purchasing/licensing from 1995 to 2008 and specify the reasons why such other system was or was not used?*

**Response to Interrogatory No. 13.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. Vacation Express objects further that the term "tour operator enterprise system" is ambiguous, vague or otherwise incomprehensible. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that other software it considered purchasing include: Softrip, Fourth Dimension Software, Rex Tour Management and EzRez. Vacation Express has decided to purchase Softrip. Vacation Express chose Softrip because it was better suited to its needs.

**Interrogatory No. 14.**

*Provide detailed accounts stating the amounts that Vacation Express has paid to employees and/or contract workers or software companies to maintain or modify the system upon which Vacation Express and its predecessors operate their business? Please list these year by year from 1998 to 2008.*

**Response to Interrogatory No. 14.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that to the extent the interrogatory seeks information regarding detailed accounts of payments for years the company was owned by Vacation Express, Inc., MyTravel PLC and its subsidiary NALG and FlightServ, Inc., the interrogatory calls for or would be more completely answered by reference to documents or information in the possession, custody and

control of those entities. To the extent the interrogatory seeks information regarding detailed accounts of payments for years the company was owned by Vacation Acquisitions, LLC, this information is contained in the payments to Rick Stock, Eric Steinhardt and possibly Traci Kriz that were provided to the Court by Tech 7 in its response papers to Vacation Express's motion to allow Modification of the Temporary Restraining Order.

## Interrogatory No. 15.

*Describe the terms under which Vacation Express has allowed other entities (e.g., travel agencies) to gain access to the Tech 7 software, specifying whether money has been paid or received from any such entity for such access? If any consideration has been paid or received for such access, please provide a detailed accounting for such transactions for each entity granted access.*

## Response to Interrogatory No. 15.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. Vacation Express further objects that the words "detailed accounting" in this context are ambiguous, vague or otherwise incomprehensible. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that given the nature of its business, it is necessary for other entities and persons to interact with Vacation Express to book flights and hotels, to print manifests, as well as other functions. To do this, persons and entities may use Vacation Express's internet booking engine, its Airport Operations Menu or its Hotel Menu. Vacation Express's internet booking engine does not run on Tech 7 software and entities or persons who access the web booking engine do not have access to Tech 7 software. The Airport Operations Menu was developed by Vacation Express. Persons who access Tech 7 to use the Airport Operations Menu or Hotel Menu do not pay for that access.

## Interrogatory No. 16.

*Describe in detail the business that Vacation Express transacts in the District of Columbia, including but not limited to the names of the travel agencies which have used the Tech 7 software system, the number and gross value of tickets sold to persons with a District of Columbia address, the publications where Vacation Express has advertised in the District of Columbia and a description of any articles or publications concerning Vacation Express in publications located in the District of Columbia (e.g., The Washinton Post or the Washington Times).*

-14-

**Response to Interrogatory No. 16.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that Vacation Express has not contested the jurisdiction of the District Court for the District of Columbia in this case. As a result this interrogatory is irrelevant. Moreover, Tech 7 has access to this information from its access to the Tech 7 system. Finally, Vacation Express has not advertised in either The Washington Post or the Washington Times for a number of years.

**Interrogatory No. 17.**

*If you contend that Tech 7 has waived any contract or proprietary right, describe in detail each action taken by Tech 7 which you contend constitutes a waiver of any right under the License Agreement, specifying the date, time, place and substance of each such action, and any facts indicating that the waiver was knowing and intentional.*

**Response to Interrogatory No. 17.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that it does contend that Tech 7 has waived its contract and proprietary rights as described in Vacation Express's answer and motion for summary judgment. Further evidence of such waiver is contained in the records of Vacation Express, Inc., MyTravel PLC and its subsidiary NALG and Tech 7, to which Vacation Express does not have access.

**Interrogatory No. 18.**

*If you contend that Tech 7's contract or proprietary rights are unenforceable, describe in detail any action any facts or circumstances that support your contention that Tech 7's contract and/or proprietary rights to the software system are unenforceable against Vacation Express.*

**Response to Interrogatory No. 18.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that it does contend that Tech 7's alleged contract and proprietary rights are unenforceable as described in Vacation Express's answer and motion for summary judgment. Further evidence of the reasons for the unenforceability are contained in the records of Vacation Express, Inc., MyTravel PLC and its subsidiary NALG and Tech 7, to which Vacation Express does not have access.

**Interrogatory No. 19.**

*If you contend that Vacation Express owns a perpetual license for the unlimited use of the Tech 7 software system, describe in detail any facts or circumstances which support such contention.*

**Response to Interrogatory No. 19.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

Subject to and without waiving these objections and the General Objections, Vacation Express states that it does contend that it owns a perpetual license for the unlimited use of the Tech 7 software system as is described in Vacation Express's answer and motion for summary judgment. Further evidence of the reasons for the perpetual license are contained in the records of Vacation Express, Inc., MyTravel PLC and its subsidiary NALG, FlightServ, Inc. and Tech 7, to which Vacation Express does not have access.

**Interrogatory No. 20.**

*If you contend that Tech 7 does not have the contractual right to access its software system in use by Vacation Express, describe any and all facts or circumstances that relate to or support such contention, specifying precisely when Tech 7 lost such rights.*

**Response to Interrogatory No. 20.**

        Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

        Subject to and without waiving these objections and the General Objections, Vacation Express states that it does contend that Tech 7 does not have the contractual right to access Vacation Express's Tech 7 software system as described in Vacation Express's answer and motion for summary judgment. Further evidence of the reasons for the unenforceability are contained in the records of Vacation Express, Inc., MyTravel PLC and its subsidiary NALG and Tech 7, to which Vacation Express does not have access.

**Interrogatory No. 21.**

*Describe in detail the facts and circumstances leading up to and culminating in the opening up of the Tech 7 system to any user of the internet through the Vacation Express web site, including, but not limited to any effort to obtain the consent for such use by the licensor of the Tech 7 system, any discussion as to whether such public use was permitted, and any notification to the licensor of the Tech 7 system that such public use would take place.*

**Response to Interrogatory No. 21.**

        Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Interrogatory on the bases that it is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence. The interrogatory seeks details concerning any user of the internet, which is overly broad. Vacation Express further objects on the basis that the Interrogatory is overly broad, unduly burdensome and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not sufficiently limited as to time. In addition, Vacation Express objects to this Interrogatory to the extent it seeks information beyond that permitted under Rule 33 of the Federal Rules of Civil Procedure, which limits a party's available interrogatories to 25 in number including all discrete subparts.

        Subject to and without waiving these objections, Vacation Express states that individuals do not access Tech 7 software through the internet. The internet booking engine does

not run on Tech 7 software. It runs on Red Hat Linux, not SpeedRes. It is written in PHP, not Unibasic, like SpeedRes. The internet booking engine does download and upload data from databases that reside on Tech 7, but there is no direct interaction of the individual user with Tech 7 software. Vacation Express's programmers, Contracted Destination Representatives, Contacted Airlines and Airline Support Companies, and Contracted Airport Personnel do access Tech 7 software directly to use the Airlines and Hotel menus. Vacation Express states further that there was no discussion whether public use was permitted and no notification to Tech 7 that public use would take place.

Dated: August 12, 2008

As to Objections:

**CURTIS, MALLET-PREVOST, COLT**
**& MOSLE LLP**

Gary L. Cutler
Priya Swaminathan
Curtis, Mallet-Prevost, Colt
 & Mosle LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 696-6000
Fax: (212) 697-1559
Email: gcutler@curtis.com
          pswaminathan@curtis.com
Admitted pro hac vice

Jeffrey I. Zuckerman
D.C. Bar #369120
1200 New Hampshire Avenue, N.W.
Suite 430
Washington, D.C. 20036
Tel: (202) 452-7373
Fax: (202) 452-7333

Of Counsel:
Turner Smith
Curtis, Mallet-Prevost, Colt
  & Mosle LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 696-6000
Fax: (212) 697-1559
Email: tsmith@curtis.com

As to Answers:

Grant Cookson
Vacation Acquisitions, LLC d/b/a Vacation Express
11 Piedmont Center,
Suite 400
3495 Piedmont Road
Atlanta, GA 30305

cc:
David H. Dickieson, Esq.
Schertler & Onorato, LLP
601 Pennsylvania Avenue, N.W.
North Building, 9th Floor
Washington, D.C. 20004
Tel.: (202) 628-4199
Fax: (202) 628-4177
Email: ddickieson@schertlerlaw.com

-19-

## CERTIFICATE OF SERVICE

A copy of the foregoing Responses and Objections of Vacation Acquisition d/b/a

Vacation Express to Plaintiff's First Set of Interrogatories to Defendant have been provided by

email and by first class mail, postage pre-paid to David H. Dickieson, Esq.,

ddickieson@schertlerlaw.com on August 13, 2008.


August 13, 2008
New York, NY

Priya Swaminathan
Curtis, Mallet-Prevost, Colt
  & Mosle LLP
101 Park Avenue
New York, NY 10178
Tel: (212) 696-6000
Fax: (212) 697-1559
Email: pswaminathan@curtis.com

-20-

# Exhibit 2

# Response to Document Production Requests
# by Vacation Acquisition, LLC

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | |
|---|---|
| **TECH 7 SYSTEMS, INC.,**<br>840 Courtland Avenue<br>Park Ridge, IL 60068<br><br>                    Plaintiff,<br><br>          vs.<br><br>**VACATION ACQUISITION, LLC, d/b/a**<br>**VACATION EXPRESS**<br>301 Perimeter Center North, Suite 500<br>Atlanta, GA 30346<br>**Resident Agent:**<br>Corporate Service Company<br>2711 Centerville Road, Suite 400<br>Wilmington, DE 19808<br><br>                 Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>**Civil Case No. 08-0436** |

## RESPONSES AND OBJECTIONS TO PLAINTIFF TECH 7 SYSTEM, INC.'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS TO DEFENDANT

In accordance with Rules 26 and 34 of the Federal Rules of Civil Procedure, defendant Vacation Acquisition, LLC d/b/a Vacation Express ("Vacation Express"), by its counsel Curtis, Mallet-Prevost, Colt & Mosle LLP, hereby responds and objects to Plaintiff's First Request For Production of Documents To Defendant ("First Request"). Vacation Express reserves the right to supplement these Responses and Objections up to the time of trial.

Any statement herein that Vacation Express will produce documents responsive to a particular request is not a representation that such documents exist or are within Vacation Express's possession, custody or control. Rather, such a statement indicates that if Vacation Express has such responsive documents within its possession, custody, or control, and the production of those documents is not otherwise objected to, it will make them available for

inspection and copying at a reasonable time, place and manner mutually agreed upon by counsel, subject to the entry of an appropriate confidentiality order in this litigation.

## **GENERAL OBJECTIONS**

1.      Vacation Express objects to each and every Request to the extent that they seek to impose obligations greater than those imposed by the Federal Rules of Civil Procedure.

2.      Vacation Express objects to each and every Request to the extent that they are ambiguous, vague or otherwise incomprehensible.

3.      Vacation Express objects to each and every Request on the grounds that they are overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence and are not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

4.      Vacation Express objects to each and every Request as overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent they are not sufficiently limited as to time.

5.      Vacation Express objects to each and every Request to the extent that they seek information or documents protected by the attorney-client privilege, the attorney work product doctrine, the accountant-client privilege, the joint defense privilege, the party communication privilege, the consulting expert privilege, the self-critical analysis privilege, or any other applicable privilege or immunity from discovery.  By providing information or producing documents, Vacation Express does not waive any claim to privilege, work product, or other applicable privileges or protections as to any such documents or information or as to any subject matter related to any such documents or information.

6.      Vacation Express objects to each and every Request to the extent that they seek documents that are publicly available or to which Plaintiff or Plaintiff's counsel have equal

-2-

access or which Plaintiff or Plaintiff's counsel could obtain by equal effort or which are available from other, more convenient sources.

       7.     Vacation Express objects to each and every Request to the extent that they ask for documents that are not in Vacation Express's possession, custody or control.

       8.     Vacation Express objects to each and every Request to the extent that they seek trade secrets or proprietary or confidential or sensitive business information. No such information will be provided except to the extent and as allowed by the confidentiality order entered in this litigation.

       9.     Vacation Express objects to each and every Request to the extent that they seek sensitive personal information, without an explanation of how these materials could potentially be relevant or why there is good cause to provide them. Vacation Express further objects to each and every Request to the extent that they impinge upon constitutional, statutory or common law, and/or protected rights of privacy.

      10.    Vacation Express further objects that to the extent any Request seeks electronic documents or e-mail and to the extent the Request fails to adequately limit the number of e-mail accounts and the nature of the electronic documents that are the subject of the Request, the Request is overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

      11.    Vacation Express further objects to each and every request to the extent that Request seeks documents already available to Plaintiff through its open access to Vacation Express's Tech 7 system.

12.     Vacation Express objects to "Definitions and Instructions" B relating to "Identity" or "identities" as a definition and instruction intended for an interrogatory and not a document request.

13.     Vacation Express objects to "Definitions and Instructions" C relating to "identify" as a definition and instruction intended for an interrogatory and not a document request.

14.     Vacation Express objects to "Definitions and Instructions" D relating to privileged documents to the extent the instruction is inconsistent with the Federal Rules of Civil Procedure or the Local Civil Rules of the United States District Court for the District of Columbia.

15.     Vacation Express objects to "Definitions and Instructions" G relating to providing knowledge or information as a definition and instruction intended for an interrogatory and not a document request.  To the extent the definition and instruction calls for the production of documents, the definition and instruction is incomprehensible.

16.     Vacation Express objects to "Definitions and Instructions" H relating to the definition of the pronoun "you" as overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

17.     Vacation Express objects to "Definitions and Instructions" I relating to the definition of "communication" as overly broad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of admissible evidence.

18.     By responding, Vacation Express does not concede the relevancy or materiality of any of the Requests or of the subject to which any such request refers.  Vacation Express's responses to any of the Requests is made expressly subject to, and without in any way

-4-

waiving or intending to waive, any questions or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the responses given herein, or of the subject matter thereof, in any proceeding (including the trial of this action or in any subsequent proceeding).

19.    Each of these General Objections is incorporated without further reference in the specific response made by Vacation Express to the specific Request propounded by Plaintiff, even though the General Objections may not be specifically set forth within the response.  Further, by making answers or objections to the Request, Vacation Express does not waive any of these General Objections.  Rather, Vacation Express preserves its rights to contest the reasonableness and validity of the Request.

## DOCUMENTS REQUESTED

### Request No. 1.

*All documents relating to any modifications to the Tech 7 software system.*

### Response to Request No. 1.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein.  Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.  Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce additionally responsive documents.

### Request No. 2.

*All documents relating to any rights Vacation Express may have or claim to have in the Tech 7 software system.*

**Response to Request No. 2.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express states that it has no responsive documents, but that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 Systems, Inc. ("Tech 7") and its predecessors.

**Request No. 3.**

*All documents relating to the purchase or acquisition of a license to use the Tech 7 software system.*

**Response to Request No. 3.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express states that it has no responsive documents, but that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 Systems, Inc. ("Tech 7") and its predecessors.

**Request No. 4.**

*All documents and tangible things which may be used to support any claim or defense asserted by Vacation Express or which may relate to such claim or defense.*

**Response to Request No. 4.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7

already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce responsive documents not already available to Plaintiff. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

## Request No. 5.

*All documents which may be used as exhibits at trial.*

## Response to Request No. 5.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express states that the request is premature.

## Request No. 6.

*All documents which relate to any access to the Tech 7 system by consultants or non-employees of Vacation Express.*

## Response to Request No. 6.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce responsive documents not already available to Plaintiff. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 7.**

All documents which relate to opening up the Tech 7 system to any person using the internet, including documents showing direct use of the Tech 7 system by non-employees of Vacation Express.

**Response to Request No. 7.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce responsive documents not already available to Plaintiff. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 8.**

All documents which relate to consulting fees paid to non-employees of Vacation Express for work relating to the Tech 7 software system.

**Response to Request No. 8.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no additionally responsive documents. To the extent the Request seeks documents relating to fees paid to Vacation Express's contract employees, Vacation Express has no documents that are not already available to Tech 7. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 9.**

      *All documents relating to the experience, qualifications, prior work, education, of each person, employee or non-employee, who has had any involvement in servicing, repairing or modifying the Tech 7 system.*

**Response to Request No. 9.**

      Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

      Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 10.**

      *All documents relating to efforts to transfer to another software system to replace the Tech 7 system.*

**Response to Request No. 10.**

      Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

      Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce responsive documents.

**Request No. 11.**

      *All documents supporting Vacation Express's contention that it is authorized to use the Tech 7 software system.*

**Response to Request No. 11.**

      Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible

evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

### Request No. 12.

*All documents relating to correspondence or communications between Vacation Express and Tech 7 or any predecessor entity relating to the Tech 7 software system.*

### Response to Request No. 12.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express objects further to the extent such documents are equally available to Tech 7.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

### Request No. 13.

*All documents relating to any complaints about the Tech 7 software system.*

### Response to Request No. 13.

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express objects further to the extent such documents are equally available to Tech 7.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and

its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 14.**

>        *All documents relating to negotiations with any alternative provider of a software system to modify, supplement, or replace the Tech 7 system.*

**Response to Request No. 14.**

>        Vacation Express repeats and reasserts its General Objections as if fully set forth herein.  Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

>        Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce responsive documents.

**Request No. 15.**

>        *All documents which relate to, identify, or describe any modification of the Tech 7 system.*

**Response to Request No. 15.**

>        Vacation Express repeats and reasserts its General Objections as if fully set forth herein.  Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.  Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

>        Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express will produce additionally responsive documents.

**Request No. 16.**

>        *All documents indicating, evidencing, describing or projecting the fees generated by Vacation Express through the use of the Tech 7 system from the period beginning with Vacation Express' use of non-Tech 7 personnel for servicing the software system to the present.*

**Response to Request No. 16.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no additionally responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 17.**

*Any documents relating to this litigation or the subjects of this litigation used by, reviewed, provided to, or generated by any expert who the Defendant intends to call as a witness at trial.*

**Response to Request No. 17.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express states that the request is premature.

**Request No. 18.**

*All corporate tax returns, audited financial statement and other financial documents concerning the financial condition of the Defendant and/or providing financial information about Vacation Express during the periods of use of the Tech 7 system for purposes of allowing a judge or jury to determine the appropriate amount of punitive damages that may be awarded to the Plaintiff.*

**Response to Request No. 18.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure. Vacation Express further objects that Tech 7 already has access to responsive documents through its open access to Vacation Express's Tech 7 system; Vacation Express will not search further in that location. Vacation Express further objects that such a request is premature.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express has no additionally responsive documents. Vacation Express also states that such responsive documents may reside in the files of Vacation Express, Inc., MyTravel, PLC and its subsidiary North American Leisure Group ("NALG"), FlightServ, Inc. and its subsidiary FS Tours, Inc. and Tech 7 and its predecessors.

**Request No. 19.**

*All contracts and other documents relating to servicing or maintaining the Tech 7 software system.*

**Response to Request No. 19.**

Vacation Express repeats and reasserts its General Objections as if fully set forth herein. Vacation Express further objects to this Request to the extent that it is overly broad, unduly burdensome, irrelevant or not reasonably calculated to lead to the discovery of admissible evidence, it is not sufficiently limited as to time, the documents requested are protected by any applicable privilege or immunity from discovery, and it is not within the scope of discovery permitted by the Federal Rules of Civil Procedure.

Subject to, and without waiving these objections and the General Objections set forth above, Vacation Express states that it has no responsive documents.

Dated: August 12, 2008

CURTIS, MALLET-PREVOST, COLT
& MOSLE LLP

_____
Gary L. Cutler
Curtis, Mallet-Prevost, Colt
& Mosle LLP
101 Park Avenue
New York, NY  10178
Tel:  (212) 696-6000

Fax:  (212) 697-1559
Email:  gcutler@curtis.com
Admitted pro hac vice:

Jeffrey I. Zuckerman
D.C. Bar #369120
1200 New Hampshire Avenue, N.W.
Suite 430
Washington, D.C. 20036
Tel:  (202) 452-7373
Fax:  (202) 452-7333

Of Counsel:
Turner Smith
Curtis, Mallet-Prevost, Colt
 & Mosle LLP
101 Park Avenue
New York, NY  10178
Tel:  (212) 696-6000
Fax:  (212) 697-1559
Email:  tsmith@curtis.com


cc:
David H. Dickieson, Esq.
Schertler & Onorato, LLP
601 Pennsylvania Avenue, N.W.
North Building, 9th Floor
Washington, D.C.  20004
Tel.:  (202) 628-4199
Fax:  (202) 628-4177
Email:  ddickieson@schertlerlaw.com

## CERTIFICATE OF SERVICE

A copy of the foregoing Responses and Objections to Plaintiff Tech 7 Systems,

Inc.'s First Request for Production of Documents to Defendant has been provided by email and

first class mail to:

> David H. Dickieson, Esq.
> Schertler & Onorato, LLP
> 601 Pennsylvania Avenue, N.W.
> North Building, 9th Floor
> Washington, D.C. 20004
> Tel.: (202) 628-4199
> Fax: (202) 628-4177
> Email: ddickieson@schertlerlaw.com

August 13, 2008
New York, NY

> Priya Swaminathan
> Curtis, Mallet-Prevost, Colt
>  & Mosle LLP
> 101 Park Avenue
> New York, NY 10178
> Tel: (212) 696-6000
> Fax: (212) 697-1559
> Email: pswaminathan@curtis.com

# Exhibit 3

# Asset Purchase Agreement produced by Vacation Acquisition, LLC

ASSET PURCHASE AGREEMENT

BY AND AMONG

FS TOURS, INC.

AND

VACATION ACQUISITION, LLC

DATED AS OF

December 9, 2004

# TABLE OF CONTENTS

Article I DEFINITIONS........................................................................................................1 **Page #**

Article II SALE AND PURCHASE OF ASSETS ..............................................................4

| | | |
|---|---|---|
| 2.1 | Transfer of the Assets .......................................................... | 4 |
| 2.2 | Assets ................................................................................... | 4 |
| 2.3 | Assumed Liabilities. ............................................................ | 4 |
| 2.4 | Excluded Liabilities. ............................................................ | 7 |

Article III PURCHASE PRICE AND ADJUSTMENT .....................................................7

| | | |
|---|---|---|
| 3.1 | Purchase Price....................................................................... | 8 |
| 3.2 | [Intentionally Omitted] ........................................................ | 8 |
| 3.3 | [Intentionally Omitted] ........................................................ | 8 |
| 3.4 | [Intentionally Omitted] ........................................................ | 8 |
| 3.5 | [Intentionally Omitted]. ....................................................... | 8 |
| 3.6 | Effectiveness......................................................................... | |

Article IV REPRESENTATIONS AND WARRANTIES OF THE COMPANY .............8

| | | |
|---|---|---|
| 4.1 | Organization and Good Standing. ......................................... | 8 |
| 4.2 | Authority; Enforceability. .................................................... | 8 |
| 4.3 | No Conflict or Breach. ......................................................... | 8 |
| 4.4 | Governmental Consents and Approvals. ............................... | 9 |
| 4.5 | Litigation............................................................................... | 9 |
| 4.6 | Valid Title; No Liens. ........................................................... | 9 |
| 4.7 | Brokers.................................................................................. | 10 |
| 4.8 | Tax Matters .......................................................................... | 10 |
| 4.9 | Financial Statements; Undisclosed Liabilities ..................... | 10 |
| 4.10 | Receivables .......................................................................... | 11 |
| 4.11 | Consents and Approvals ....................................................... | 12 |
| 4.12 | Permits/Compliance with Laws ............................................ | 12 |
| 4.13 | Employee Benefit Plans; ERISA .......................................... | 12 |
| 4.14 | Contracts .............................................................................. | 12 |
| 4.15 | Condition and Sufficiency of Assets .................................... | 13 |
| 4.16 | Environmental Matters ......................................................... | 14 |
| 4.17 | Real Property ........................................................................ | 14 |
| 4.18 | Labor Matters ....................................................................... | 15 |
| 4.19 | Insurance............................................................................... | 15 |
| 4.20 | Intellectual Property............................................................. | 16 |
| 4.21 | Customer Relationships ........................................................ | 16 |
| 4.22 | Customer Deposits and Pre-Paid Expenses .......................... | 17 |
| 4.23 | Full Disclosure ..................................................................... | 17 |

Article V REPRESENTATIONS AND WARRANTIES OF PURCHASER ..................17

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing; Governing Documents. .... | 17 |
| 5.2 | Authority; Enforceability. .................................................... | 17 |
| 5.3 | No Conflict or Breach. ......................................................... | 18 |

2110403v15

**Page #**

| | | |
|---|---|---|
| 5.4 | Governmental Consents and Approvals. ............................................................. | |
| 5.5 | Litigation............................................................................................................ | 18 |
| 5.6 | Brokers............................................................................................................... | 18 |

**Article VI COVENANTS** ...................................................................................... 18

| | | |
|---|---|---|
| 6.1 | Conduct of Business ........................................................................................ | **18** |
| 6.2 | Bulk Transfer Laws ........................................................................................ | 18 |
| 6.3 | Employees........................................................................................................ | 19 |
| 6.4 | Confidentiality; Tax Disclosure ..................................................................... | 19 |
| 6.5 | Notification of Certain Matters........................................................................ | 19 |
| 6.6 | Access to Books and Records Following the Closing ...................................... | 20 |
| 6.7 | Non-Competition; Non-Solicitation ............................................................... | 20 |
| 6.8 | Credit Card Processing .................................................................................... | 21 |
| 6.9 | Remaining Transitional Arrangement ............................................................. | 22 |
| 6.10 | [Intentionally Omitted] .................................................................................. | 22 |
| 6.11 | Operating Account Balances. .......................................................................... | |
| 6.12 | FS SunTours Credit ........................................................................................ | 22 |
| 6.13 | FS SunTours Amounts Forgiven ..................................................................... | 22 |
| 6.14 | FS SunTours Prepayments............................................................................... | 22 |

**Article VII CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS**................**22**

| | | |
|---|---|---|
| 7.1 | Representations and Warranties. ..................................................................... | |
| 7.2 | Compliance with Covenants. ........................................................................... | 22 |
| 7.3 | Absence of Litigation. ..................................................................................... | 23 |
| 7.4 | Due Diligence. ................................................................................................. | 23 |
| 7.5 | FS SunTours Payable....................................................................................... | 23 |
| 7.6 | Termination of DBA Certificates .................................................................... | 23 |
| 7.7 | Permits ............................................................................................................. | 23 |
| 7.8 | Company's Affiliate Guarantee........................................................................ | 23 |
| 7.9 | Transitional Arrangements .............................................................................. | 23 |
| 7.10 | Ancillary Documents. ...................................................................................... | 24 |
| | | 23 |

**Article VIII CONDITIONS PRECEDENT TO THE COMPANY'S OBLIGATIONS**........**24**

| | | |
|---|---|---|
| 8.1 | Representations and Warranties. ..................................................................... | |
| 8.2 | Compliance with Covenants. ........................................................................... | 24 |
| 8.3 | Absence of Litigation. ..................................................................................... | 24 |
| 8.4 | Purchaser Affiliate Guarantee......................................................................... | 24 |
| 8.5 | Ancillary Agreements. ..................................................................................... | 24 |

**Article IX CLOSING** .......................................................................................... 24

| | | |
|---|---|---|
| 9.1 | Closing.............................................................................................................. | **24** |
| 9.2 | Deliveries by Seller.......................................................................................... | 24 |
| 9.3 | Deliveries by Purchaser. .................................................................................. | 24 |
| 9.4 | Transfer Costs. ................................................................................................. | 25 |
| 9.5 | Further Assurances. .......................................................................................... | 26 |
| | | 26 |

**Page #**

**Article X INDEMNIFICATION**.................................................................................................
10.1    Indemnification by the Company. ........................................................................27
10.2    Indemnification by Purchaser. .............................................................................27
10.3    Indemnification Threshold...................................................................................27
10.4    Time Limits on Indemnification. .........................................................................27
10.5    Notice of Third Party Claim. ...............................................................................27
10.6    Claims between Purchaser and the Company.......................................................28
10.7    Dollar Limit on Indemnification by Purchaser and the Company........................28
10.8    Exclusive Remedy. ..............................................................................................28
10.9    Limitation on Damages........................................................................................29

**Article XI TERMINATION** ...................................................................................................29
11.1    Termination..........................................................................................................29
11.2    Effect on Obligations. ..........................................................................................29

**Article XII MISCELLANEOUS** ..............................................................................................30
12.1    Expenses. .............................................................................................................30
12.2    Publicity. ..............................................................................................................30
12.3    Best Efforts. .........................................................................................................30
12.4    Notices. ................................................................................................................30
12.5    Governing Law. ...................................................................................................30
12.6    Dispute Resolution...............................................................................................31
12.7    Counterparts.........................................................................................................31
12.8    Assignment. .........................................................................................................31
12.9    Third Party Beneficiaries. ....................................................................................31
12.10    Headings. ............................................................................................................31
12.11    Amendments. ......................................................................................................31
12.12    Specific Performance..........................................................................................31
12.13    Severability. ........................................................................................................31
12.14    Entire Agreement. ..............................................................................................32
12.15    Representations and Warranties Exclusive..........................................................32
12.16    Disclosure Schedules ..........................................................................................32
.................................................................................................................................32

**EXHIBITS**

Exhibit A:  [Intentionally Omitted]
Exhibit B:  Bill of Sale
Exhibit C:  Lease Assignments
Exhibit D:  Intellectual Property Assignments
Exhibit E:  Opinion of Counsel to the Company
Exhibit F:  Assumption Agreement
Exhibit G:  Opinion of Counsel to Purchaser
Exhibit H:  Releases
Exhibit I:  Transitional Services Agreement

Page #

**SCHEDULES**

Schedule 2.2(a)(ii) Tangible Personal Property and Leases Related Thereto
Schedule 2.2(a)(iii) Contracts Other Than Excluded Contracts
Schedule 2.2(b)(iv) Excluded Contracts
Schedule 2.2(b)(ix) Transitory Arrangements
Schedule 2.3(i) Assumed Liabilities (Assumed Payables and Assumed Contracts)
Schedule 4.4 Company Governmental Consents and Approvals
Schedule 4.5 Litigation
Schedule 4.6 Liens
Schedule 4.8 Tax Matters
Schedule 4.9(a) Financial Information-GAAP Exceptions
Schedule 4.9(b) Material Adverse Effect
Schedule 4.10 Receivables
Schedule 4.11 Consents
Schedule 4.12 Permits/Compliance With Laws
Schedule 4.13 Employee Benefit Plans/ERISA
Schedule 4.14(a) Material Contracts
Schedule 4.14(b) Defaults Under Material Contracts
Schedule 4.14(c) Specific Contract Disclosures
Schedule 4.15 Sufficiency of Assets
Schedule 4.16 Environmental Matters
Schedule 4.17(b) Leased Realty
Schedule 4.18(a) Employees
Schedule 4.18(b) Collective Bargaining and Other Employment Contracts
Schedule 4.18(c) Grievances and Proceedings
Schedule 4.18(d) Labor Actions
Schedule 4.18(f) Hostile Work Environment, Sexual Discrimination and Racial Discrimination
Schedule 4.19 Insurance
Schedule 4.20(a) Registered Intellectual Property
Schedule 4.20(b) Intellectual Property Actions or Proceedings
Schedule 4.20(c) Rights in Business Intellectual Property
Schedule 4.20(d) Misappropriation of Intellectual Property
Schedule 4.21 Customer Relationships
Schedule 5.4 Purchaser Governmental Consents and Approvals
Schedule 6.3 Employees to Whom Purchaser will Make Offers of Employment

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (together with the Schedules and Exhibits hereto, the "Agreement") dated as of December 9, 2004 is entered into by and among Vacation Acquisition, LLC, a Delaware limited liability company ("Purchaser"), and FS Tours, Inc., a Delaware corporation (the "Company"), a wholly-owned direct subsidiary of Flightserv, Inc., a Delaware corporation ("Flightserv") and a wholly-owned indirect subsidiary of RCG Companies Incorporated, a Delaware corporation ("RCG").

### RECITALS:

1.      Pursuant to an Asset Purchase Agreement dated as of October 31, 2003 (the "2003 Asset Purchase Agreement"), by and among the Company, VE Holdings, Inc. ("VE Holdings"), Suntrips, Inc. and FS SunTours, Inc. ("FS SunTours"), the Company purchased from VE Holdings, substantially all of the assets of VE Holdings used exclusively or principally by or relating to the business of serving as public charter airline operator under the name of 'Vacation Express' (the "Business"), subject to certain liabilities in connection with the Business;

2.      Pursuant to the 2003 Asset Purchase Agreement, FS Tours was indemnified by VE Holdings with respect to certain representations, warranties, covenants and agreements made by VE Holdings therein;

3.      Purchaser desires to purchase, and the Company desires to sell, substantially all of the assets of the Company used in and comprising the Business, on the terms and subject to the conditions hereinafter set forth;

NOW, THEREFORE, in consideration of premises and the respective covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

### ARTICLE I
### DEFINITIONS

The definitions of the following terms are set forth in the Sections specified below and, unless otherwise specified, will apply throughout this Agreement:

| DEFINITION | SECTION |
| --- | --- |
| Action | Section 4.12 |
| Affiliate | Section 2.2(b) |
| Agreement | Preamble |
| Allocation Schedule | Exhibit A |
| Ancillary Documents | Section 4.2 |
| Assets | Section 2.2(a) |

| DEFINITION | SECTION |
|---|---|
| Assumed Contracts | Section 2.3 |
| Assumed Liabilities | Section 2.3 |
| Assumption Agreement | Section 9.3 |
| Benefit Plans | Section 4.13 |
| Bill of Sale | Section 9.2 |
| Business | Recital 1 |
| Business Day | Section 3.2 |
| Business Intellectual Property | Section 4.20 |
| Claims | Section 4.5 |
| Closing | Section 9.1 |
| Closing Date | Section 9.1 |
| Code | Section 4.8(a) |
| Company | Preamble |
| Consents | Section 4.11 |
| Control | Section 2.2(b) |
| Employee | Section 4.18 |
| Environmental Claims | Section 4.16 |
| Environmental Laws | Section 4.16 |
| ERISA | Section 4.13 |
| Excluded Assets | Section 2.2(b) |
| Excluded Contracts | Section 2.2(b)(iv) |
| Excluded Liabilities | Section 2.4 |
| Financial Information | Section 4.9(a) |
| Flightserv | Preamble |
| FS SunTours | Recital 1 |
| FS SunTours Payment | Section 7.6 |
| Governmental Authority | Section 4.11 |

2110403v15

| DEFINITION | SECTION |
|---|---|
| Hazardous Materials | Section 4.16 |
| Hazardous Substances | Section 4.16 |
| Hired Employee | Section 6.3(a) |
| Indemnified Party | Section 10.5 |
| Indemnifying Party | Section 10.5 |
| Intellectual Property | Section 4.20 |
| Intellectual Property Assignments | Section 9.2 |
| Knowledge of the Company | Section 4.5 |
| Lease Assignments | Section 9.2 |
| Lease Realty | Section 4.17(b) |
| Leases | Section 4.17(b) |
| Lien | Section 4.3(d) |
| Loss | Section 10.1 |
| Material Adverse Effect | Section 4.9(b) |
| Material Contracts | Section 4.14(a) |
| MyTravel | Section 9.2(i) |
| Permits | Section 4.12 |
| Permitted Liens | Section 4.6 |
| Person | Section 2.2(b) |
| Purchase Price | Section 3.1 |
| Purchaser | Preamble |
| RCG | Preamble |
| Recipients | Section 6.4 |
| Registered Intellectual Property | Section 4.20 |
| Release | Section 4.16 |
| RSI Contract | Section 2.2(b)(x) |
| Seller | Preamble |

| DEFINITION | SECTION |
|---|---|
| Tax Returns | Section 4.8(b) |
| Taxes | Section 4.8(a) |
| Third Party Claim | Section 10.5 |
| Threshold | Section 10.3 |
| Transitory Arrangements | Section 2.2(b)(ix) |
| Transmeridian | Section 7.5 |
| VE Holdings | Recital 1 |
| 2003 Asset Purchase Agreement | Recital 1 |

## ARTICLE II
## SALE AND PURCHASE OF ASSETS

2.1    Transfer of the Assets.  On the terms and subject to the conditions of this Agreement, the Company agrees to sell, convey, assign, transfer and deliver to Purchaser, and Purchaser agrees to purchase and accept from the Company, at the Closing, all of the Company's right, title and interest in and to the Assets owned or controlled by the Company or used in the Business as currently operated by the Company.

2.2    Assets.

(a)    As used in this Agreement, the term "Assets" shall mean the Business, properties, assets and rights of the Company (other than the Excluded Assets), including, in each case as relating exclusively to the Business:

(i)    all of the Company's right, title and interest in, to and under the Leased Realty;

(ii)    except to the extent any of the following are Excluded Assets, all inventory, computer equipment and hardware (including "thin client computers"), equipment, supplies and other goods, all office furniture and fixtures, leasehold improvements, machinery, owned vehicles, and other tangible personal property and the Leases related thereto set forth on Schedule 2.2(a)(ii);

(iii)    all right, title and interest of the Company in, to and under all Contracts to which they are a party listed on Schedule 2.2(a)(iii), but excluding any Excluded Contracts;

(iv)    except to the extent any of the following are Excluded Assets, all accounts receivable of the Business (net of any reserves for bad debt), and notes

payable to the Company in relation to the Business and all claims, contract rights and judgments relating thereto, including all of the Company's rights to any proofs of claim filed against account debtors and any negotiable instruments, letters of credit or any other writing that evidences a right of the Company to the payment or performance of a monetary obligation;

(v)    any securities, whether certificated or uncertificated, held by the Company;

(vi)    all right, title and interest of the Company in, to and under all Permits, to the extent such Permits are transferable;

(vii)    all prepaid assets, including all prepaid rentals and all prepaid expenses, bonds (including the surety bonds), escrow accounts and deposits of the Company except to the extent any such prepaid assets are Excluded Assets;

(viii)    the originals and all copies of all books of account, sales and promotional materials, general, financial, accounting and personnel records solely with respect to any Hired Employee, files, manuals, invoices, customers and suppliers lists and other data owned or used by the Company, but excluding the corporate minute books, stock records and organizational documents of the Company;

(ix)    all right, title and interest of the Company in, to and under all Business Intellectual Property (including the trademark, tradename and name 'Vacation Express'), except to the extent any Business Intellectual Property is an Excluded Asset;

(x)    all of the Company's right, title and interest in, to and under telephone numbers, answering service numbers, e-mail addresses, web pages, and other communication codes, numbers or devices (including the software components for all internet websites for or used by the Company, other than the 'SunTrips' website);

(xi)    all of the Company's right, title and interest in, to and under all passenger escrow accounts maintained with a bank or other financial institution or received from any customer for deposit therein;

(xii)    all causes of action, other than those related to or otherwise arising in connection with, the Excluded Assets or Excluded Liabilities;

(xiii)    all goodwill relating exclusively or principally to the Business;

(xiv)    all right, title and interest of the Company in, to and under any indemnity rights of the Company arising under or with respect to the 2003 Asset Purchase Agreement, solely to the extent it relates to the Business or Vacation Express; and

(xv)    any other assets used exclusively or principally in the Business on the Closing Date that are not specifically listed above.

(b)    The term "Excluded Assets" shall mean:

(i)    the minute books, corporate seal, stock records and organizational documents of the Company;

(ii)    copies of such books of account, general, financial, accounting and personnel records, files, manuals, invoices, customer and suppliers lists and other data as the Company may be required by applicable Laws to retain or as may be necessary to assist the Company in preparation of the Company's Tax Returns;

(iii)    all right, title and interest in, to and under any Benefit Plans listed (or required to be listed) in Section 4.13;

(iv)    those Contracts that are listed on Schedule 2.2(b)(iv) (the "Excluded Contracts");

(v)    all of the Company's right, title and interest in, to and under Tax credits and other Tax benefits, Tax refunds, prepaid Taxes, insurance premium refunds, and insurance and other claims or rights to recoveries and similar benefits of and relating to the Business prior to the Closing Date;

(vi)    all of the Company's right, title and interest in, to and under this Agreement;

(vii)    all notes, drafts, accounts or other obligations for the payment of money, made or owed to the Company by any current or former employees or Affiliates;

(viii)    all of the Company's right, title and interest in, to and under the computer hardware and other equipment on which the SunTrips website is hosted and/or maintained;

(ix)    except in the event of the assignment by the Company and assumption by Purchaser as set forth in Section 7.9, all of the Company's right, title and interest in, to and under those bonds, letters of credit or other similar arrangements listed on Schedule 2.2(b)(ix) (the "Transitory Arrangements");

(x)    all of the Company's right, title and interest in, to and under the Agreement for Licenses of Computer Software by and among Reservation Systems, Inc., Flightserv, FS SunTours and the Company ("RSI Contract"); and

(xi)    all of the Company's right, title and interest in, to and under all cash or accounts (excluding any amounts in passenger escrow accounts held by any bank or financial institution), or received from any customer for deposit therein.

2110403v15

As used in this Agreement, "Affiliate" means, as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. "Person" means an individual, a corporation, a partnership, an association, a trust or other entity or organization. "Control" (including, with correlative meanings, the terms "controlled by" and "under common control with"), as applied to any Person, means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or other ownership interest, as trustee or executor, by contract, credit arrangement or otherwise, of the Company.

2.3    <u>Assumed Liabilities</u>. On the terms and subject to the conditions of this Agreement, at Closing Purchaser will assume and agree to pay, perform and discharge when due the Company's obligations under and with respect to only those trade payables of the Company set forth on Schedule 2.3, in the amount of Eight Million U.S. Dollars (U.S.$8,000,000); provided, however, that Purchaser shall have the right to settle any such trade payable and any resulting reduction shall inure to the benefit of Purchaser; and liabilities or obligations arising under the contracts and other matters, if any, listed on Schedule 2.3 hereto (the "Assumed Contracts") assumed by Purchaser at Closing (collectively, the "Assumed Liabilities").

2.4    <u>Excluded Liabilities</u>. Except as expressly assumed in Section 2.3, in no event shall Purchaser assume and be responsible for any other liability, obligation, debt commitment of the Business, the Company, Vacation Express or any Affiliate of RCG, as principal or successor of any kind or nature whatsoever (and Purchaser shall not be deemed a successor owner or operator of the Business), whether absolute or contingent, accrued or unaccrued, known or unknown, liquidated or unliquidated, due or to become due, or otherwise (collectively, the "Excluded Liabilities"), including, but not limited to, (a) any liability of the Company or any Affiliate of RCG to any employee, former employee or their beneficiaries or dependents, arising out of or accruing in connection with, any employment relationship between the Company or any Affiliate of RCG and such persons or the Company or any Affiliate of RCG and any labor union purporting to represent any such person, or arising out of any employee Benefit Plan, program or policy of the Company or any Affiliate of RCG including, but not limited to, any liability for severance or termination payments arising out of, or alleged to have arisen out of, the transactions contemplated by this Agreement or any prior action or relationship between the Company or any Affiliate of RCG and such employees, including, but not limited to, any and all liabilities and obligations arising under any written or oral agreements with the Company or any Affiliate of RCG or under the Worker Adjustment and Retraining Notification Act and the Consolidated Omnibus Budget Reconciliation Act, if any, and the regulations promulgated thereunder and any applicable similar state or local statute and regulation or at common law; (b) any liabilities or obligations arising under the Assumed Contracts prior to the Closing Date to the extent such liabilities are not Assumed Liabilities, (c) any other liabilities or obligations which otherwise arise or are asserted by reason of the condition of the Assets, events, acts (or failures to act) or transactions occurring, or the operation of the Business, prior to the Closing including, but not limited to, environmental liabilities (including, but not limited to, any Claims relating to or arising from any off-site storage, treatment, recycling or disposal facilities owned, leased or used at any time by the Company); (d) the Claims; (e) any liability or obligation of the Company or any Affiliate of RCG, whenever arising or accruing, arising out of any Excluded Asset; (f) any Taxes of the Company, the Business or any Affiliate of RCG, except as such Taxes are apportioned to Purchaser based on its ownership of the Assets post-Closing Date, in

- 7 -

accordance with Section 9.4; (g) any obligation of the Company, the Business or Vacation Express arising under the 2003 Asset Purchase Agreement; (h) any liability or obligation of the Company, the Business or Vacation Express or any Affiliate of the Company arising under that certain Letter of Credit Agreement dated as of March 1, 2004, as amended as of November 9, 2004, by and among RCG, Flightserv, the Company and FS SunTours, K. Wesley M. Jones, Sr., Aubrey John Elam, Jr., Stefano Piraino and Greg Currie and the FiveOaks Capital Partners, LLC, and any ancillary documents referred therein; or (i) any obligation incurred by the Company or any Affiliate of RCG (including, without limitation, Flightserv) and not expressly assumed by Purchaser hereunder. The parties hereto further agree that all of the Excluded Liabilities shall remain the sole, exclusive obligation and responsibility of the Company.

## ARTICLE III
## PURCHASE PRICE AND ADJUSTMENT

3.1    Purchase Price. The aggregate purchase price (the "Purchase Price") for the Assets will be Purchaser's assumption of the Assumed Liabilities.

3.2    [Intentionally Omitted]

3.3    [Intentionally Omitted]

3.4    [Intentionally Omitted]

3.5    [Intentionally Omitted]

3.6    Effectiveness. In the event that the Closing shall occur, Purchaser and the Company agree that the results of operations of the Business acquired by Purchaser hereunder from 12:01 am on the Closing Date shall be for the account of the Company.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company represents and warrants to Purchaser as follows:

4.1    Organization and Good Standing. The Company is a corporation duly organized, validly existing and in good standing under the laws of Delaware. The Company has all requisite power and authority to own its properties, and to conduct its business as presently conducted.

4.2    Authority; Enforceability. The Company has all requisite corporate power and authority to execute, deliver and perform its obligations arising under this Agreement, the Ancillary Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement, the Ancillary Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been, or will be on or prior to the Closing Date, duly and validly authorized by all necessary action on the part of the Company. This Agreement has been, and at the Closing the Ancillary Documents to which it is a party will have been, duly executed and delivered by the Company and constitute a valid and binding obligation of the Company enforceable against

2110403v15

the Company in accordance with its terms except that enforcement may be subject to any bankruptcy, insolvency, reorganization, moratorium, or other laws, now or hereafter in effect relating to or limiting creditors' rights generally and the remedy of specific performance, injunction and other forms of equitable relief and may be subject to equitable defenses and to the discretion of the court before which any proceeding may be brought.  As used in this Agreement, "Ancillary Documents" means the Bill of Sale, the Assumption Agreement, the Lease Assignments, the Intellectual Property Assignments, and each instrument, agreement or other document contemplated by this Agreement as being executed and delivered by the applicable party hereto and any side letters delivered by the parties or their Affiliates in connection herewith.

   4.3    <u>No Conflict or Breach</u>.  Except as set forth in Schedule 4.3, the execution, delivery and performance of this Agreement and the Ancillary Documents to which it is a party does not and will not:

   (a)    conflict with or constitute a violation of the Certificate of Incorporation or other constitutive documents of the Company;

   (b)    conflict with or constitute a violation of any law, statute, judgment, order, decree or regulation of any legislative body, court, administrative agency, governmental authority or arbitrator applicable to or relating to the Company or the Assets or any portion of any thereof;

   (c)    conflict with, constitute a default under, result in a breach or acceleration of or require notice to or the consent of any third party under any contract, agreement, commitment, mortgage, note, license or other instrument or obligation to which the Company is party or by which it is bound or by which the Assets or any portion of any thereof is affected; or

   (d)    result in the creation or imposition of any Lien.  As used in this Agreement, "Lien" means any lien, security interest, mortgage, pledge, charge or similar encumbrance, of any nature whatsoever on the Assets or any portion of any thereof;

except in the case of items (b) and (c) where such conflicts, violations, defaults, breaches or consents, individually or in the aggregate, would not have a Material Adverse Effect on the Business or the Assets.

   4.4    <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance by the Company of this Agreement and the Ancillary Documents to which it is a party do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to any governmental authority, except as described in Schedule 4.4 attached hereto.

   4.5    <u>Litigation</u>.  Except as set forth on Schedule 4.5, there are no pending or, to the Knowledge of the Company, threatened claims, actions, suits, arbitration proceedings, inquiries, hearings, injunctions or investigations ("Claims") against the Company which if adversely determined would result in a Lien on the Assets or that may seek to enjoin the transactions contemplated hereby.  As used in this Agreement, "Knowledge of the Company" or phrases of

similar import mean the actual knowledge, after reasonable inquiry, of Gantt Cookson, and the president of the Company and director of finance of the Company.

4.6    Valid Title; No Liens. Except as set forth on Schedule 4.6, (i) the Company is the sole and exclusive owner of, and has good and valid title, and in the case of the leased (a valid leasehold interest) to, all of the Assets wherever located, free and clear of all Liens other than Permitted Liens and the Assumed Liabilities, and (ii) no other person or legal entity has or will have at Closing any interest whatsoever in any of the Assets. At Closing, the Company will transfer and convey to Purchaser, and Purchaser will acquire, good and valid title to the Assets, free and clear of all Liens of any kind or nature whatsoever, other than Permitted Liens and the Assumed Liabilities. As used in this Agreement, "Permitted Liens" means (i) mechanics', carriers', workmen's or repairmens' Liens arising or incurred in the ordinary course of business with respect to liabilities that are not yet due or delinquent, (ii) Liens arising by operation of law for Taxes, assessments and other governmental charges which are not due and payable or which may hereafter be paid without penalty or which are being contested in good faith by appropriate proceedings, (iii) other imperfections of title or encumbrances, if any, which imperfections of title or other encumbrances, individually or in the aggregate, would not reasonably be expected to materially detract from the value of the property or asset to which it relates or materially impair the ability to use the property or asset to which it relates in substantially the same manner as it was used prior to the Closing Date, and (iv) Liens arising from travel agency regulations relating to customer funds.

4.7    Brokers. No finder, broker, agent or other intermediary has acted for or on behalf of the Company or any Affiliate of the Company in connection with the negotiation or consummation of this Agreement, and there are no claims for any brokerage commission, finder's fee or similar payment due from the Company or its Affiliates.

4.8    Tax Matters.

(a)    For the purposes of this Agreement, "Taxes" are any federal, state, local, or foreign income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental (including taxes under Internal Revenue Code of 1986 (the "Code") section 59A), customs duties, capital stock, franchise, profits, withholding, social security (or similar), unemployment, disability, real property, personal property, sales, use, transfer, registration, value added, alternative or add-on minimum, estimated, or other tax of any kind whatsoever, including any interest, penalty, or addition thereto, whether disputed or not.

(b)    The Company has filed all returns, declarations, reports or information returns or statements relating to Taxes, including any schedules or attachments thereto, and including any amendments thereof ("Tax Returns") that it was required to file prior to the date hereof. All such Tax Returns were correct and complete in all material respects. All Taxes owed by the Company shown on any such Tax Return have been paid. The Company is not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no security interests on any of the Assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax.

(c)     To the Knowledge of the Company no authority will assess any additional Taxes for any period for which Tax Returns have been filed. There is no dispute or claim concerning any Tax liability of the Company either (A) claimed or raised by any authority in writing to the Company, or (B) as to which any of the direct or indirect shareholders of the Company has Knowledge. Except as provided by Schedule 4.8, no Tax Return filed with respect to the Company has been or currently is the subject of audit.

(d)     The Company has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency. The Company has disclosed on its federal income Tax Returns all positions taken therein that could give rise to a substantial understatement of federal income Tax within the meaning of Code section 6662. The Company is not a party to any Tax allocation or sharing agreement. The Company has no liability for the Taxes of any other person.

4.9     Financial Statements; Undisclosed Liabilities.

(a)     The Company delivered to Purchasers the unaudited balance sheets for the Company dated September 30, 2004 and the unaudited operating income statements for the Company for the twelve (12) month periods ended September 30, 2004 (collectively, the "Financial Information"). Except as set forth on Schedule 4.9(a), the Financial Information has been prepared in conformity with GAAP applied on a basis consistent with the Company's past practice (except for changes, if any, required by GAAP and disclosed therein, and except for the absence of notes and normal recurring adjustments). The Financial Information presents fairly and accurately in all material respects the financial position of the Company in the manner required by GAAP, for the applicable time periods covered thereby.

(b)     Except as set forth in Schedule 4.9(b), there has been no change in the business of the Business or the occurrence of any event, in each case, since September 30, 2004 that has resulted, or could be reasonably expected to result, in a Material Adverse Effect. As used in the Agreement, "Material Adverse Effect" means any change or effect that is materially adverse to the financial condition, assets, liabilities or results of operations of the Business, individually or taken as a whole, except for such changes or effects resulting from (a) the transactions contemplated by this Agreement, (b) industry-wide regulatory changes, or (c) an event or circumstances affecting (i) the industry in which the Business operates in an country in which the Business operates or (ii) United States economy generally or the economy generally in any other country in which the Business operates.

(c)     The Business does not have any liabilities of the type required to be reflected as liabilities on a balance sheet prepared in accordance with GAAP, whether accrued, absolute, contingent or otherwise, except such liabilities that (i) are reflected, disclosed or reserved against in the Financial Information, or (ii) were incurred after September 30, 2004 in the ordinary course of business by the Company, consistent with past practice. Except as otherwise disclosed herein (including on the Schedules hereto), the Business will not have at Closing any other liabilities that are material to the Business; provided, that this representation and warranty shall not apply, and there shall be no breach of this

representation and warranty, to the extent that any such liability is (i) unknown and upon reasonable investigation could not have been known or (ii) disclosed

(d)    The Financial Information is based upon information contained in the books and records of the Company, which such books and records have been kept in accordance with GAAP, consistent with past practice.

4.10    <u>Receivables</u>. Except as set forth in Schedule 4.10, all accounts receivable and notes receivable of the Business (i) to the Company's Knowledge, are valid obligations of the obligors, (ii) have arisen from bona fide transactions in the ordinary course of business consistent with past practice, (iii) are, to the Company's Knowledge, collectible in the ordinary course of business and have been adequately reserved for in the Financial Information.

4.11    <u>Consents and Approvals</u>. The execution and delivery of this Agreement and each Ancillary Document to which the Company is a party does not, and the performance by the Company of this Agreement and each Ancillary Document to which the Company is party and the consummation of the transactions contemplated hereby and thereby will not, require the Company to obtain (i) any consent, approval, waiver, authorization or permit of, or to make any filing or registration with or notification to ("Consents"), any court, agency or commission, or other governmental entity, authority or instrumentality, whether domestic or foreign (each, a "Governmental Authority"), or (ii) any Consent of any third party under any Contract, except where the failure to obtain such Consent would not have a Material Adverse Effect and except for the Consents set forth in Schedule 4.11.

4.12    <u>Permits/Compliance with Laws</u>. The Company possess all material franchises, grants, authorizations, licenses, permits, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate their properties and assets and to carry on the Business as it is now being conducted (collectively, the "Permits"), and there is no Action pending or, to the Knowledge of the Company, threatened, regarding suspension or cancellation of any such Permits. Except as set forth in Schedule 4.12, the Company is in compliance in all material respects with such Permits and in compliance with all material Laws applicable to them or by or to which any of the Assets are bound or subject. Except as set forth in Schedule 4.12, none of the Permits will lapse, terminate or expire as a result of the performance of this Agreement by the Company or the consummation of the transactions contemplated hereby. As used in this Agreement, "Action" means any claim, action, suit or proceeding, arbitral action, governmental inquiry, criminal prosecution or other investigation.

4.13    <u>Employee Benefit Plans; ERISA</u>. Schedule 4.13 lists each Benefit Plan. Except as set forth on Schedule 4.13, or to the extent that any breach of the representations set forth in this sentence would not have a Material Adverse Effect: (i) each Benefit Plan has been administered and operated in all respects in accordance with its terms and in accordance with the applicable provisions of the Code and ERISA; (ii) no Benefit Plan is subject to Title IV of ERISA or subject to section 412 of the Code or section 302 of ERISA; (iii) neither the Company nor to the Knowledge of the Company, any other "disqualified person" or "party in interest" (as defined in section 4975(e) (2) of the Code and section 3(14) of ERISA, respectively) has engaged in any transaction in connection with any Benefit Plan that could reasonably be expected to result in the imposition of a penalty pursuant to section 502 of ERISA or an excise tax pursuant to section 4975 of the Code; (iv) no Benefit Plan provides for post-employment or

- 12 -

retiree welfare benefits, except to the extent required by Part 6 of Title I of ERISA or section 4980B of the Code; and (v) no Action has been made, commenced or, to the Knowledge of the Company, threatened with respect to any Benefit Plan (other than routine claims for benefits payable in the ordinary course and appeals of denied claims). As used in this Agreement, "Benefit Plans" means any "employee benefit plan" with the meaning of Section 3(3) of ERISA that is maintained or contributed to by the Company (or any of its Affiliates) for the benefit of Employees. "ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

4.14    Contracts.

(a)    Set forth on Schedule 4.14(a) is a complete list of all of the following contracts (the "Material Contracts"): (i) noncompetition or other agreements restricting the ability of the Company to engage in any line of business in any location, (ii) each contract involving payments made by the Company that are expected to exceed Fifty Thousand Dollars ($50,000), and (iii) each contract involving payments made to the Company that are expected to exceed Fifty Thousand Dollars ($50,000).

(b)    Each Material Contract is a valid and binding obligation of the Company party thereto and is enforceable by the Company in accordance with its terms against each other party thereto and except as set forth on Schedule 4.14(b), the Company is not (with or without the lapse of time or the giving of notice, or both) in breach or default thereunder. To the Knowledge of the Company, none of the other parties to any Material Contract is (with or without the lapse of time or the giving of notice, or both) in breach or default thereunder or has given notification of cancellation thereunder. To the Knowledge of the Company, no defenses, offsets or counterclaims to any Material Contract have been asserted by any party thereto other than the Company, and the Company has not waived any rights under any Material Contract.

(c)    Except as set forth specifically on Schedule 4.14(c), the Company is not party to, and none of the Assets is subject to, any agreement, understanding or other arrangement with respect to any:

(i)    contracts under which the Company is a lessor or sublessor of, or makes available for use by any third party, (a) any real property owned or leased by the Company exclusively or principally in connection with the Business, or any portion of premises otherwise occupied by the Company, or (b) any material personal property owned or leased by the Company exclusively or principally in connection with the Business;

(ii)    contracts under which the Company has borrowed or loaned any money or issued any note, bond, indenture or other evidence of indebtedness or directly or indirectly guaranteed any indebtedness, liability or obligation of any third party (other than any loan made to any employee for relocation, travel or other employment—related purposes, in each case, in the ordinary course of business consistent with past practice), or any other note, bond, indenture or other evidence of indebtedness;

(iii)    contracts under which any other person has directly or indirectly guaranteed any indebtedness, liability or obligation of the Company, or letter of credit issued to guarantee any obligation of the Company, or any vendor or customer of the Company; or

(iv)    contracts with any Governmental Authority except those entered into in the ordinary course of business consistent with past practice which do not involve aggregate payments thereunder by the Company in excess of Fifty Thousand Dollars ($50,000).

4.15    Condition and Sufficiency of Assets. The buildings, plants, structures, and equipment included in the Assets are in good operating condition and repair (ordinary wear and tear excepted) and are adequate for the uses to which they are being employed. Except (i) for the Excluded Assets, (ii) as set forth on Schedule 4.15, the Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted prior to the Closing.

4.16    Environmental Matters. Except as set forth in Schedule 4.16, there is no Environmental Claim pending or, to the Knowledge of the Company, threatened against the Company. To the Knowledge of the Company, there have been no Releases of Hazardous Materials on, beneath or adjacent to any property currently or formerly owned, operated, or leased by the Company in quantities sufficient to form the basis for an Environmental Claim. As used in this Agreement, "Environmental Claim" means any Action or notice by any person or entity alleging potential liability (including, without limitation, potential liability for investigatory costs, cleanup costs, governmental response cost, natural resources damages, property damages, personal injuries, or penalties) arising out of, based on or resulting from (a) the presence or Release of any Hazardous Materials at any location, whether or not owned or operated by the Company, or (b) circumstances forming the basis of any violation of any Environmental Law. As used in this Agreement, "Environmental Laws" means all laws and regulations relating to pollution or protection of human health or the environment, including laws relating to Release or threatened Release of Hazardous Materials or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport of handling of Hazardous Materials and all Laws with regard to recordkeeping, notification, disclosure and reporting requirements respecting Hazardous Materials. As used in this Agreement, "Hazardous Material" means all materials regulated by law as capable of causing harm or injury to human health or the environment, including (a) Hazardous Substances, (b) friable asbestos containing materials, (c) polychlorinated biphenyls, (d) highly toxic materials as defined by OSHA in 29 C.F.R. ss. 1910.1200, (d) radioactive materials and (f) all substances defined as Hazardous Substances, Oils, Pollutants or Contaminants in the National Oil and Hazardous Substances Pollution Contingency Plan, 40 C.F.R. ss. 300.5, or defined as such by, or regulated as such under, any Environmental Law. As used in this Agreement, "Hazardous Substances" means any hazardous substances within the meaning of Section 101(14) of CERCLA, 42 U.S.C ss. 9601(14), or any pollutant or constituent that is regulated under any Environmental Law. As used in this Agreement, "Release" means any release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal, leaching or migration into the indoor or outdoor environment (including ambient air, surface water, groundwater and surface or subsurface

- 14 -

strata), or into or out of any property, including the movement of Hazardous Materials through or in the air, soil, surface water, groundwater or property.

### 4.17  Real Property.

(a)  There is no real property to which the Company has legal or equitable title.

(b)  Schedule 4.17(b) sets forth a true and complete list of all real property in which the Company has a valid and subsisting leasehold or other interest (the "Leased Realty"). To the Knowledge of the Company, the Company as the lessee of each particular piece of Leased Realty possesses a valid and subsisting leasehold or other interest in such Leased Realty pursuant to the leases or other instruments set forth in Schedule 4.17(b) (the "Leases"). Each Lease is in full force and effect and the Company have not received any outstanding notice of default from the landlord under any such Lease. There has not occurred any event of default under any Lease or any event which, with or without lapse of time, shall constitute an event of default thereunder.

### 4.18  Labor Matters.

(a)  Schedule 4.18(a) sets forth a complete list of all employees of the Company engaged in the Business ("Employee").

(b)  Except as set forth in Schedule 4.18(b), the Company is not a party to (i) any collective bargaining agreement or similar agreement with any labor organization or employee association, or (ii) any other written employment contract.

(c)  Except as set forth in Schedule 4.18(c), no grievance or arbitration proceeding arising out of or under any collective bargaining agreement is pending, and no such grievance or proceeding is threatened.

(d)  Except as set forth in Schedule 4.18(d), since November 1, 2003, there has not been, nor is there pending, or, to the Company's Knowledge, threatened, (i) any labor dispute between the Company and any labor organization, or any strike, slowdown, jurisdictional dispute, work stoppage or other similar organized labor activity involving any Employee of the Company or affecting the Company or (ii) any union organizing, or election activity involving, any employee of the Company.

(e)  There exists no pending or to the Knowledge of the Company, threatened lawsuit, administrative proceeding or investigation between the Company and any current or former director, officer or employee of the Company, including any claim for wrongful termination, breach of express or implied contract of employment or for violation of equal employment opportunity laws.

(f)  Except as set forth in Schedule 4.18(f), there exists no pending or, to the Knowledge of the Company, threatened lawsuit, administrative proceeding or investigation of the Company or any employee thereof regarding allegations of hostile work environment, sexual discrimination or racial discrimination.

(g)    All bonuses due and payable to any Employee as of the Closing Date have been paid.

4.19    Insurance.  Set forth in Schedule 4.19 is a complete and accurate list of all primary, excess and umbrella policies, bonds and other forms of insurance currently owned or held by or on behalf of or providing insurance coverage to the Business, including the coverage amounts and expiration dates thereof.  All policies set forth in Schedule 4.19 are in full force and effect and shall remain in full force and effect through the Closing Date and no pending notice of default, cancellation or termination has been received by the Company with respect to any such policy.

4.20    Intellectual Property.

(a)    Schedule 4.20(a) sets forth all of the following United States and foreign Business Intellectual Property: (i) patents and patent applications (including provisional applications); (ii) trademark registrations and trademark applications; (iii) registered copyrights and applications for copyright registration; and (iv) domain names (the items set forth in the forgoing clauses (i) through (iv), collectively, the "Registered Intellectual Property").  All necessary registration, maintenance and renewal fees in connection with such Registered Intellectual Property that have come due have been paid and all necessary maintenance and renewal documents in connection with such Registered Intellectual Property that have come due have been filed with the relevant patent, copyright, trademark or domain name authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of maintaining such Registered Intellectual Property.  As used in this Agreement, "Business Intellectual Property" means any Intellectual Property that is owned by or licensed to the Company exclusively or primarily for the benefit of the Business, other than any Intellectual Property that is an Excluded Asset.  As used in this Agreement, "Intellectual Property" means any or all of the following:  (i) all patents and applications therefor and reissues, divisions, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (ii) inventions (whether patentable or not), invention disclosures, improvements, trade secrets, proprietary information, know-how, technology, technical data and customer lists; (iii) copyrights, copyright registrations and applications therefor; (iv) trade names, trade dress, logos, trademarks and service marks, and registrations and applications therefor and the goodwill associated therewith; (v) databases; (vi) computer software, including all source code therefor and (vii) domain names and all rights therein throughout the world.

(b)    Schedule 4.20(b) sets forth any proceedings or actions before any court, tribunal challenging the validity or the Company's ownership of any of the Registered Intellectual Property.

(c)    Except as set forth on Schedule 4.20(c), the Company has not granted to any Person any rights in the Business Intellectual Property.

(d)    To the Knowledge of the Company, the operation of the Business, taken individually or as a whole, as such Business currently is conducted, does not infringe or misappropriate the Intellectual Property of any other Person.  The Company has not

- 16 -

received any notice from any Person that the provision of their respective services, infringes or misappropriates the Intellectual Property of any Person. Except as set forth on Schedule 4.20(d), to the Knowledge of the Company, no Person is infringing or misappropriating any of the Business Intellectual Property.

4.21    <u>Customer Relationships</u>.  To the Knowledge of the Company, other than past due payables, all of which are listed on Schedule 4.21, there exists no condition, state of facts or circumstances involving any customers, suppliers, distributors or vendors of the Company (including airlines), that has resulted in, or could be reasonably expected to result in, a Material Adverse Effect.

4.22    <u>Customer Deposits and Pre-Paid Expenses</u>.  The customer deposits and prepaid expenses of the Company are reasonable in amount, were obtained in the Company's ordinary course of business and, to the Knowledge of the Company, can be used by Purchaser in the conduct of the Business after the Closing Date in substantially the same manner as conducted prior to the Closing Date.

4.23    <u>Full Disclosure</u>.  None of the information contained in this Agreement (including the Schedules and Exhibits hereto) or in any Ancillary Document to be furnished by the Company (i) contains an untrue statement of a material fact as of the date when made or (ii) omits to state any material fact necessary to be stated in order to make any other statements herein or therein not misleading in light of the circumstances under which they were made. Copies of all documents referred to in any Schedule hereto have been delivered to Purchasers and are true, correct and complete copies thereof, including all minutes, exhibits, schedules, appendices, supplements or modifications thereto and all written waivers thereunder.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to the Company as follows:

5.1    <u>Organization and Good Standing; Governing Documents</u>.  Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.  Purchaser has all requisite power and authority to own its properties and to conduct its business as presently conducted.

5.2    <u>Authority; Enforceability</u>.  Purchaser has all requisite power and authority to execute and deliver this Agreement, the Ancillary Documents to which it is a party, to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement, the Ancillary Documents to which it is a party and the consummation of the transactions contemplated hereby and thereby have been, or will be on or prior to the Closing Date, duly and validly authorized by all necessary action on the part of Purchaser.  This Agreement has been, and the Ancillary Documents to which Purchaser is a party will be on and as of the Closing Date, duly executed and delivered by Purchaser and constitute valid and binding obligations of Purchaser enforceable against Purchaser in accordance with their respective terms.

2110403v15

5.3    <u>No Conflict or Breach</u>.  The execution, delivery and performance of this Agreement and the Ancillary Documents to which Purchaser is a party will not:

(a)    conflict with or constitute a violation of the Certificate of Formation, the Limited Liability Company Agreement or other constitutive documents of Purchaser;

(b)    conflict with or constitute a violation of any law, statute, judgment, order, decree or regulation of any legislative body, court, administrative agency, governmental authority or arbitrator applicable to or relating to Purchaser; or

(c)    conflict with, constitute a default under, result in a breach or acceleration of or require notice to or the consent of any third party under any contract, agreement, commitment, mortgage, note, license or other instrument or obligation to which Purchaser is party or by which it is bound, other than notices which have been given and consents which have been obtained;

except in the case of (b) and (c) where such conflicts, violations, defaults, breaches or consents, individually or in the aggregate, would not have a Material Adverse Effect on Purchaser.

5.4    <u>Governmental Consents and Approvals</u>.  The execution, delivery and performance of this Agreement or the Ancillary Documents to which it is a party, do not and will not require any consent, approval, authorization or other order of, action by, filing with or notification to any governmental authority, except as described in Schedule 5.4 attached hereto.

5.5    <u>Litigation</u>.  There are no Claims pending or, to the knowledge of Purchaser, threatened, against Purchaser which if adversely determined would result in a Lien on its assets or that may affect or seek to enjoin the transactions contemplated hereby.

5.6    <u>Brokers</u>.  No finder, broker, agent or other intermediary has acted for or on behalf of Purchaser or its Affiliates in connection with the negotiation or consummation of this Agreement, and there are no claims for any brokerage commission, finder's fee or similar payment due from Purchaser or its Affiliates.

<div align="center">ARTICLE VI<br>COVENANTS</div>

6.1    <u>Conduct of Business</u>.  Except as expressly permitted by this Agreement or with the prior written consent of Purchaser, during the period from the date hereof until the Closing Date, the Company shall conduct the Business only in the ordinary course consistent with past practice (including maintaining current advertising practices, maintaining salary levels as in effect on the date hereof and refraining from hiring additional executive-level personnel) and the Company shall use commercially reasonable efforts (subject to availability of capital to run its operations) to preserve intact its present business organization, keep available the services of its present officers, employees and independent contractors, maintain the Assets in good condition and preserve its current working conditions and relationships with customers, suppliers, creditors and business partners.

2110403v15

6.2    Bulk Transfer Laws. Purchaser hereby waives compliance by the Company with the provisions of any "bulk transfer law" of any jurisdiction in connection with the sale of the Assets to Purchaser; provided that such Purchaser shall be entitled to indemnification in connection therewith pursuant to Section 10.1.

6.3    Employees.

(a)    Purchaser shall have the option, at its sole discretion, to offer employment, effective as of the Closing Date, to any Employee; provided, however, that Purchaser shall have no obligation to offer employment to any Employee. Each Employee who accepts an offer of employment from a Purchaser, if any, is hereinafter referred to as a "Hired Employee".

(b)    It is hereby acknowledged and agreed that the Company shall have no liability of any type or nature in relation to any Hired Employee other than any such liabilities arising prior to the Closing Date and which are not subject to indemnification by Purchaser as set forth in the following sentence. Purchaser hereby agrees, to indemnify and hold harmless the Company from any payments with respect to claims for severance, bonus, accrued vacation, or other employee benefit obligations imposed upon, incurred or suffered by the Company arising out of or relating to any of Purchaser's actions with regard to any Hired Employee (including termination of employment thereof). Schedule 6.3 hereto sets forth a list of those employees to whom Purchaser intends to make offers of employment.

(c)    The Company will pay to all Hired Employees all accrued employee benefits arising under any employee Benefit Plan up to and including the Closing Date within the time required by applicable law, but in no event later than thirty (30) days from the Closing Date. In addition, the Company agrees to deliver to all Hired Employees and any benefit provider any and all notices with respect to their employment by the Company and their Benefit Plan in connection therewith, as may be required by applicable law as a result of the transactions contemplated hereby.

(d)    Effective upon the Closing Date, all Hired Employees shall cease to participate in the eRCG 401(k) Plan (the "eRCG Plan"). The Company will permit each Hired Employee who is a participant in the eRCG Plan to elect a distribution of his or her account balance in the eRCG Plan, pursuant to the provisions thereof and in accordance with ERISA.

6.4    Confidentiality; Tax Disclosure.

(a)    From and after the Closing, the Company shall, and shall use reasonable efforts to cause its Affiliates and their respective officers, directors, employees and advisors (collectively, the "Recipients") to, keep confidential any information relating to the Business, except for any such information that (i) is available to the public on the Closing Date, (ii) thereafter becomes available to the public other than as a result of a disclosure by the Company or any of the Recipients, or (iii) is or becomes available to the Company or any of the Recipients on a non-confidential basis from a source that to the Company's or such Recipient's knowledge is not prohibited from disclosing such information to the

Company or such Recipient by a legal, contractual or fiduciary obligation to any other Person; provided, that nothing contained in this Section 6.4(b) shall prohibit the Company from disclosing any information in connection with any Action by or against the Company or any of its Affiliates or any disclosure required by law by any Affiliate of the Company. Should the Company or any such Recipient be required to disclose any such information in response to a governmental order or as otherwise required by law or administrative process, it shall inform the Purchaser in writing of such request or obligation as soon as possible after the Company is informed of it and, if possible, before any information is disclosed, so that a protective order or other appropriate remedy may be obtained by the Purchaser. If the Company or such Recipient is obligated to make such disclosure, it shall only make such disclosure to the extent to which it is so obligated, but not further or otherwise. Nothing in this Agreement shall be deemed to restrict Company's Affiliate from filing an 8-K and issuing a press release with respect to the transactions contemplated hereby; provided, however, that Purchaser and Company's Affiliate shall agree on all language describing this transaction to be contained therein, such agreement not to be unreasonably withheld.

(b)     Anything herein to the contrary notwithstanding, each party hereto (and each employee, representative, or other agent of any party hereto) may disclose to any and all persons, without limitation of any kind, the Federal income tax treatment and Federal income tax structure of any and all transaction(s) contemplated herein and all materials of any kind (including opinions or other tax analyses) that are or have been provided to any party (or to any employee, representative, or other agent of any party) relating to such tax treatment or tax structure, provided, however, that this authorization of disclosure shall not apply to restrictions reasonably necessary to comply with securities laws. This authorization of disclosure is retroactively effective immediately upon commencement of the first discussions regarding the transactions contemplated herein, and the parties aver and affirm that this tax disclosure authorization has been given on a date which is no later than thirty (30) days from the first day that any party hereto (or any employee, representative, or other agent of any party hereto) first made or provided a statement as to the potential tax consequences that may result from the transactions contemplated hereby.

6.5     Notification of Certain Matters.  The Company shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to the Company, of the occurrence, or non-occurrence, of any event the occurrence or non-occurrence of which would be reasonably likely to cause the Company or any Purchaser, as the case may be, to fail to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder; provided, however, that the delivery of any notice pursuant to this Section 6.5 shall not limit or otherwise affect the remedies available hereunder to the party receiving such notice.

6.6     Access to Books and Records Following the Closing.  Following the Closing, Purchaser shall permit the Company and their authorized representatives, during normal business hours and upon reasonable notice, to have reasonable access to, and examine and make copies of, all books and records which relate to transactions or events occurring prior to the Closing or transactions or events occurring subsequent to the Closing which are related to or arise out of transactions or events occurring prior to the Closing.

- 20 -

6.7    Non-Competition; Non-Solicitation.

(a)    For the period of three (3) years commencing on the Closing Date neither the Company nor any of its Affiliates shall directly or indirectly (i) engage in public charter airline business in competition with Purchaser using the same gateways as those used by the Company as of the Closing Date or (ii) have an ownership interest in, any person, firm, corporation, association or other enterprise that is directly or indirectly engaged in conducting public charter operations using the same gateways used by the Company as of the Closing Date (the "Restricted Activity"); provided, however, that nothing contained in this Section 6.7 shall prohibit the Company or any of its Affiliates from owning, in the aggregate, (x) three percent (3%) or less of any class of capital stock or other equity interest of any company engaged in any Restricted Activity that has securities listed on a national or regional securities exchange or traded in the over-the-counter market or (y) one percent (1%) or less of any class of capital stock or other equity interest of any other business enterprise engaged in any Restricted Activity. For purposes of clarification, "using the same gateways" shall mean flying a route which has the same departure and destination cities as those of a route flown by Vacation Express. For example, the Company or its Affiliates cannot fly a route which has a Vacation Express departure city to a Vacation Express destination city. But, the Company or its Affiliates may fly a route from a Vacation Express departure city to a non-Vacation Express destination city, or from a non-Vacation Express departure city to a Vacation Express destination city, and not be in violation of this Section 6.7 In addition, the parties agree that upon the consummation of the acquisition of an online travel consolidator by the Company or any of its Affiliates, the Company and its Affiliates may sell scheduled airline service on Vacation Express' gateways, as long as Vacation Express flights receive preferential display on the Worldspan booking/distribution system or on a different global distribution system. In no event shall the Company or any of its Affiliates be permitted to work with any other charter company with respect to the provision of airline services/vacation packages using the same gateways as those used by Vacation Express without violation of this Section 6.7. In connection with the foregoing, (i) Purchaser hereby represents that the limitations set forth herein are reasonable and are properly required for the adequate protection of the Business and (ii) the Company hereby acknowledges and agrees to the foregoing.

(b)    For the period of three (3) years commencing on the Closing Date neither the Company nor any of its Affiliates shall directly or indirectly induce or attempt to induce any Hired Employee or other employee of a Purchaser to leave the employ of such Purchaser, or in any way interfere with the relationship between such Purchaser and any Hired Employee or other employee thereof.

(c)    The Company agrees that Purchaser would suffer irreparable harm from a breach by the Company or any of its Affiliates of any of the covenants or agreements contained in this Section 6.7. In the event of an alleged or threatened breach by the Company or any of its Affiliates of any of the provisions of this Section 6.7, Purchaser or its Affiliates or assigns may, in addition to all other rights and remedies existing in its favor, apply to any court of competent jurisdiction for specific performance and/or injunctive or other relief in order to enforce or prevent any violations of the provisions hereof. To the extent

- 21 -

2110403v15

of any breach of this Section 6.7 by the Company or any of its Affiliates, the noncompete period for the Company or any of its Affiliates shall automatically be extended by the length of such breach.

6.8    <u>Credit Card Processing</u>.  During the period between the date hereof and the Closing Date, the Company shall be responsible for conducting, and/or ensuring the conduct of, all credit card processing relating to the Business.

6.9    <u>Remaining Transitional Arrangement</u>.  The Company's letter of credit with respect to the Leased Realty will be returned to the Company by the landlord within thirty (30) days of Purchaser's delivery to the landlord of immediately available funds equal to the amount of US$ 105,175.

6.10    [Intentionally Omitted]

6.11    <u>Operating Account Balances</u>.  The Company will maintain sufficient available dollar account  balances in the operating account at Fidelity Bank, Account #018 000 7558 at all times to pay all checks drawn on such account by the Company or Vacation Express prior to the Closing.

6.12    <u>FS SunTours Credit</u>.  Purchaser's Affiliate shall give FS SunTours a one year, non-assignable, 25% credit per invoice (inclusive of all marketing and advertising deductions), up to a maximum amount of Six Hundred Thousand Dollars (US$ 600,000.00).  Purchaser's Affiliate shall charge FS SunTours rates no less favorable than those charged to other third parties.

6.13    <u>FS SunTours Amounts Forgiven</u>.  Purchaser's Affiliates shall forgive and release FS SunTours from any and all amounts due to Purchaser's Affiliates from FS SunTours relating to arrivals up to and including November 21, 2004.  The amount forgiven hereunder is $381,907.

6.14    <u>FS SunTours Prepayments</u>.  After the Closing Date FS SunTours will prepay all arrangements and business with Purchaser, d/b/a Vacation Express and its Affiliates.

## ARTICLE VII
## CONDITIONS PRECEDENT TO PURCHASER'S OBLIGATIONS

The obligations of Purchaser to consummate or cause the consummation of the transactions contemplated by this Agreement are subject to the satisfaction of the following conditions on or before the Closing Date, unless specifically waived in writing by Purchaser prior to the Closing Date:

7.1    <u>Representations and Warranties</u>.  The representations and warranties of the Company contained in this Agreement shall have been true and correct in all material respects on the date of this Agreement and shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, except in the case of those that speak of a specific date, which shall be true and correct in all material respects on and as of such date.

2110403v15

7.2    <u>Compliance with Covenants</u>.  The Company shall have duly performed and complied or caused the performance or compliance with in all material respects all covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing.

7.3    <u>Absence of Litigation</u>.  No action or proceeding shall be pending by or before any court or other governmental body or agency seeking to restrain, prohibit or invalidate the transactions contemplated by this Agreement or which would adversely affect the right of the Purchaser to own, operate or control the Assets or any portion thereof after the Closing Date.

7.4    <u>Due Diligence</u>.  The results of Purchaser's due diligence shall be satisfactory to it in its sole and absolute discretion.

7.5    <u>FS SunTours Payable</u>.  FS SunTours shall have paid in full to Purchaser's Affiliates, any and all sums due and owing to them for all arrivals from and including November 22, 2004 up to and including the Closing Date (the "FS Suntours Payment") on or before the Closing.

7.6    <u>Termination of DBA Certificates.</u>  The Company shall deliver to Purchaser executed documents sufficient under applicable law or regulations to terminate any and all DBA Certificates, and change the name on any business or other authorization, currently under or using the name 'Vacation Express.'

7.7    <u>Permits</u>.  Purchaser shall have obtained any and all Permits in its name necessary to run the Business to the extent the Company's Permits are not assignable.

7.8    <u>Company's Affiliate Guarantee</u>.  The Company shall have delivered to Purchaser a letter, on terms reasonably acceptable to Purchaser, from Company's Affiliate guaranteeing all of the Company's or any of its Affiliates payment and performance obligations arising hereunder, all as set forth therein.

7.9    <u>Transitional Arrangements</u>.  The Company shall deliver (a) the written consent by National City Bank of the Midwest to the assignment of all of the Company's right, title and interest in, to and under the deposit/letter of credit and Security Agreement number 272 to Purchaser; (b) Fidelity Bank's written acceptance of, and consent to, the assignment of all of the applicant's right, title and interest in, to and under the deposit/letter of credit with Airline Reporting Corporation ("ARC"); (c) Fidelity Bank's written consent to the assignment of all of the Company's right, title and interest (as applicant) in, to and under the letter of credit issued for the benefit of Delta Airlines, to the Purchaser.

7.10    <u>Ancillary Documents</u>.  The parties thereto (other than persons under the control of Purchaser) shall have executed and delivered all of the Ancillary Documents, including those contemplated to be delivered pursuant to Section 9.2.

## ARTICLE VIII
## CONDITIONS PRECEDENT TO THE COMPANY'S OBLIGATIONS

The obligations of the Company to consummate or cause the consummation of the transactions contemplated by this Agreement are subject to the satisfaction of each of the following conditions on or before the Closing Date, unless specifically waived in writing by the Company prior to the Closing:

8.1    <u>Representations and Warranties</u>.  The representations and warranties of Purchaser contained in this Agreement shall have been true and correct in all material respects on the date of this Agreement, and shall be true and correct in all material respects on the Closing Date as though made on and as of the Closing Date, except in the case of those that speak of a specific date, which shall be true and correct in all material respects on and as of such date.

8.2    <u>Compliance with Covenants</u>.  Purchaser shall have duly performed and complied or caused the performance and compliance in all material respects with all covenants, agreements and obligations required by this Agreement to be performed or complied with by it on or prior to the Closing.

8.3    <u>Absence of Litigation</u>.  No action or proceeding shall be pending by or before any court or other governmental body or agency seeking to restrain, prohibit or invalidate the transactions contemplated by this Agreement.

8.4    <u>Purchaser Affiliate Guarantee</u>.  Purchaser shall deliver to the Company and RCG a letter, on terms reasonably acceptable to the Company, from Purchaser's Affiliate guaranteeing all of Purchaser's payment and performance obligations arising hereunder.

8.5    <u>Ancillary Agreements</u>.  The parties thereto (other than persons under the control of the Company) shall have executed and delivered the Ancillary Documents, including those contemplated to be delivered pursuant to Section 9.3.

## ARTICLE IX
## CLOSING

9.1    <u>Closing</u>.  The closing of the sale of the Assets (the "Closing") shall take place at the offices of Curtis, Mallet-Prevost, Colt & Mosle LLP, 101 Park Avenue, New York, New York, or such other place as may be mutually agreed upon by the parties hereto.  The date of the Closing is referred to as the "Closing Date."

9.2    <u>Deliveries by Seller</u>.  At the Closing, the Company shall deliver or cause to be delivered to Purchaser the following:

(a)    A certificate of an authorized officer of the Company confirming the satisfaction of the conditions set forth in Sections 7.1 and 7.2 hereof.

(b)    A copy of all corporate resolutions authorizing the execution, delivery and performance by the Company and RCG of this Agreement and such other agreements as may be executed and delivered by the Company pursuant to this Agreement, and the

- 24 -

consummation of the transactions contemplated herein and therein, accompanied by the certification of an authorized representative of each of the Company and RCG to the effect that such resolutions are in full force and effect and have not been amended, modified or rescinded.

(c)     Good standing certificates from the Secretary of State of Delaware for the Company and RCG.

(d)     Bill of sale and assignment of the Assets executed by the Company in favor of Purchaser (the "Bill of Sale"), in the form annexed here to as Exhibit B.

(e)     Assignment and assumption of the Lease and such other documents and instruments (including, without limitation, an estoppel certificate and a consent of the Landlord, each executed by the landlord of the Leased Realty) as may reasonably be requested by Purchaser for the assignment by the Company to Purchaser of the Leased Realty, mutually agreed between Purchaser and the Company (the "Lease Assignments").

(f)     Assignments for the assignment by the Company to Purchaser of the Business Intellectual Property (the "Intellectual Property Assignments"), in the form annexed hereto as Exhibit D.

(g)     An opinion of legal counsel of the Company and RCG satisfactory to Purchaser, in the form annexed hereto as Exhibit E.

(h)     RCG will obtain and deliver to Purchaser releases from MyTravel USA Holdings, Inc. ("My Travel"), Pace Airlines, Inc., and K. Wesley M. Jones, Sr., Greg Currie, and FiveOaks Capital Partners, LLC, in favor of Purchaser and its Affiliates, substantially in the form of Exhibit H (i), (ii) and (iii) hereto.

(i)     A copy of the consent of MyTravel to the assignment of all right, title and interest in, to and under any indemnification rights of the Company arising under and with respect to the 2003 Asset Purchase Agreement.

(j)     Proof of the FS SunTours Payment.

(k)     Purchaser, Flightserv and FS SunTours shall have entered into mutually acceptable letter agreements with respect to the division of the Solarcom LLC Equipment Leases with Flightserv and the MCI Services Agreement dated August 27, 2004 between MCI WORLDCOM Communications, Inc. and Flightserv.

(l)     Such other documents, instruments or agreements as may be reasonably requested by Purchaser, including, without limitation, copies of all third party consents to the transfer and assignment of the Assets, the Permits and the Assumed Contracts.

9.3     <u>Deliveries by Purchaser</u>. At the Closing, Purchaser will deliver or cause to be delivered to the Company (except as otherwise noted in (j) below) the following:

(a)     A certificate of an authorized officer of Purchaser confirming the satisfaction of the conditions set forth in Sections 8.1 and 8.2 hereof.

(b)      A copy of all corporate resolutions authorizing the execution, delivery and performance by Purchaser of this Agreement and the Ancillary Documents to which it is a party and the consummation of the transactions contemplated herein and therein, accompanied by the certification of an authorized officer of Purchaser to the effect that such resolutions are in full force and effect and have not been amended, modified or rescinded.

(c)      US$ 200,000, by wire transfer of immediately available funds, representing the amount of the Company's deposit/letter of credit with National City Bank of the Midwest under the DOT Security Agreement Number 272 for Charter Operator in the name of FS Tours, Inc. *d/b/a* Vacation Express..

(d)      US$ 73,500, by wire transfer of immediately available funds, representing an amount equal to the Company's deposit/letter of credit with ARC.

(e)      US$ 10,000, by wire transfer of immediately available funds, representing the amount of the letter of credit to Delta Airlines.

(f)      An assignment and assumption agreement (the "Assumption Agreement") for the Assumed Liabilities, in the form annexed hereto as Exhibit F.

(g)      The Bill of Sale, Lease Assignments, Intellectual Property Assignments, executed by Purchaser.

(h)      An opinion of legal counsel to Purchaser, in the form annexed hereto as Exhibit G.

(i)      A good standing certificate from the Secretary of State of Delaware for Purchaser.

(j)      Purchaser shall deliver to the landlord of the Leased Realty immediately available funds in the amount of US$ 105,175.

(k)      Purchaser, Flightserv and FS SunTours shall have entered into mutually acceptable letter agreements with respect to the division of the Solarcom LLC Equipment Leases with Flightserv and the MCI Services Agreement dated August 27, 2004 between MCI WORLDCOM Communications, Inc. and Flightserv.

(l)      Such other documents, instruments or agreements as may be reasonably requested by the Company.

9.4      Transfer Costs.  The Company and Purchaser shall share equally (a) any fees and disbursements in connection with the transfer of the Assets as provided in Section 2.1, and (b) all property transfer taxes, including, without limitation, conveyance, sales, use and stamp taxes and any recording, registration, and other fees, which become payable in connection with the Closing of the transactions contemplated by this Agreement.

9.5      Further Assurances.  The parties hereto will, at any time on or after the Closing Date, take any and all steps reasonably requested by the other party to confirm title to Purchaser of the Assets (or any portion thereof), and will do, execute, acknowledge and deliver all such

further acts, deeds, conveyances, powers of attorney and assurances as may be required for the more effective transfer to Purchaser, or its successors or assigns, of any of the Assets and to consummate the transactions contemplated hereby.

## ARTICLE X
## INDEMNIFICATION

10.1    <u>Indemnification by the Company</u>.  From and after the Closing Date, the Company will indemnify, defend and hold harmless Purchaser and its officers, directors and Affiliates from, against, and with respect to any and all action or cause of action, loss, damage, claim, obligation, liability, penalty, fine, cost and expense (including, without limitation, reasonable attorneys' and consultants' fees and costs and expenses incurred in investigating, preparing, defending against or prosecuting any litigation, claim, proceeding, demand or request for action by any governmental or administrative entity), of any kind or character (a "Loss") arising out of or in connection with any of the following:

(a)    any breach of any of the representations or warranties, covenants or agreements of the Company contained in or made pursuant to this Agreement or any Ancillary Document;

(b)    any Excluded Liability; and

(c)    any claim made against Purchaser by any creditor of, or claimant against the Company as a result of the waiver granted pursuant to Section 6.2.

10.2    <u>Indemnification by Purchaser</u>.  From and after the Closing Date, Purchaser will indemnify, defend and hold harmless the Company and each of their officers, directors and Affiliates from, against and with respect to any Loss arising out of or in connection with any of the following:

(a)    any breach of any of the representations and warranties, covenant or agreement of Purchaser contained in or made pursuant to this Agreement or any Ancillary Document; and

(b)    the Assumed Liabilities.

10.3    <u>Indemnification Threshold</u>.  Neither party will be entitled to indemnification under Section 10.1(a) or Section 10.2(a) hereof until such party has sustained aggregate Losses under such Sections in excess of Fifty Thousand Dollars (US$50,000.00) (the "Threshold").  If either party suffers indemnifiable Losses in excess of the Threshold, such party will be entitled to indemnification hereunder with respect to the aggregate amount of all such indemnifiable Losses in excess of the Threshold.  Furthermore, payments by the Indemnifying Party shall be reduced by the amount of any insurance proceeds paid to the Indemnified Party with respect to such Losses.

10.4    <u>Time Limits on Indemnification</u>.  Neither party will have liability to the other party for indemnification under Section 10.1(a) (other than in connection with Losses with respect to breaches of the representations and warranties contained in Section 4.6 hereto (unless

- 27 -

notice of loss is given by the Indemnified Party within three (3) years of Closing)) or Section 10.2(a), unless notice of the Loss is given by the Indemnified Party to the Indemnifying Party within eighteen (18) months of the Closing Date.

10.5    Notice of Third Party Claim. A party that may be entitled to be indemnified pursuant to Section 10.1 or 10.2 (the "Indemnified Party") shall promptly notify the other party (the "Indemnifying Party") in writing within fifteen (15) days of notice of any pending or threatened claim or demand asserted by a third party which the Indemnified Party has determined has given or could give rise to a right of indemnification under this Agreement ("Third Party Claims") against the Indemnified Party, describing in reasonable detail the facts and circumstances with respect to the subject matter of such claim or demand; *provided, however,* that the failure to provide such notice shall not release the Indemnifying Party from any of its obligations under this Article X except to the extent the Indemnifying Party is materially prejudiced by such failure. Subject to the Indemnifying Party's right to defend in good faith Third Party Claims as hereinafter provided, the Indemnifying Party shall satisfy or contest its obligations under this Article X within fifteen (15) days after the receipt of written notice thereof from the Indemnified Party. If the Indemnifying Party acknowledges in writing its obligation to indemnify the Indemnified Party hereunder against any Losses that may result from a Third Party Claim, then the Indemnifying Party shall be entitled to assume and control the defense of such Third Party Claim at its expense and through counsel of its choice if it gives notice of its intention to do so to the Indemnified Party within fifteen (15) days of the receipt of such notice from the Indemnified Party; *provided, however,* that the Indemnified Party may participate in such defense and retain separate counsel at its own cost and expense, without prejudice to the rights of the parties to control the defense of their respective interests. In the event the Indemnifying Party exercises the right to undertake any such defense against any such Third Party Claim as provided above, the Indemnified Party shall cooperate with the Indemnifying Party in such defense and make available to the Indemnifying Party, at the Indemnifying Party's expense, all witnesses, pertinent records, materials and information in the Indemnified Party's possession or under the Indemnified Party's control relating thereto as is reasonably required by the Indemnifying Party. Similarly, in the event the Indemnified Party is, directly or indirectly, conducting the defense against any such Third Party Claim, the Indemnifying Party shall cooperate with the Indemnified Party in such defense and make available to the Indemnified Party, at the Indemnifying Party's expense, all such witnesses, records, materials and information in the Indemnifying Party's possession or under the Indemnifying Party's control relating thereto as is reasonably required by the Indemnified Party. No such Third Party Claim may be settled by the Indemnifying Party without the written consent of the Indemnified Party (which consent shall not be unreasonably withheld); provided, however that any such settlement shall in all cases release the Indemnified Party from all liability with respect thereto.

10.6    Claims between Purchaser and the Company. Purchaser and the Company shall attempt to resolve between themselves any claims for indemnification hereunder not a result of a Third Party Claim. The notification provisions of Section 10.5 shall also apply to claims between Purchaser and the Company. Any disputes not resolved within ninety (90) days of notice shall be settled by arbitration as provided in Section 12.6.

10.7    Dollar Limit on Indemnification by Purchaser and the Company. Notwithstanding anything to the contrary contained in this Agreement, the maximum aggregate

amount of indemnifiable Losses which may be recovered (a) from the Company or its Affiliates by Purchaser and its Affiliates arising out of or resulting from the causes enumerated in Section 10.1(a) (with the exception of any Losses relating to or arising from the breach of any representation or warranty contained in Section 4.1, 4.2, 4.3 and 4.6, or with respect to an indemnity pursuant to Sections 10.1(b) or (c)), or (b) from Purchaser or its Affiliates by the Company and its Affiliates arising out of or resulting from the causes enumerated in Section 10.2(a) (with the exception of any Losses relating to or arising from the breach of any representation or warranty contained in Section 5.1, 5.2 and 5.3 or with respect to an indemnity pursuant to Section 10.1(b)), shall in either case be an amount equal to One Million Dollars (US$1,000,000).

10.8    _Exclusive Remedy_.  Except as otherwise expressly provided herein, or in the case of any intentional default, the provisions of this Article X shall be the exclusive remedy of the parties hereto with respect to any Loss covered hereby.

10.9    _Limitation on Damages_.  The Losses covered by this Article X shall be limited to the direct and indirect out-of-pocket costs of the Indemnified Party.

<div align="center">ARTICLE XI<br>TERMINATION</div>

11.1    _Termination_.  This Agreement may be terminated at any time prior to the Closing:

(a)    By the mutual written consent of Purchaser and the Company;

(b)    By the Company (if the Company is not then in breach of any term of this Agreement), if Purchaser (i) fails to perform in any material respect its agreements contained herein required to be performed on or prior to the Closing Date, or (ii) materially breaches any of its representations or warranties contained herein, which failure or breach is not cured within ten (10) days after the Company has notified Purchaser of its intent to terminate this Agreement pursuant to this subparagraph; or (iii) the conditions precedent to the Company's obligations have not been met;

(c)    By Purchaser (if Purchaser is not then in breach of any term of this Agreement), if the Company (i) fails to perform in any material respect its agreements contained herein required to be performed on or prior to the Closing Date, or (ii) materially breaches any of its representations or warranties contained herein , which failure or breach is not cured within ten (10) days after Purchaser has notified the Company of its intent to terminate this Agreement pursuant to this subparagraph; or (iii) the conditions precedent to Purchaser's obligations have not been met;

(d)    By either the Company or Purchaser, if there is any order, writ, injunction or decree of any court or governmental or regulatory agency binding on Seller or Century which prohibits or restrains Purchaser or the Company from consummating the transactions contemplated hereby;

(e)    By either party if the Closing has not occurred by the later of (i) thirty (30) days after the date hereof, or (ii) December 15, 2004; or

2110403v15

(f)     By Purchaser pursuant to Section 12.15.

11.2    Effect on Obligations.  Termination of this Agreement pursuant to this Article shall terminate all obligations of the parties hereunder, except for the obligations under Sections 12.1 (with respect to expenses) and 12.2 (with respect to publicity); *provided*, *however*, that termination pursuant to Sections 11.1(b) or (c) will not relieve the defaulting or breaching party from any liability to any other party hereto, in the case of fraud or an intentional default of the defaulting party.

## ARTICLE XII
## MISCELLANEOUS

12.1    Expenses.  Each party shall bear its own fees, costs and expenses incurred in connection with the transactions contemplated hereby.

12.2    Publicity.  Except as may be required by law or stock exchange rules, no party to this Agreement shall make, or cause to be made, any press release or public announcement in respect of this Agreement or the transactions contemplated hereby or otherwise communicate with any news media without the prior written consent of the other party, and the parties shall cooperate as to the timing and contents of any such press release or public announcement. Notwithstanding the foregoing, where an announcement is required by law or stock exchange rules, the party required to make such an announcement shall notify the other party of such requirement (and provide a copy of such announcement to the other party) as soon as practicable in advance of such announcement and, to the extent practical, take the views of the other party in respect of such announcement into account prior to making such announcement.

12.3    Best Efforts.  Each party hereto agrees to use its best efforts to satisfy the conditions to the Closing set forth in this Agreement and otherwise to consummate the transactions contemplated by this Agreement.

12.4    Notices.  All notices, demands and other communications made hereunder will be in writing and shall be given either by personal delivery, by nationally recognized overnight courier (with charges prepaid) or by telecopy (with telephone confirmation), and will be deemed to have been given or made when personally delivered, the day following the date deposited with such overnight courier service or when transmitted to telecopy machine and confirmed by telephone, addressed to the respective parties at the following addresses (or such other address for a party as shall be specified by like notice):

If to the Company:

FS Tours, Inc.
c/o RCG Companies Incorporated
6836 Morrison Road
Suite 200
Charlotte, NC  28211
Attention: Michael Pruitt
Facsimile No.: (704) 366-5056.

2110403v15                                        - 30 -

If to Purchaser:

Vacation Acquisition, LLC
c/o Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178
Attention: William L. Bricker, Jr.
Facsimile No.: (212) 697-1559

    12.5   Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, applicable to contracts executed in and to be performed entirely within that state.

    12.6   Dispute Resolution. Any controversy or claim arising out of or relating to this Agreement, or any breach thereof, shall be settled by arbitration administered by the American Arbitration Association ("AAA") in New York City under the AAA Commercial Arbitration Rules. The panel of arbitrators shall consist of three arbitrators. Each party shall select one arbitrator and the two selected arbitrators shall select a third to complete the panel. Judgment on the award rendered by the arbitrators may be entered in any court having jurisdiction thereof. The determination of the arbitrators shall be final and binding on the parties.

    12.7   Counterparts. This Agreement may be executed in one or more original or facsimile counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

    12.8   Assignment. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. Neither this Agreement nor any of the rights, interest or obligations hereunder may be assigned by any of the parties hereto without the prior written consent of all other parties hereto, and any purported assignment without such consent shall be void.

    12.9   Third Party Beneficiaries. None of the provisions of this Agreement or any document contemplated hereby is intended to grant any right or benefit to any person or entity which is not a party to this Agreement.

    12.10   Headings. The Article and Section headings contained in this Agreement are solely for the purpose of reference, are not part of this Agreement and shall not in any way affect the meaning or interpretation of this Agreement.

    12.11   Amendments. Any waiver, amendment, modification or supplement of or to any term or condition of this Agreement will be effective only if in writing and signed by all parties hereto and the parties hereto waive the right to amend the provisions of this Section orally.

    12.12   Specific Performance. The Company acknowledges that each of the Assets is unique and that if the Company fails to consummate the transactions contemplated by this Agreement such failure will cause irreparable harm to Purchaser for which there will be no adequate remedy at law. Purchaser shall be entitled, in addition to its other remedies pursuant to

2110403v15

Article X hereof, to specific performance of this Agreement if the Company will, without cause, refuse to consummate the transactions contemplated by this Agreement.

12.13  <u>Severability</u>.  In the event that any provision in this Agreement shall be determined to be invalid, illegal or unenforceable in any respect, the remaining provisions of this Agreement will not be in any way impaired, and the illegal, invalid or unenforceable provision shall be fully severed from this Agreement and there will be automatically added in lieu thereof a provision as similar in terms and intent to such severed provision as may be legal, valid and enforceable.

12.14  <u>Entire Agreement</u>.  This Agreement, the Ancillary Documents and the Schedules and Exhibits hereto constitute the entire contract between the parties hereto pertaining to the subject matter hereof, and supersede all prior and contemporaneous agreements and understandings between the parties with respect to such subject matter.

12.15  <u>Representations and Warranties Exclusive</u>.  The representations, warranties, covenants and agreements set forth in this Agreement and the Ancillary Documents (including all of the Schedules and Exhibits hereto and thereto) constitute all of the representations, warranties, covenants and agreements of the parties hereto and their respective shareholders, directors, officers, employees, affiliates, advisors (including financial, legal, and accounting advisors), agents and representatives and upon which the parties have relied.  The parties expressly disclaim any implied warranties.  In particular, and without limiting the generality of the foregoing, the Purchaser acknowledges and agrees that except as expressly contemplated hereby, in making its decision to purchase the Acquired Assets and assume the Assumed Liabilities, except to the extent set forth herein or in the Ancillary Documents (including all of the Schedules and Exhibits hereto and thereto), it is not relying on (a) any information set forth in any information distributed in connection with the proposed sale of the Acquired Assets or the Business or the assumption Assumed Liabilities, (b) any information or materials, oral or written, distributed or made available to the Purchaser prior to the date hereof other than matters set forth in this Agreement, including the Exhibits and Schedules hereto or any Ancillary Document, or (c) any financial projection, forecast or business plan relating to the Business.  To the extent an event or occurrence makes the Schedules not true and accurate at any time prior to Closing, the Company shall update such Schedules and deliver them to Purchaser prior to Closing.

12.16  <u>Disclosure Schedules</u>.  Disclosure of any matter in any of the Schedules hereto shall not constitute an expression of a view that such matter is material or is required to be disclosed pursuant to this Agreement.  To the extent that any representation or warranty in Article IV of this Agreement is qualified by materiality or "Material Adverse Effect," the inclusion of any matter in any Schedule in Article IV of this Agreement does not constitute a determination by the Company that any such matter is material.

<center>[SIGNATURE PAGE FOLLOWS]</center>

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be signed by its duly authorized officer or representative as of the date first above written.

**FS Tours, Inc.**

By: _____

Name: Michael D. Pruitt
Title: CEO

**Vacation Acquisition, LLC**

By: _____

Name:
Title:

IN WITNESS WHEREOF, each of the parties hereto has caused this Agreement to be signed by its duly authorized officer or representative as of the date first above written.

FS Tours, Inc.

By: _____
Name:
Title:

Vacation Acquisition, LLC

By: _____
Name: René JONGMANS
Title: President

2110403v15

# Exhibit 4

# Asset Purchase Agreement Schedules produced by Vacation Acquisition, LLC

# DISCLOSURE SCHEDULES

## TO

## ASSET PURCHASE AGREEMENT

## BY AND AMONG

## VACATION ACQUISITION, LLC

## AND

## FS TOURS, INC.

## DATED AS OF

## DECEMBER 9, 2004

Pursuant to that certain Asset Purchase Agreement dated December 9, 2004 (the "*Agreement*") between Vacation Acquisition, LLC, a Delaware limited liability company (the "*Purchaser*") and FS Tours, Inc., a Delaware Corporation (the "*Company*"), the Company provides the following Disclosure Schedules. Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Agreement. Section references are to sections in the Agreement pursuant to which the information is being disclosed. Any item disclosed in one Disclosure Schedule shall be deemed disclosed for purposes of any other Disclosure Schedule to which it is applicable, even if it is not listed in such Disclosure Schedule.

The information provided herein is being provided solely for the purpose of making disclosures under the Agreement. In disclosing this information, neither party waives any attorney-client privilege associated with such information or any protection afforded by the work-product doctrine with respect to any of the matters disclosed or discussed herein.

The inclusion of any item in the Disclosure Schedules does not constitute a representation by the Company that such items are material to the Company nor is such inclusion an admission of liability to any party.

In accordance with the Agreement, the Company hereby provides the information hereinafter set forth.

## Schedule 2.2(a)(ii)

## Leases Transferred

1.     Purchaser's rights and obligations arising under that certain letter agreement dated December 9, 2004, by and among Flightserv, the Company, FS SunTours and Purchaser regarding the allocation of rights and obligations arising under the Solarcom LLC Equipment Leases with Flightserv for equipment used by the Company, Flightserv and FS SunTours.

2.     Purchaser's rights and obligations arising under that certain letter agreement dated December 9, 2004, by and among Flightserv, the Company, FS SunTours and Purchaser regarding the allocation of rights and obligations arising under the MCI Service Agreement dated August 27, 2004 between MCI WORLDCOM Communications, Inc. and Flightserv.

3.     AT&T month to month agreement with the Company for the provision of long distance service.

4.     Photocopiers of the Company, Xenographic in favor of CitiCorp ($525/mo) and Atlanta Office Systems in favor of CitiCapital ($360/mo).

5.     Pitney Bowes Postage Meter/Mailing Machine ($630/mo).

6.     Pitney Bowes Postage Meter ($120.50/mo).

7.     Xenographic Fax machine with GE Capital ($255/mo).

## Schedule 2.2(a)(iii)

### Transferred Contracts

1. Lease dated April 22, 2004 between GA-Perimeter Center, L.L.C. and Flightserv.

2. Delta Air Lines, Inc. Leisure Sales Program bulk ticketing contracts, dated July 18, 2003, April 30, 2002 and July 24, 2003.

3. Aeromexico contract dated March 1, 2004.

4. Air Jamaica contract dated April 1, 2004.

5. All travel liabilities associated with the travel related funds deposited in the escrow accounts assigned and transferred to Purchaser pursuant to the Agreement and constituting part of the Assets.

6. See leases listed on Schedule 2.2(a)(ii).

7. All In-Service Agreement between Flightserv and the Company dated November 30, 2004.

**Schedule 2.2(b)(iv)**
**Excluded Contracts**

All agreements with My Travel Canada Holidays, Inc. entered into in connection with the 2003 Asset Purchase Agreement, including, (i) Purchase Agreement Supplement dated October 31, 2003 between MyTravel Canada Holidays Inc., Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc. for hotel purchasing services, as amended by that certain Amendment Agreement dated November 4, 2004 among MyTravel Canada Holidays Inc., VE Holdings, Inc., SunTrips, Inc., RCG Companies Incorporated Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc. Provided, however, Purchaser shall be entitled to an assignment of indemnification rights from MyTravel as set forth in that certain consent to the assignment of indemnification rights arising under the 2003 Asset Purchase Agreement delivered by the Company at Closing; and (ii) Promissory Note executed and delivered by Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc. in favor of VE Holdings, Inc. and SunTrips, Inc. as amended by that certain Amendment Agreement dated November 4, 2004 among MyTravel Canada Holidays Inc., VE Holdings, Inc., SunTrips, Inc., RCG Companies Incorporated Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc.

Co-charter Supplementary Agreement, dated as of August 15, 2001, among Flightserv.com, Inc., V.E. Holdings, Inc. and Pace Airlines, Inc.

Indirect Charter Agreement No. VE0007, dated November 30, 2001, between Flightserv.com, Inc. and VE Holdings, Inc. d/b/a Vacation Express

Aircraft-Charter A.C.M.I. Agreement dated August 15, 2001 between Flightserv.com and Pace Airlines, Inc.

Employment Agreement with Robert Gantt Cookson dated April 1, 2000

Employment Letter with Dennis P. Werner.

Solarcom Leases except as otherwise set forth in the Asset Purchase Agreement and any Ancillary Agreements related thereto.

Letter of Credit Agreement dated March 1, 2004 among RCG Companies Incorporated, Flightserv, Inc., FS Tours, Inc., FS SunTours, Inc., FiveOaks Capital Partners, Inc. and four individual investors thereto, as amended on November 9, 2004.

## Schedule 2.2(b)(ix)

### Transitory Arrangements

See Schedule 4.14(c).

## Schedule 2.3

### Assumed Liabilities

1.      Liabilities arising under those leases transferred to Purchaser and listed on Schedule 2.2(a)(ii).

2.      Liabilities arising under those Contracts assigned and assumed by Purchaser and any other matters, in each case, as expressly listed on Schedule 2.2(iii).

3.      Trade Accounts Payable in the amount of Eight Million Dollars (US$ 8,000,000.00) with respect to the liabilities set forth on Annex A hereto; provided, however, that Purchaser shall have the right to settle any such trade payable and any resulting reduction shall inure to the benefit of Purchaser.

4.      Liabilities for Hired Employees arising from and after the Closing Date, subject to Section 6.3(b) of the Agreement Closing Date.

Annex A

## Assumed Payables

| | Actual | Assumed Amount |
|---|---|---|
| CC Processing Fee | $ 65,000.00 | $ 65,000.00 |
| Newspaper - Orlando | $ 99,000.00 | $ 99,000.00 |
| Newspaper - Oct | $ 60,000.00 | $ 60,000.00 |
| Newspaper - November | $ 43,000.00 | $ 43,000.00 |
| Payroll | $ 118,000.00 | $ 118,000.00 |
| Bonus Obligation | $ 8,251.00 | $ 8,251.00 |
| Commission Expense | $ - | $ - |
| Capital Lease | $ 91,962.00 | $ 91,762.00 |
| Aviation Taxes | $ 506,737.00 | $ 350,675.00 |
| Penalty Protection G/C | $ 935,375.00 | $ 935,375.00 |
| Total Operating | $1,927,325.00 | $ 1,771,063.00 |
| | | |
| Hotel Payables | | |
| Riu | $2,515,407.00 | $ 1,886,555.00 |
| Palace | $1,865,164.00 | $ 1,865,164.00 |
| Allegro / Occidental | $ 308,047.00 | $ 246,437.00 |
| Reals | $ 298,674.00 | $ 238,939.00 |
| Oasis | $ 293,697.00 | $ 234,957.00 |
| Melia / Paradisus | $ 546,252.00 | $ 417,001.00 |
| | | |
| Total Large Chains | $5,827,241.00 | $ 4,889,053.00 |
| | | |
| Total Other Hotels[1] | $1,794,009.00 | $ 1,339,884.00 |
| | | |
| Total Hotels | $7,621,250.00 | $ 6,228,937.00 |
| | | |
| Grand Total | $9,548,575.00 | $ 8,000,000.00 |

(1) The total amount set forth under the category Total Other Hotels represents the same % for each other hotel of the amount owed to each hotel to which there is a payable outstanding. Attached hereto is a list of all hotels and the actual amounts payable to each. "Other Hotels" represent the hotels listed thereon which are not separately mentioned above.

Vacation Express
Hotel Contingents by Hotel, by Month
As of 12/00/04

| HOTEL CODE | HOTEL NAME | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Total | In-House Invoicing AP | Gross Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

HOTEL CONTINGENTS

Summary of Largest Hotels

Grand Total

Vacation Expense
Hotel Costs by Hotel, by Month
As of 12/05/04

| HOTEL CODE | HOTEL NAME | Mar-04 | Apr-04 | May-04 | Jun-04 | Jul-04 | HOTEL CONTINGENCIES Aug-04 | Sep-04 | Oct-04 | Nov-04 | Dec-04 | Total | In-House Invoicing AP | Gross Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|



Vacation Express
Hotel Contingencies by Hotel, by Month
As of 12/03/04

**Schedule 4.3**
**No Conflict or Breach**

Schedule 4.11 is incorporated herein by reference.

**Schedule 4.4**
**Governmental Consents and Approvals**

None.

**Schedule 4.5**

**Litigation**

1.  Consent Order, docket # OST-2002-12273, issued October 22, 2002 by the US Department of Transportation affecting MyTravel North America.

2.  Consent Order, issued in June 2001 by the US Department of Transportation affecting Vacation Express Holdings, Inc.

3.  DOT Aviation Enforcement correspondence regarding late booking fee.

**Schedule 4.6**

**Title to Assets**

The trademarks "Vacation Express" and "Exotic Escapes" are owned by FS SunTours, Inc. and will be assigned at Closing.

K. Wesley M. Jones, Sr. and Greg Currie have a security interest in the Company's deposit account with Fidelity Bank, Account Number 120007893 which is not an Asset under the Agreement.

Photocopiers of FS Tours, Inc., Xenographic in favor of CitiCorp ($525/mo) and Atlanta Office Systems in favor of CitiCapital ($360/mo)

Pitney Bowes Postage Meter/Mailing Machine ($630/month)

Pitney Bowes Postage Meter ($120.50/mo)

Xenographic Fax Machine with GE Capital ($255/mo)

Liens of Solarcom LLC pursuant to Equipment Leases with Flightserv, Inc. for equipment used by the Company, Flightserv, Inc. and FS SunTours, Inc.

**Schedule 4.8**

**Tax Matters**

None.

**Schedule 4.9(a)**

**Financial Statements**

None.

**Schedule 4.9(b)**

**Financial Statements, Undisclosed Liabilities**


The Company needs significant capital in order to keep operating.
Cancellation of Punta Cana as a destination on September 17, 2004

**Schedule 4.10**

**Receivables**

None.

## Schedule 4.11

## Consents and Approvals

1. Release of Pace Airlines, Inc.
2. Office Lease dated April 22, 2004 between GA-Perimeter Center, L.L.C. and Flightserv,Inc.
3. Consent of Solarcom LLC to assignment of Equipment Leases to extent assumed by Purchaser as set forth in the Asset Purchase Agreement and any Ancillary Agreements related thereto
4. Consent of MCI to assignment of Services Agreement to extent assumed by Purchaser as set forth in the Asset Purchase Agreement and any Ancillary Agreements related thereto. Purchaser must meet MCI's creditworthiness standards in order for assignment of MCI Services Agreement dated August 27, 2004 between MCI WORLDCOM Communications, Inc. and Flightserv, Inc. to be effective.
5. Airline Reporting Corporation No. 11-535731-1 in the name VE Holdings, Inc.
6. Release of My Travel Canada Holidays, Inc.
7. Release of FiveOaks Capital, K. Wesley M. Jones, Sr and Greg Currie

## Schedule 4.12

### Permits/Compliance with Laws

3.    DOT Aviation Enforcement correspondence regarding late booking fee.

**Schedule 4.13**
**Employee Benefit Plans; ERISA**

- Group Medical
- Group Dental
- Travelers Life and Annuity 401(k) Plan (RCG)
- Life/AD&D
- Business Travel Insurance (AIG International)
- Employee Assistance Plan
- Supplemental Life
- Vision Care
- STD
- LTD
- FS Tours, Inc. Severance Pay Plan (reflecting current practice - 1 week/yr of service - min.2, max. 8)
- Employment Agreement with Robert Gantt Cookson dated April 1, 2000 (providing severance pay benefits) and Employment Letter with Dennis P. Werner

## Schedule 4.14(a)

## Material Contracts

1.    Co-charter Supplementary Agreement, dated as of August 15, 2001, among Flightserv.com, Inc., V.E. Holdings, Inc. and Pace Airlines, Inc.

2.    Indirect Charter Agreement No. VE0007, dated November 30, 2001, between Flightserv.com, Inc. and VE Holdings, Inc. d/b/a Vacation Express

3.    Aircraft-Charter A.C.M.I. Agreement dated August 15, 2001 between Flightserv.com and Pace Airlines, Inc.

4.    Lease dated April 22, 2004 between GA-Perimeter Center, L.L.C. and Flightserv,Inc.

5.    Delta Air Lines, Inc. Leisure Sales Program bulk ticketing contracts, dated July 18, 2003, April 30,2002 and July 24, 2003.

6.    Aeromexico contract dated March 1, 2004

7.    Air Jamaica contract dated April 1, 2004

8.    All agreements with My Travel entered into in connection with the 2003 Asset Purchase Agreement, including, (i) Purchase Agreement Supplement dated October 31, 2003 between MyTravel Canada Holidays Inc., Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc. for hotel purchasing services, as amended by that certain Amendment Agreement dated November 4, 2004 among MyTravel Canada Holidays Inc., VE Holdings, Inc., SunTrips, Inc., RCG Companies Incorporated Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc.; and (ii) Promissory Note executed and delivered by Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc. in favor of VE Holdings, Inc. and SunTrips, Inc. as amended by that certain Amendment Agreement dated November 4, 2004 among MyTravel Canada Holidays Inc., VE Holdings, Inc., SunTrips, Inc., RCG Companies Incorporated Flightserv, Inc, FS Tours, Inc. and FS SunTours, Inc.

9.    Letter of Credit Agreement dated March 1, 2004 among RCG Companies Incorporated, Flightserv, Inc., FS Tours, Inc., FS SunTours, Inc., FiveOaks Capital Partners, Inc. and four individual investors thereto, as amended on November 9, 2004.

10.    MCI Services Agreement dated August 27, 2004 between MCI WORLDCOM Communications, Inc. and Flightserv, Inc.

11.    Employment Agreement with Robert Gantt Cookson dated April 1, 2000

12.    Solarcom LLC Equipment Leases with Flightserv, Inc. for equipment used by the Company and Flightserv, Inc. but specifically excluding equipment used by FS SunTours, Inc. (see attachments hereto)

13.    Employment Letter with Dennis P. Werner

14.    All In-Service Agreement between Flightserv, Inc. and Vacation Express dated November 30, 2004 with respect to ACMI contract with Pace Airlines, Inc.

15.    Credit Card Processing Agreement

**Schedule 4.14(b)**

**Contracts in Default**

None.

**Schedule 4.14(c)**

**Certain Contracts**

1.    Four individual investors entered into a March 1, 2004 Letter of Credit transaction, as amended on November 9, 2004, which benefited an affiliate of the Company. Under the terms of the agreement, the investors provided Flightserv, Inc. with two letters of credit to replace the existing letters of credit and were granted a security interest in that certain deposit account of the Company.

2.    Substituted Bonds and Letters Of Credit:

A.    $200,000 Cash Surety issued by National City Bank in favor of the Department of Transportation.

B.    $73,500 Letter of Credit issued by Fidelity Bank for the benefit of Airline Reporting Corporation.

C.    $105,175 Letter of Credit issued by Fidelity Bank for Office Lease

D.    $10,000 Letter of Credit issued for the benefit of Delta Air Lines by Fidelity Bank

## Schedule 4.15

### Condition and Sufficiency of Assets

1.    The Company receives legal, tax accounting and other administrative services from RCG Companies Incorporated

2.    My Travel Canada Holidays does hotel purchasing and performs certain other services on behalf of the Company

3.    The Company needs significant capital in order to continue operating

4.    Schedule 4.19 is incorporated by reference herein.

5.    The Company needs to enter into a definitive agreement with TransMeridian Airlines for air service commencing after the termination of the current Pace Airlines contract.

**Schedule 4.17(b)**

**Leased Real Property**

Office Lease, dated April 22, 2004 between GA-Perimeter Center, L.L.C. and Flightserv, Inc.

## Schedule 4.18(a)

### Employees

| DEPT. | NAME |
|---|---|
| Sales | Barrera, Maribel |
| Sales | Dunlap, Russel |
| Sales | Freeman, Sylvia |
| Sales | LiPira, Kim |
| Sales | McNeil-Pitter, Shirly |
| Sales | Paxton, Penelope |
| Sales | Reheis, Diane |
| Sales | Tautkus, Barbara |
| Sales | Warren, Heather |
| Sales | Wheale, Kathy |
| Reservations | Arvin, Bond |
| Reservations | Baughn, Dwayne |
| Reservations | Brown, Loretta |
| Reservations | Cody, Sherry |
| Reservations | Cole, Donna |
| Reservations | Cooper, Camellia |
| Reservations | Courtney, Corey |
| Reservations | Darby, Vincent |
| Reservations | Davis, Kathryn |
| Reservations | Delvaux, Robert |
| Reservations | Easley, Amanda |
| Reservations | Fenhagen, James |
| Reservations | Ferguson, Rentia |
| Reservations | Gionfriddo, Stephen |
| Reservations | Godfrey, Melvin |
| Reservations | Hicks, Jeffrey |
| Reservations | Hilliard, Sandra |
| Reservations | Kelly, Angela |
| Reservations | Lorenzo, Gerardo |
| Reservations | Maldonado, Miguel |
| Reservations | Martin, Donovan |
| Reservations | McCay, John |
| Reservations | McEntire-Logan, Shameka |
| Reservations | McKnight, Dianada |
| Reservations | McLaurin, Rene |
| Reservations | Morrison Jr, Stephen |
| Reservations | Ramsey, Shakisha |
| Reservations | Redmond, Terrell |
| Reservations | Robinson, Randi |

| | |
|---|---|
| Reservations | Rodgers, Carl |
| Reservations | Stewart, Ronald |
| Reservations | Stokes, Marisa |
| Reservations | Taylor, Pencila |
| Reservations | Thomas, Martine |
| Reservations | Tritschler, Jeanie |
| Reservations | Wilson, Mocille |
| Product | Alley, Jeanelee |
| Product | Borders, Kathy |
| Product | Braun, Kevin |
| Product | Lewis, Jodi |
| Product | Munford, Sandra |
| Operations | Cottingham, Teresa |
| Operations | Ferguson, Patricia |
| Operations | Henson, Vanessa |
| Operations | Hernandez, Deborah |
| Operations | Jimenez, David |
| Operations | McCoy, Selisia |
| Operations | Memmer, Ann |
| Operations | Priestley, Simone |
| Operations | Walker, Sidney |
| Operations | Williams, Marguerite |
| Operations | Wolfe III, Eddie |
| Marketing | Alley, Todd |
| Marketing | Hagerty, Roberta |
| Marketing | Hanrahan, Leesa |
| Marketing | Hopkins, Vickie |
| Marketing | McNab, Davinci |
| Marketing | Moore, Harry |
| Marketing | Nodine, Jack |
| Marketing | Olson, Michele |
| Marketing | Simitses, Victoria |
| Marketing | Smith, Bradford |
| Internet Help Desk | Jasinski, Gene |
| Internet Help Desk | Shubert, Curtis |
| I.T. | Meagh, Christine |
| I.T. | Moon, Ronald |
| I.T. | Persons, Jule |
| I.T. | Persons, Jule (increase) |
| I.T. | TBA / Network Admin |
| Human Resources | Dickinson, Scott |
| Groups | Hamilton, Beverly |
| Groups | Hilliard, Gwendolyn |
| Groups | Klimp, Michael |

| | |
|---|---|
| Groups | Law, Casey |
| Groups | Morrison, Stephen |
| Groups | Walcott, Aisha |
| Exotic Vacations | Hollander, Anita |
| Exotic Vacations | McPherson, Gayle |
| Exotic Vacations | Stubbs, Cori |
| Executives | Collister, Edward |
| Executives | Cookson, Robert |
| Executives | Haser, Magali |
| Executives | Kennedy, Angelika |
| Executives | Meeks, Robert |
| Executives | Noa, Patricia |
| Executives | Pease, Sidney |
| Executives | Wys, Patricia |
| Customer Service | Davis, Tierrea |
| Customer Service | Kearney, Josephine |
| Customer Care | Curtis, Ebony |
| Customer Care | Duvall, Monique |
| Customer Care | Henderson, Phyllis |
| Customer Care | Henson III, James |
| Customer Care | Moore, Mary |
| Customer Care | Taylor, Jennifer |
| Customer Care | Thomas, Scott |
| Call Center Support | Brown, Barbra |
| Call Center Support | Bryant, Stephanie |
| Call Center Support | Okelley, Charles |
| Call Center Support | Ramsey, Stephania |
| Call Center Support | Roberts, Debbie |
| Call Center Support | Shell, Michelle |
| Call Center Support | Vann, Edna |
| Call Center Support | Vizzari, Leanne |
| Call Center Support | Willey, Jennifer |
| Accounting | Beamon, Teka |
| Accounting | Broadnax, Tai |
| Accounting | Bryant, Latarsha |
| Accounting | Chestnut, Emily |
| Accounting | Commerse, Deanna |
| Accounting | Dixon, Veronica |
| Accounting | Grier, Semethia |
| Accounting | Hamilton, Shelon |
| Accounting | Kow, Michelle |
| Accounting | Marchitello, Amanda |
| Accounting | Porter, Sylvia |
| Accounting | Pruett, Christy |

Accounting       Santos, Jose
Accounting       Stallings, Jeffery

## Schedule 4.18(b)

## Employment Agreements

(i)     None.

(ii)     FS Tours, Inc. has an Employment Agreement with Robert Gantt Cookson dated April 1, 2000 and an Employment Letter with Dennis P. Werner.

**Schedule 4.18(c)**

**Grievance and Arbitration Proceedings**

None.

**Schedule 4.18(d)**

**Labor Disputes**

None.

## Schedule 4.18(f)

## Discrimination Claims

None.

## Schedule 4.19

### Insurance

Note that all policies are covering Flightserv, Inc., FS SunTours, Inc. d/b/a SunTrips and FS
Tours, Inc. d/b/a Vacation Express

Flightserv, Inc.     FEIN: 23-2265039
F.S. SunTours, Inc. dba SunTrips  FEIN: 20-0319571
F.S. Tours, Inc. dba Vacation Express FEIN: 20-0313332

| Policy | Insurer | Policy # | Term | Limits |
|---|---|---|---|---|
| Commercial Property | Hartford | Not Yet Issued | 11/18/04–11/01/05 | Building – **$1,990,600** Scheduled Personal Property – **$3,591,000** Business Interruption – **$2M** |
| Crime | Hartford | Not Yet Issued | 11/18/04–11/1/05 | **$100,000** per claim (blanket) |
| Motor Fleet | Steadfast Ins. Co. | EOL 542831800 | 11/1/04–11/1/05 | Bodily Injury – **$1M** Uninsured Motorist – **$1M** Hired and Non-Owned Auto Liability – **$1M** Medical Payment – **$5K** |
| Commercial General Liability | Steadfast Ins. Co. | EOL 542831800 | 11/1/04–11/1/05 | Bodily Injury – **$1M** Property Damage – **$1M** Personal Injury – **$1M** (aggregate) Fire Damage Legal Liability – **$50K** |
| Travel Agents Professional/Public Liability | Steadfast Ins. Co. | EOL 542831800 | 11/1/04–11/1/05 | Professional Liability – **$1M** |
| Non-California Workers Compensation | Hartford | Not Yet Issued | 11/18/04–11/01/05 | Employers Liability – **$500,000** Bodily Injury by Accident/Disease – **$500,000** |

## Schedule 4.20(a)

## Registered Intellectual Property

1.     Patents and patent applications.

None.

2.     Trademark applications and registrations.

Owned by FS SunTours, Inc. and will be assigned at Closing.

Exotic Escapes, US Reg. No. 2,233,943
Vacation Express, US Reg. No. 2,236,598

3.     Registered Copyrights and applications to register Copyrights.

None.

4.     Domain Names.

All of the following are owned by FS Tours, Inc.

vacationexpress.com
vacationexpress.org
vacationexpress.net
exoticescapes.com
exoticescapes.net
exoticescaptes.org

**Schedule 4.20(b)**

**Intellectual Property - Proceedings**

None.

## Schedule 4.20(c)

## Intellectual Property – Third Party Rights

Owned by FS SunTours, Inc. and will be assigned at Closing:

Exotic Escapes, US Reg. No. 2,233,943
Vacation Express, US Reg. No. 2,236,598

**Schedule 4.20(d)**

**Intellectual Property - Infringement**

None.

## Schedule 4.21

### Customer Relationships
### Past Due Payables

See hotel payables as of 12/5/04 attached hereto

Other estimated payables as of 12/5/04 (approximate numbers):

| | |
|---|---|
| Fuel | 321,000 |
| Taxes | 398,000 |
| Ground Handling | 580,403 |
| Catering | 277,279 |
| Other aviation accruals | 551,027 |
| PFCs | 139,000 |
| | |
| Overhead accruals | 797,000 |
| | |
| Gift certificates | 5,000 |
| | |
| Penalty protection | 922,000 |
| | |
| Credit card processing fee | 65,000 |
| Newspapers | 202,000 |

Payables due Flightserv under the All In-Service Agreement dated November 30, 2004
Differences of actual payables vs estimates and payables incurred from 12/5/04 through Closing

Vacation Express
Hotel Contingents by Hotel, by Month
As of 12/08/06

# Exhibit 5

Computer screen shots obtained from
Vacation Acquisition, LLC



EX 4 JONGANS
EX 3 MEEKS

```
OPERATIONS                    PORT: 514
                                         AGNT: 8980
       JUN  3, 2008  15:57:04


            1.  REPORT PRINTING MENU


            2.  PROCESS QUEUES MENU


            3.  PRODUCT CONTROL MENU


            4.  PRINT MANIFESTS MENU


            5.  MISCELLANEOUS OPERATIONS MENU


            6.  AIRPORT OPERATIONS


                SELECT: ▮


       S P E E D - R E S    an exclusive product by   TECH-7  SYSTEMS
```

Added by Rob Meeks to recognize Unibasic files
March 26, 2008

string        SAVE      UNIBASIC


YOUR LOGICAL UNIT IS /etc/DCI
.#/usr/bin/ls -l

Case 1:05-cv-01212-RMC   Document 36-4   Filed 05/23/2006   Page 2 of 21

```
                    MISCELLANEOUS OPERATIONS MENU


             1.   PRINT DAILY LAND REQUIREMENTS
             2.   PRINT DAILY AIR REQUIREMENTS
             3.   CLEAR OLD CANCELLATION SNAPSHOTS
             4.   ANALYSIS OF HOTEL ROOM USAGE BY ARRIVAL
             5.   AIR MOVEMENT ANALYSIS
             6.   DAILY BOOKING ACTIVITY
             7.   ITEMS-TO-DO SCHEDULE MENU
             8.   CREDIT CARD PROCESSING
             9.   QUOTE SYSTEM MAINTENANCE MENU
            10.   ACTION CODE ANALYSIS
            11.   TOUR COMPONENTS SALES ANALYSIS
            12.   BOOKING COSTING ANALYSIS
            13.   WEB CONTROL TABLES
            14.   WEB BOOKING ANALYSIS

                       SELECT:


        S P E E D - R E S    an exclusive product by    TECH-7   SYSTEMS
```

vex_mm, 4, 3



```
                    PRODUCT CONTROL MENU

              1.  PRINTER SPOOLING QUEUE
              2.  INVENTORY SOLD COUNTS TRACKING
              3.  INVENTORY POOL BY LOCATION
              4.  INVENTORY BALANCE REPORT/UPDATE
              5.  BLOCK VERIFICATION REPORT
              6.  BLOCK RELEASE MENU
              7.  RESERVATIONS AUDIT
              8.  WAITLISTED BOOKINGS REPORT
              9.  LOW INVENTORY STATUS REPORT
             10.  TICKETING REQUIREMENTS REPORT
             11.  CUSTOM AIR REPORT/TABLE
             12.  COMMISSION OVERRIDE TABLE SETUP
             13.  ROOM NIGHT/DOLLAR PRODUCTIVITY
             14.  PAYMENT REQUIREMENT TABLE
             15.  EXPRESS CASH ENTRY TABLE
             16.  AIR INVENTORY REPORT
             17.  COMMISSION CONTROL BY DATE
             18.  CHARTER AIR INVENTORY REPORT


                    SELECT:



    S P E E D - R E S    an exclusive product by    TECH-7  SYSTEMS
```

vex_mm,4,2

**(A) TELNET [10.0.1.210]* - PowerTerm WebConnect HostView**

File  Edit  Terminal  Communication  Sessions  Options  Help

```
                    PROCESS QUEUES MENU



          1.  ADD A BOOKING TO A QUEUE
          2.  FINALIZE DOCUMENTS BY DEPARTURE
          3.  PRINT INVOICES QUEUE
          4.  PRINT VOUCHERS QUEUE
          5.  PROCESS TICKETING QUEUE
          6.  PRINT LOGGED TICKETS
          7.  DOCUMENTS MAILED/REMARKS
          8.  PRINT CHARTER TICKETS
          9.  PRINT LABELS QUEUE
         10.  PRINT ITINERARIES QUEUE
         11.  FREEBIE VOUCHER TABLE
         12.  FAX SCHEDULE CHANGES FROM QUEUE
         13.  URGENT FAXES FROM QUEUE




                    SELECT: █



        S P E E D - R E S   an exclusive product by   TECH-7  SYSTEMS
```

TWI925   21:32  Caps  Wrap  Hold  On Line

Added by Rob Meeks to recognize unibasic files
March 26, 2008

    string        SAVE      UNIBASIC


YOUR LOGICAL UNIT IS /etc/DCI
.#/usr/bin/ls -]

1:07 PM

vet_mm, 4, 1



**[A] TELNET (10.0.1.210) * - PowerTerm WebConnect HostView**

File  Edit  Terminal  Communication  Sessions  Options  Help

```
                    REPORT PRINTING MENU


            1.   BOOKINGS BY DEPARTURE DATE
            2.   BOOKINGS BY LEAD NAME
            3.   BOOKINGS BY BOOKING DATE
            4.   BOOKINGS BY CLIENT CODE
            5.   BOOKINGS BY BOOKING CODE
            6.   EXPIRED OPTIONS REPORT
            7.   BOOKINGS STATUS REPORT
            8.   FINAL PAYMENTS DUE REPORT
            9.   PAYMENT REMINDER NOTICES
           10.   DAYS PRIOR BOOKING REPORT
           11.   SCHEDULE CHANGE REPORT
           12.   CANCELLED BOOKINGS REPORT
           13.   EXCEL BLOCK REPORT


                 SELECT:



     S P E E D - R E S    an exclusive product by    TECH-7    SYSTEMS
```

TVI925   20:32   Caps  Wrap  Hold  OnLine

```
11000 END
12000 REM
12010 INPUT @0,23;'CL '"[1] - CHARTER AIR INVENTORY REPORT,    2 - TABLE MAINTAINA
NCE ;"Z8$
12020 IF Z8$="2" CHAIN "re.chtairtbl"
12030 CHAIN "re.chtairinv"
13000 NOBRAKE: REM
13001 STOP
13190 RETURN
```

Start    1:06 PM



ver. mm. 6.9

```
                        MASS CHANGES MENU                         PORT: 514
                        JUN  3, 2008  15:46:37                     AGNT: 8980

                                          DATA BASE


BOOKINGS

1.  HEADERS - CLIENT CODE/ADDRESS          10.  SCHEDULED TOURS
2.  HEADERS - BOOKING CODE                 11.  TOUR COMPONENTS
3.  HEADERS - RES AGENT ID NUMBER          12.  FARE INCREASE/DECREASE
4.  DETAILS - DESCRIPTION/SUPPLIER-PROD ID  13.  CHANGE FLIGHT SCHEDULE
5.  DETAILS - ALL DETAIL FIELDS            14.  MASS CHANGE - FLIGHT SCHEDULE
6.  DETAILS - INVENTORY CONTROL
7.  HEADERS - ID NUMBER


                                     CLEAR OLD DATA


                         20.  PACKAGES AND SCHEDULED TOURS
                         21.  TOUR COMPONENTS
                         22.  PRODUCT COSTING
                         23.  TICKETING FARES


                             SELECT: .


S P E E D - R E S    an exclusive product by    TECH-7   SYSTEMS
```

ve_mm.1-38



```
(A) TELNET (10.0.1.210) * - PowerTerm WebConnect HostView
File  Edit  Terminal  Communication  Sessions  Options  Help

          MISCELLANEOUS ACCOUNTING MENU                    PORT:  514
             ░JUN  3, 2008  15:42:50                        AGNT:  8980


  1.  BANK RECONCILIATION              12.  SPLIT A TRANSACTION
  2.  OUTSTANDING CHECKS REGISTER
                                       13.  AUTOMATIC REFUNDS/RECEIVABLES
  3.  RES AGENT PRODUCTIVITY
  4.  VENDOR PRODUCTIVITY              14.  CREATE/UPDATE CUSTOMIZED STATEMENT
  5.  CLIENT PRODUCTIVITY              15.  PRINT CUSTOMIZED STATEMENT
  6.  CREATE/CHANGE PRODUCTIVITY TABLE
                                       16.  ESCROW ACCOUNTS SETUP
  7.  BOOKING COSTING ANALYSIS
  8.  VOUCHER RECONCILIATION MENU      17.  DEPOSIT/FINAL PAYMENTS SETUP
                                       18.  CREATE DEPOSIT/FINAL PAYMENTS
  9.  PRINT ACCOUNT STATEMENTS
 10.  OUTSTANDING MCO/AMEX REPORT      19.  AUTOMATIC JOURNAL ENTRY MENU
                                       20.  POST SALES TO GENERAL LEDGER
 11.  COMPANY PROFILE SETUP            21.  VENDOR COST REPORT
                                       22.  PERCENTAGE CREDIT TABLE
 24.  EXPRESS CASH PROCESSING          23.  CO-OP/ARH LEDGERS


                        SELECT:  ░.

          S P E E D - R E S   an exclusive product by   TECH-7   SYSTEMS

  TVI925 | 23:42 | Caps | Wrap | Hold | On Line |
# Added by Rob Meeks to recognize unibasic files
# March 26, 2008
#0         string        UNITBASIC

YOUR LOGICAL UNIT IS /etc/DCI
.#/usr/bin/ls -]
```

SAVE



vex-mm,1

```
CLIENT MAILING LIST  JUN  3, 2008  16:14:37 CLIENT ACTIVITY AGNT: 8980   PORT: 514

1.  CLIENT PROFILE SETUP                    20.  CLIENT ACTIVITY ANALYSIS
2.  CLIENT LIST BY CODE                     21.  CLIENT ACTIVITY BY GEOGRAPHIC AREA
3.  CLIENT LIST BY NAME                     22.  CLIENT ACTIVITY BY STATE
4.  CLIENT LIST BY ZIP CODE                 23.  CLIENT ACTIVITY BY TOTAL BOOKINGS
5.  MAILING LABELS BY GEOGRAPHIC AREA       24.  CLIENT ACTIVITY BY DOLLAR VOLUME
6.  MAILING LABELS BY STATE                 25.  CLIENT ACTIVITY BY TOTAL PASSENGRS
7.  MAILING LABELS BY ACTIVITY TABLE        26.  GEOGRAPHIC AREA SETUP
8.  MERGE TO LETTERS BY GEOGRAPHIC AREA     27.  GEOGRAPHIC AREA LIST
9.  MERGE TO LETTERS BY STATE               28.  ACTIVITY TABLE SETUP
10. MERGE TO LETTERS BY ACTIVITY TABLE      29.  ACTIVITY TABLE LIST
11. MAILING LABELS FOR BROCHURE REQUESTS    30.  TABLE DIRECTORY LIST
12. POSSIBLE DUPLICATE CLIENTS REPORT       31.  AGENTS OVERRIDE COMMISSION SETUP
13. BOOKING CODE SETUP                      32.  FUTURE SALES REPORT
14. BROCHURE CODE SETUP                     33.  GATEWAY/SOURCE ANALYSIS

15. AGENT LOYALTY SETUP        SELECT:



            S P E E D - R E S   an exclusive product by   TECH-7   SYSTEMS
```

ver_mm.4



```
(A) TELNET [10.0.1.210] * - PowerTerm WebConnect HostView
File  Edit  Terminal  Communication  Sessions  Options  Help


                    OPERATIONS                          PORT: 514
              JUN  3, 2008  15:57:04                    AGNT: 8980


              1.  REPORT PRINTING MENU

              2.  PROCESS QUEUES MENU

              3.  PRODUCT CONTROL MENU

              4.  PRINT MANIFESTS MENU

              5.  MISCELLANEOUS OPERATIONS MENU

              6.  AIRPORT OPERATIONS


                  SELECT: ▮


        S P E E D - R E S   an exclusive product by   TECH-7  SYSTEMS


TVI925  | 22:37  | Caps | Wrap | Hold | OnLine
```

Added by Rob Meeks to recognize unibasic files
March 26, 2008

string        SAVE      UNIBASIC

YOUR LOGICAL UNIT IS /etc/DCI
.#·/usr/bin/ls -]

#·#·#·0

vex_db.mc.menul



```
1350 ON  S1+1 GOSUB  2000,2100,2200,2300,2400,2500,2600,2700,2800,2900
1360 ON  S1-9 GOSUB  3100,3200,3300,3400,3500,3600,3700,3800,3900,4000
1365 ON  S1-19 GOSUB  4100,4200,4300,4400,4500,4600,4700,4800,4900,5000
1368 ON  S1-29 GOSUB  5100,5200,5300,5400,5500,5600,5650,5700,5750,5800
1370 GOSUB 9804
1372 PRINT "\233'h"
1380 IF S<>0 GOSUB 6020
1385 IF S1=7 CLOSE  \ CHAIN "db.mc.idnumber"
1400 GOTO 5900
1500 LET V[2]=0 \ LET V[3]=0
1505 LET O$="CALC : "
1510 LET I=0 \ GOSUB 9806 \ IF Z8$="" RETURN
1515 LET V=Z8$ \ IF Z8$[1,1]="M" GOSUB 1555 \ LET V=V[1]
1520 FOR I=1 TO LEN Z8$
1525    IF Z8$[I,I]>")" IF Z8$[I,I]<"0" GOSUB 1550
1530 NEXT I
1532 LET O$="CALC : ",Z8$, "=",V
1535 IF Z8$[I-3]="=M1" LET V[2]=V
1540 IF Z8$[I-3]="=M2" LET V[3]=V
1545 GOSUB 9806 \ GOTO 1505
1550 LET V[1]=Z8$[I+1] \ LET O$=Z8$[I,I]
1555 IF Z8$[I+1,I+2]="M1" LET V[1]=V[2]
1560 IF Z8$[I+1,I+2]="M2" LET V[1]=V[3]
[MORE]

         S P E E D - R E S     an exclusive product by     TECH-7   SYSTEMS
```



```
1235 PRINT A$
1240 PRINT @42,9;'BD';" 14. MASS CHANGE - FLIGHT SCHEDULE"; 'ED';
1242 PRINT @1,11;"7. HEADERS - ID NUMBER"
1300 REM *** INPUT KEY FIELDS
1302 LET V$=A$[29,30]," "
1305 LET K=1
1308 LET S1=0
1310 LET Z3=1
1315 GOSUB 6010
1320 IF Z1=0 GOTO 1350
1321 LET S1=Z8$ \ IF SPC 5=11010 OR SPC 5=4135 OR SPC 5=4136 OR SPC 5=8255 OR S
PC 5=4200 OR SPC 5=8907 OR SPC 5=6208 OR SPC 5=4906 OR SPC 5=8194 OR SPC 5=8197
IF S1=14 GOTO 8600
1322 IF S1>7 IF S1<10 GOTO 1300
1323 IF S1>14 IF S1<20 GOTO 1300
1324 IF S1>23 GOTO 1300
1325 REM GOSUB 8500 \ IF E1 GOTO 1300 ! SECURITY MODULE ** DO NO ACTIVATE UNLES
S PURCHASED **
1326 IF Z8$[1,4]="MAIL" GOTO 1700
1327 IF S1=14 GOTO 1300
1330 IF Z8$[1,1]="," GOSUB 1500 \ GOTO 1300
1347 LET S=0
1350 ON S1+1 GOSUB 2000,2100,2200,2300,2400,2500,2600,2700,2800,2900
        S P E E D - R E S   an exclusive product by   TECH-7   SYSTEMS
[MORE]
```

```
list -v
  100 REM ** DB.MC.IDNUMBER ** ERIC 7/25/2007
  200 OPEN #0,"re.crt5"
 1125 DIM 1%,K[8],2%,R[8]
 1130 DIM P$[80],H$[50],A1$[11],B1$[11],T$[220],F$[10]
 1145 LET P$=" ",P$
 1148 LET T$=" ",T$
 1150 GOSUB 9800
 1152 GOSUB 9804
 1155 LET H$=0$[5]
 1200 LET K[2]=2 \ GOSUB 7200
 1210 LET K[8]=8 \ GOSUB 7800
 1300 PRINT 'CS';@2,1;"MASS CHANGES - HEADERS - ID NUMBER"
 1301 LET T$=" ",T$
 1302 PRINT @1,5;'CE';
 1304 PRINT "THIS PROGRAM WILL REPLACE THE BOOKINGS THAT HAVE THE ID NUMBER(S) W
ITH"
 1306 PRINT " THE MAIN ID NUMBER.  YOU MAY ENTER UP TO 20 ID NUMBERS TO CHANGE."
 1308 PRINT " PRESS RETURN WHEN FINISHED ENTERING OLD ID NUMBERS."
 1309 PRINT @20,12;"----- ID NUMBERS TO CHANGE -----"
 1310 PRINT @30,10;"
 1315 INPUT @1,10;"ENTER ID NUMBER TO REPLACE  : "A1$
[MORE]
       S P E E D - R E S   an exclusive product by   TECH-7   SYSTEMS
```



```
4597 LET P$="-",P$
4598 GOSUB 4000
4599 RETURN
5000 REM
5005 LET O$="2301        PRINTER #: "
5010 GOSUB 9806
5015 IF ZB$="99" GOTO 5060
5020 LET I=ZB$
5025 IF I<=1 LET V$="$LPT"
5030 IF I>1 IF I<11 LET V$="$LPT",I-1 USING "##"
5031 IF I>10 LET V$="$LPT",I-1 USING "##"
5035 IF ERR 0 GOTO 5080
5040 OPEN #7,V$
5045 LET Z$="  2401"
5050 GOSUB 9802
5055 RETURN
5060 GOSUB 9804
5062 LET G1=1
5065 RETURN
5080 LET O$="2402PRINTER BUSY. (CR)-TRY AGAIN, E-EXIT: "
5085 GOSUB 9806
5090 IF ZB$="E" GOTO 5900
5095 GOTO 5000
[MORE]

        S P E E D - R E S     an exclusive product by   TECH-7  SYSTEMS
```



```
4000list -v
4000 REM PRINT A LINE
4010 PRINT #7;P$
4015 LET P$=" ",P$
4020 LET L=L+1
4030 IF L>60 GOSUB 4500 !NEW PAGE
4035 IF G1=1 RETURN
4040 PRINT @1,21;"PAGE: ";G;" LINE: ";L;
4060 RETURN
4500 REM
4502 LET M=80
4505 LET L=1
4507 IF G<>0 PRINT #7;"\214\"
4510 LET G=G+1
4515 LET P$[M-20]="PAGE: ", G USING "####"
4520 LET P$[1,LEN(H$)]=H$
4525 GOSUB 4000
4526 LET A$=""
4528 CALL 99,A$
4530 LET P$="MASS CHANGES - HEADERS - ID NUMBERS   ",A$
4535 GOSUB 4000
4540 LET P$="CHANGED FROM "
4541 FOR X=1 TO 5
[MORE]
        S P E E D - R E S   an exclusive product by   TECH-7 SYSTEMS
```

Case 3:05-cv-03704-TC Document 181-5 Filed 08/21/2006 Page 10 of 27



ver_re_oment

```
8752   CHAIN "api.recon"
8754 ENDIF
8756 IF Z8$="16" CLOSE  \ CHAIN "sm.emergency.del"
8758 IF Z8$="2" CALL "sm.seatass" \ PRINT 'CS' \ GOTO 8700
8760 IF Z8$="5" CALL "sm.prtflt" \ PRINT 'CS' \ GOTO 8700
8762 IF Z8$="11" CALL "sm.dispflt" \ PRINT 'CS' \ GOTO 8700
8764 IF Z8$="6" CHAIN "api.man.apt"
8766 REM  IF Z8$="12" CALL "c.apiname" \ PRINT 'CS' \ GOTO 8700
8768 IF Z8$="13" CHAIN "api.man.tst"
8770 IF Z8$="14" GOTO 8800 ! rick 122304 CALL "c.apimake" \ PRINT 'CS' \ GOTO 8
700
8772 IF Z8$="15" CHAIN "api.reconprt"
8774 REM IF Z8$="16" CHAIN "api.recon.tst"
8776 IF Z8$="10" CHAIN "tsa.address.add"
8778 IF Z8$="20" CHAIN "api.man.test"
8796 CLOSE  \ CHAIN "RM"
8800 REM choose pace or transmeridian
8810 INPUT @5,20;"[1]-TRANSMERIDIAN 2-PACE 3-NEW TABLE LOOKUP 4-new un/edifact
formatt: "Z8$
8820 IF Z8$="2" CALL "c.apimake"
8825 IF Z8$="3" CALL "c.apimake.table"
8827 IF Z8$="4" CALL "c.edifact"
8830 IF Z8$<"2" CALL "c.apimake.trans"
8840 CLOSE  \ CHAIN "RM"
           S P E E D - R E S    an exclusive product by   TECH-7   SYSTEMS
```



```
7010 LET V$[4]="XANAL"
7015 IF SPC 5=8993 LET V$[4]="XANAL.ARCH"
7020 LET S=0
7030 RETURN
7100 REM
7110 LET V$[4]="TANAL"
7120 LET S=0
7130 RETURN
7200 REM
7210 LET V$[4]="BCOST"
7220 LET S=0
7230 RETURN
7300 INPUT @1,23;"[1]-Web Charter Products 2-Web Charter Late Fees 3-Web Charte
r Exop Dates: "Z8$
7310 IF Z8$="2" CHAIN "bh.latefees"
7320 IF Z8$="3" CHAIN "bh.exoprules"
7330 CHAIN "bh.webroutes"
7340 END
7400 REM
7410 LET V$[4]="WEBANAL"
7420 LET S=0
7430 RETURN
7500 REM
[MORE]

                 S P E E D - R E S    an exclusive product by    TECH-7   SYSTEMS
```

vet_re_0menu2



```
6715 IF Z8$="2" LET V$[4]="CCAUDIT"
6720 LET S=0
6730 RETURN
6800 REM
6820 INPUT @1,23;"[1]-FORMS,  2-MULTI-MERCHANT ,3-GLOBAL PC FORMAT : "Z8$ \ PRIN
T @1,23: 'CL';
6830 IF Z8$="2" LET V$[4]="CCSYS.MM" \ LET S=0 \ RETURN  !MULTI-MERCHANT
6835 IF Z8$="3" LET V$[4]="CCSYS.GLO" \ LET S=0 \ RETURN  ! GLOBAL PC FORMAT 1/
00
6836 IF SPC 5=1106 IF Z8$="3" LET V$[4]="CCSYS.NEW" \ LET S=0 \ RETURN  ! SUE D
P ONLY renamed .glo
6840 REM IF Z8$="3" LET V$[4]="CCSYS.T1" \ LET S=0 \ RETURN  ! GLOBAL PC FORMAT
1/00
6850 REM RENAME .T1 TO .GLOBAL
6860 LET V$[4]="CCFORM"
6870 LET S=41
6880 RETURN
6900 REM
6910 LET V$[4]="QSYS"
6920 LET S=0
6930 RETURN
7000 REM
7010 LET V$[4]="XANAL"
[MORE]
               S P E E D - R E S     an exclusive product by     TECH-7    SYSTEMS
```

Case 1:08-cv-xxxx-xxx-xxx   Document 36-9   Filed 08/25/2008   Page 19 of 21



```
3300 REM
3302 INPUT @1,23;"1-PRINT INVOICE QUEUE, 2-FAX INVOICE QUEUE, 4-EMAIL INVOICE
: "Z8$ \ PRINT @1,23;'CL';
3310 LET V$[4]="INVOICE"
3315 IF Z8$="2" LET V$[4]="INVOICE.FX"
3318 IF Z8$="3" LET V$[4]="INVOICE.DEP"
3320 IF Z8$="4" LET V$[4]="INVEML"
3330 LET S=0
3340 RETURN
3400 REM
3410 INPUT @1,23;"1-PRINT QUEUE #2  2-EMAIL/FAX QUEUE #3:  3-TEST PRINT to prt
4-Old Docs: "Z8$
3411 IF Z8$="E" CLOSE \ CHAIN "RM"
3412 REM IF Z8$="3" LET V$[4]="VCHR.TST" \ GOTO 3430
3413 IF Z8$<>"1" AND Z8$<>"2" AND Z8$<>"3" AND Z8$<>"4" AND Z8$<>"5" GOTO 3400
! 5=group vchrs
3415 IF Z8$="1" LET V$[4]="VCHR"
3420 IF Z8$="2" LET V$[4]="VCHR.EMFX.NEW"
3422 IF Z8$="3" LET V$[4]="VCHR.RICK" \ GOTO 3430
3425 IF Z8$="4" LET V$[4]="VCHR.EMFX"
3427 IF Z8$="5" LET V$[4]="VCHR.EMFX.GRP"
3430 LET S=0
3440 RETURN
[MORE]
                    S P E E D - R E S   an exclusive product by   TECH-7   SYSTEMS
```

Case ... Document 2010 ... Filed 03/23/2010 ... Page 20 of 21

vef_re.omenu



```
(A) TELNET [10.0.1.210]* - PowerTerm WebConnect HostView
File  Edit  Terminal  Communication  Sessions  Options  Help

list -v
  100 REM ** RE.OMENU
  1110 IF ERR 0 STOP
  1120 DIM Y$[80],W$[20]
  1150 GOSUB 9800
  1152 LET A$[29,30]="RE"
  1155 GOSUB 1600
  1160 LET S=90
  1180 GOSUB 9804
  1185 IF SPC 13=7 GOTO 1205
  1190 PRINT "\233\h"
  1201 LET Y$="\233\f          S P E E D - R E S     an exclusive product by    TECH-7
       SYSTEMS\215\"
  1202 PRINT Y$,"\233\g"
  1205 READ #0,S+16,0;Z0$;
  1210 PRINT Z0$
  1215 PRINT @65,0;"PORT:";SPC 6 \ PRINT @65,1;"AGNT:";SPC 5
  1220 PRINT @24,19;'BD';"6. AIRPORT OPERATIONS"; 'ED';
  1300 REM
  1302 LET Z7$=""
  1305 CALL 99,Z7$
  1307 PRINT @23,1;Z7$
  1308 IF Z9$[115,115]="S" PRINT @31,2;"STATIC"
[MORE]
```

```
          S P E E D - R E S     an exclusive product by    TECH-7  SYSTEMS
```

TVI925   24,1   Caps  Wrap  Hold  OnLine



vex_mnn446



```
                 AIRPORT OPERATIONS MENU


     1.  ALPHA MANIFEST PRINT          11.  FLIGHT SEATMAP
     2.  SEAT ASSIGNMENT
     3.  BOARDING PASS PRINT           13.  TEST MANIFEST
     4.  POST FLIGHT RECONCILIATION    14.  MAKE API CUSTOMS FILE
     5.  PRINT CURRENT SEAT MAP        15.  API RECON PRT
     6.  SFB PAX LIST                  16.  REMOVE BAD BOOKING

     8.  EXPRESS CLASS LIST
     9.  FLIGHT INFORMATION  REPORT    20.  TEST ALPHA MANIFEST
    10.  ADD TSA ADDRESS


                  SELECT:




     S P E E D - R E S   an exclusive product by    TECH-7  SYSTEMS
```

UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

TECH 7 SYSTEMS, INC.,                    )        No. 08-0436
                                         )
            Plaintiff,                   )
                                         )
        vs.                              )        In Support of OPPOSITION TO
                                         )        MOTION FOR
VACATION ACQUISITION, LLC                )        SUMMARY JUDGMENT
d/b/a Vacation Express                   )
                                         )
            Defendant.                   )


DECLARATION OF RICHARD M. DICKIESON, PRESIDENT
TECH 7 SYSTEMS, INC.

Pursuant to 28 U.S.C. Section 1746, I, Richard M. Dickieson, declare under

penalty of perjury under the laws of the United States as follows:

      1.      I am the President and owner of Tech 7 Systems, Inc., and I am an adult

over the age of 18, residing in Park Ridge, Illinois.

      2.      I am familiar with the Tech 7 software system and the functions that it

performs as a software platform for tour companies.

      3.      I have reviewed the Statement of Facts presented by the Defendant

Vacation Acquisition, LLC.  I have attended all of the depositions in this litigation.  I

have reviewed all the exhibits provided to the Court and I have interviewed employees of

Tech 7 Systems, Inc.  I was the person designated to speak on behalf of Tech 7 at a

deposition in Washington, DC on August 20, 2008.  Based on my knowledge of the facts,

I respectfully contest the assertion by the Defendant that the facts presented are material

and undisputed. I also contest the interpretation of those facts by Defendant's counsel, as such interpretation incorrectly portrays the actual context of the facts.

4.    The following statements are made in opposition to the Statement of Uncontested Facts:

**Disputed Statement 1:** *Vacation Express, Inc. and Tech 7 Systems, Inc. ("Tech 7") entered into a Sales and Licensing Agreement effective June 26, 1990.*

Vacation Express, Inc. is not a party to this litigation. There are several transfers of stock or assets involved between the time period that Vacation Express, Inc. entered into a contract with Tech 7 Systems, Inc in 1990 and the time that Vacation Acquisitions, LLC was formed as an entity in 2004. No written contract exists between the two parties where the two parties have both signed the written agreement.

**Disputed Statement 2:** *The SLA provided a perpetual license for the Tech 7 software.*

The Defendant misstates the nature of the license provided by the SLA. The SLA states "A perpetual, single system License, revocable on the terms herein stated, to use the software provided by SELLER in the manner described in paragraphs 3 and 4 of this Article." It clearly states this is a "revocable" license, which is contrary to the assertion that the license is "perpetual." In fact one of the points in paragraph 4 states "BUYER agrees not to employ, in any capacity, either now or in the future, any individual who has been employed by or is employed by SELLER". Paragraph 3 states "The exclusivity and confidentiality of SELLER's proprietary interest in the software must be protected to retain the special and intrinsic value of the software to SELLER". The Defendant has acknowledged facts which constitute a violation of the SLA and such violations make the License revocable.

2

**Disputed Statement 3:** *Article III, paragraph 4 of the SLA states in relevant part: "In no event will any warranty or liability on SELLER survive alteration or modification by anyone other than SELLER, unless SELLER agrees in writing."*

The SLA specifically provides other remedies apart from Article III, paragraph 4, and there is no clause which makes the contract remedies the exclusive remedies. This clause is designed to address a very narrow set of circumstances to ensure that Tech 7 has the right to allow modifications to the software which we will support, but it must be with Tech 7's consent. If the software were to be modified and it failed to perform as stated in the manual and it were to come to light that the modifications were not done by us and were done without our permission, we would have the right to charge the client to fix this even if it happened during the first 12 month software warranty period. Nowhere in the SLA does it state what Defendant argues that Tech 7 has no other remedies flowing from a breach by the Licensee.

**Disputed Statement 4:** *Article III, paragraph 5 of the SLA states in relevant part: "Help Desk support and additional training at either BUYER's or SELLER's site are optional and not included in this Agreement."*

Help Desk support is optional. That doesn't mean a client has a contractual right to contract for help desk support from other parties. It just means that the Licensee does not have to subscribe and pay for the Help Desk support if their operations do not require help desk support or additional training.

**Disputed Statement 5:** *In an April 21, 1995 memo from Gantt Cookson of Vacation Express to Amnon Gibly of Tech 7, Mr. Cookson expressed his "unhappiness" with Tech 7's Worldspan Toursource product.*

**Disputed Statement 6:** *In a November 15, 1995 memo from Gantt Cookson of Vacation Express to Pamela Luan-Zaehler of Tech 7, Mr. Cookson registered a complaint concerning Tech 7's product, "Charter Load."*

**Disputed Statement 7:** *In a July 10, 1996 memo from Gantt Cookson of Vacation Express to Lyle Hobbs of Tech 7, Mr. Cookson requested a refund for the Toursource product.*

In my experience, all companies have complaints and most companies work to improve customer service. Vacation Express, Inc. (which is not the Defendant in this case) persisted in criticizing the Tech 7 product, told Tech 7 that they were not interested in upgrading Tech 7 product and refused a proposal to switch to another Tech 7 product. Vacation Express, Inc. eventually went out of business and sold its assets. Tech 7 learned in late 2007 that the Defendant Vacation Acquisition was using the Tech 7 product that was disparaged in the memos described above.

**Statement 8:** *A sample letter for the signature of Jeffrey R. Kruse, Executive Vice President of Tech 7, and dated April 10, 1997 stated, "In our last letter we promised a few announcements regarding some of the changes that we are currently making at Tech 7. One of these announcements was to cover the reorganization of our Customer Service department and the fact that we would be adding a new group of account coordinators. The primary objective of this group is to increase Tech 7 customer satisfaction."*

This sample letter was provided by Tech 7 in document production to the Defendant. The sample unsigned letter says what it says, but this letter was not dispatched to Vacation Acquisition as Vacation Acquisition did not exist in 1997. In short, I do not see any context that makes this sample, unsigned letter material to the dispute.

**Disputed Statement 9:** *An email from Masood Saidi-Nejat of Tech 7 to Deanna Bernett and Jeff Kruse of Tech 7 dated May 14, 1998 is entitled "VAE –*

> *Information for you to know..." and refers to Vacation Express. The document states, among other things, "Y2K Data Plus told them that it will get done sometime soon... Report writer DATA PLUS ... Service DATA PLUS support."*

The Defendant has taken pieces of the e-mail out of context. Tech 7 worked with Data Plus on hardware issues during the 1990's. Data Plus became very knowledgeable about the Tech 7 software by virtue of the fact that the Tech 7 software was often installed on Data Plus hardware. The mere fact that an e-mail mentions that Tech 7 personnel was aware of the fact that Data Plus was providing service on the hardware of another company is not relevant.

**Disputed Statement 10:** *An email from Jeff K. to persons at Tech 7 dated June 8, 1998 states in relevant part, "[j]ust some notes from visit to Vacation Express – Rhoda and I visited this account last Thursday and met with Gantt Cookson, Exec. Dir. They are using Dataplus for service and customization. They originally switched to Dataplus because Toursource had been installed for two years and was not working. Dataplus has had it for another two years and they are just switching to Beta this month. Gantt said that Dataplus service was good at first but now he is no better off. I suggest we send him a current proposal."*

**Disputed Statement 11:** *In a June 15, 1998 letter from Deanna Bernett, Marketing Executive at Tech 7 to Gantt Cookson of Vacation Express, Ms. Bernett stated, "They confirmed that you are still receiving system support services from Data Plus ..." Ms. Bernett than stated, "you might want to look again at our support contract. I have enclosed a Support Services contract for your consideration."*

These statements are not material as they involve the Vacation Express business when it was owned by Vacation Express, LLC. The context of the statements indicate that they do not create a waiver nor an estoppel for Vacation Acquisition's benefit. Tech 7 had worked with Data Plus on hardware issues throughout the 1990's. Tech 7 was interested

in bringing the Vacation Express business back into the group of clients using Tech 7 for software support and keeping them as a customer.

**Disputed Statement 12:**    *Vacation Express, Inc. was purchased by My Travel, PLC, a United Kingdom-based company, in 1998 and made part of MyTravel subsidiary, North American Leisure Group (NALG). Vacation Express continued to use the Tech 7 software.*

This "fact" was recited in the Plaintiff's Complaint. However, this fact has been contradicted by the Defendant's designated representative who testified that Vacation Express, Inc. was sold to Vacation Express, LLC. The Defendant's statement above distorts the chain of ownership of the stock or assets of Vacation Express, Inc. – an entity which no longer exists. The Defendant's corporate designee acknowledged that Vacation Acquisition did not have documentation that it had license rights to the Tech 7 software and acknowledged that there was no unbroken chain of title between Vacation Acquisition and Vacation Express, Inc.'s license rights acquired in 1990.

**Disputed Statement 13:**    NALG did not ask Tech 7 to transfer the software license acquired by Vacation Express with the signing of the SLA.

This statement is disputed. Various documents produced in discovery indicate that personnel at Tech 7 were aware of and may have consented to the transfer of the Tech 7 software to NALG, which was at that time doing business with Tech 7's corporate parent. No similar knowledge and possible consent has been shown with respect to subsequent purchases of the Vacation Express businesses. What is undisputed is that Tech 7 did not give a permanent waiver of any subsequent transfers of the License. No subsequent transfer of any license rights was approved by, waived or even brought to the attention of Tech 7.

6

**Statement 14:**    *An October 6, 2000 "Analysis/Consultation Proposal" from Logibro/Tech 7 Systems to Vacation Express was presented by Tech 7 as part of a three day on-site analysis by Masood Saidi-Nejat of Tech 7 whose purpose was to "determine what customizations need to be moved over from VACATION EXPRESS's current SpeedRes version to the new version 10.0" The Tech 7 proposal stated further, "[t]his proposal when accepted by an authorized agent of VACATION EXPRESS and returned to Logibro/Tech 7 Systems, will become an addendum to the Sales and Licensing Agreement between VACATION EXPRESS and Tech 7 Systems." Attached to the proposal is an expense report in the name of Masood Saidi-Nejat for a three day on site analysis at Vacation Express.*

This statement is true. However, the way that this statement is used in the brief supporting the motion for summary judgment does not accurately reflect the context for these facts or the correct interpretation of these facts. This statement refers to a proposal by Tech 7's to upgrade the Vacation Express license. This proposal was for an analysis of the system to determine which customizations should be moved over to the new version and how much they would cost. The proposal was rejected and Tech 7 was led to believe that Vacation Express was moving to a competitor's software platform.

**Statement 15:**    *In a November 8, 2000 email from Gantt Cookson of Vacation Express to Rhoda Harwood of Tech 7, Mr. Cookson stated, "Ref our gateway for Amadeus ...No, we are not using the old DAT gateway. When we moved from System One to Amadeus we transferred everything from DAT (Tech 8 in my book) over to the Data Plus Product..."*

**Statement 16:**    *In an April 9, 1999 letter from Jeff Kruse of Tech 7 to Kevin Hernandez of Vacation Express, Kruse stated:    "TECH 7 hereby wishes to remind all its customers, including customers who did not enter into a Support and Maintenance Agreement with TECH 7, about some of our previous communications on the subject."* <u>See</u> *Cutler Decl, Exh. 10, p. 1.  Mr. Kruse stated further, "[p]lease remember that any modifications, for Year 2000 purposes or otherwise, to the original licensed SPEEDRES software and system, made by anyone other than TECH 7 effectively terminates any warranty remaining on your system."*

These statements are true, but the interpretation placed on these facts is not accurate. It is undisputed that the April 9, 1999 letter contained the statements of Jeff Kruse. The significance of these facts is greatly disputed, as the Defendant appears to be asserting that these statements prove that loss of warranty is the only remedy available to Tech 7. Loss of warranty may occur, but other remedies are not excluded.   The warranty in the SLA appears to refer to the first 12 months after installation for items that aren't working as outlined in the manual. It would be contrary to common sense to believe that the only remedy available to Tech 7 was the loss of a warranty that had already expired years ago.

     5.     In addition to disputing the Statement of Undisputed Facts presented by the Defendant, I also aver to the following facts:

     a. Vacation Acquisition has acknowledged in deposition testimony by its corporate designee that its use of the Tech 7 software is not based on the License Agreement from 1990 (Exhibit 1 to the Complaint).

b.  Tech 7 denies that it had knowledge of Vacation Acquisition's infringing use until shortly before the demand letter was sent to Vacation Acquisition to cease and desist from infringing use in January 2008 (Complaint Exhibit 2).

c.   Vacation Acquisition never let Tech 7 know that it was using the Tech 7 software.  It never sought permission to use Tech 7 and its employees and officers had no discussions with Tech 7 during the entire existence of Vacation Acquisition.

d.  I have reviewed the documents and discovery materials produced by the Defendant and there is no evidence provided by Vacation Acquisition showing that it purchased any asset of FS Tours, Inc. that would allow it to claim that FS Tours, Inc. was passing any rights on to Vacation Acquisition allowing the use of Tech 7 software. (See Exhibit 2, Response 2 and Exhibit 4, Disclosure Schedules to Asset Purchase Agreement).

e.  The Defendant's officers testified that despite receiving numerous, repeated, and omnipresent screen statements built into the Tech 7 software stating that the software system was the "exclusive" property of Tech 7 (See Exhibit 5, a screen shot of the operations menu), Vacation Acquisition failed to notify Tech 7 that it was using the software, failed to pay for the software, and in fact chose to retain consultants to modify and service the software without letting Tech 7 know that the software was being used.

f.  Tech 7 did not waive any rights in the Tech 7 software during the period that I was a consultant to Tech 7 – 2004 to 2007 or during the period that I owned the business – 2007 to 2008. Tech 7's comprehensive review of all of our historic files has not discovered any proof of permanent waiver of Tech 7's contract and proprietary rights and certainly no proof of Tech 7 waiving any subsequent control of its software for any person who uses the software without permission.

g.  Tech 7 has a very precise Licensing Agreement that it requires for any entity that it authorizes to use the Tech 7 software system. That Licensing Agreement, attached to the Complaint as Exhibit 1, provides control of the software system, so that Tech 7 knows who is using the system, controls whether the system can be transferred to third parties, and prevents unauthorized users from changing the proprietary code built into the software.

h.  As testified in my deposition, Tech 7 has taken diligent steps to identify infringers of the Tech 7 software and to assert Tech 7's rights against those infringers like Vacation Acquisition. Information came to light about one infringer at a trade conference in Cancun, Mexico that wasn't available prior to late 2007. With that information, I personally reviewed the list of over one hundred former customers of Tech 7 and used my industry knowledge and contacts at trade shows as well as some creative detective work to track down other infringers of the Tech 7 system.

10

Determining which software platform a tour company was using is not generally public information.

i. Five infringers, including Vacation Acquisition, were identified and all five received demand letters within weeks of the date of discovery of the infringement. Two of those infringers have agreed to make payments to cover infringing use and to cover future agreed use of the Tech 7 system. The third infringer, Vacation Acquisition, has been sued.   A draft Complaint has been prepared for a suit most likely to be filed in the federal district court for the Eastern District of Michigan after negotiations failed with the fourth infringer. The fifth infringer is small and in poor financial condition and litigation options are being evaluated with those issues in mind.

6.     To the extent that I lack personal knowledge of any facts asserted herein, my statements are based on my knowledge of business records of Tech 7, the testimony of Vacation Acquisition's Corporate Designee, and a review of publicly available documents relating to Vacation Acquisition, LLC and/or Vacation Express.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 22, 2008
Park Ridge, Illinois

Richard M. Dickieson
President
Tech 7 Systems, Inc.

## UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **TECH 7 SYSTEMS, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No.:  1:08-cv-00436-JDB** |
| | ) | |
| **VACATION ACQUISITION, LLC,** | ) | |
| **d/b/a Vacation Express** | ) | |
| | ) | |
| **Defendant.** | ) | |

### TECH 7 SYSTEM, INC.'S STATEMENT OF GENUINE ISSUES IN OPPOSITION TO THE PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Tech 7 Systems, Inc. (Tech 7) hereby responds to the Statement of Uncontested Facts filed by Vacation Acquisitions, LLC d/b/a Vacation Express[1]

The facts which the Defendant asserts are undisputed are either irrelevant and immaterial or in fact hotly disputed.   The Declaration of Tech 7's President Richard M. Dickieson establishes that the key assertions of the Defendant cannot be accepted as undisputed and/or material, much less as true.   The facts asserted as disputed are reviewed in the Richard Dickieson Declaration and in the following summary discussion of genuine issues:

**Statement 1:**  Vacation Express, Inc. and Tech 7 Systems, Inc. ("Tech 7") entered into a Sales and Licensing Agreement effective June 26, 1990.

---

[1]   To avoid confusion and to emphasize that Vacation Acquisition, LLC is not the same entity as the now defunct Vacation Express, Inc., this Brief will refer to Vacation Acquisition, LLC as "Vacation Acquisition" and Vacation Express, Inc. will be referred to by use of its full, legal name.  Vacation Acquisition's Statement of Uncontested Facts routinely confuses Vacation Acquisition with another legal entity called Vacation Express, Inc.  Vacation Acquisition did in fact buy the right to use the name "Vacation Express," but that doesn't mean that it is Vacation Express, Inc. or has succeeded to any rights that may have been contracted to Vacation Express, Inc. 18 years ago, before it transferred assets to Vacation Express, LLC.

**DISPUTED:**  Vacation Express, Inc. is not a party to this litigation and so the fact that Vacation Express, Inc. entered into a contract with Tech 7 Systems, Inc. in 1990 is simply not material to the summary judgment motion.   Before any legal conclusions can be drawn about the relationship between the Plaintiff and Defendant, the Defendant must prove that Vacation Acquisition is entitled to succeed to any rights acquired by Vacation Express, Inc. in 1990 and acknowledge that Vacation Acquisition is bound by the terms of that contract.  Vacation has failed to advance either point.   [See Opposition Brief Exhibits 3 and 4 and Dickieson Declaration, Paragraph 4 (1)]

**Statement 2:**  The SLA provided a perpetual license for the Tech 7 software.

**DISPUTED:**  The Defendant oversimplifies the nature of the license provided by the SLA. The SLA states "A perpetual, single system License, revocable on the terms herein stated, to use the software provided by SELLER in the manner described in paragraphs 3 and 4 of this Article." It clearly states this is a "revocable" license, which is contrary to the simplified assertion that the license is "perpetual."  [See SLA (attached to Complaint) and Dickieson Declaration, Paragraph 4 (2)]

**Statement 3:**  Article III, paragraph 4 of the SLA states in relevant part:  "In no event will any warranty or liability on SELLER survive alteration or modification by anyone other than SELLER, unless SELLER agrees in writing."

**DISPUTE:**   First, Vacation Acquisition implies that this contract clause applies to its relationship with Tech 7, but that is a disputed fact.  In fact, Vacation Acquisition's designated representative, Gantt Cookson, testified that the contract does not apply to Vacation Acquisition. Second, Vacation Acquisition falsely uses this contract clause to argue that no other remedy exists. This legal conclusion is simply wrong, as a full review of the contract and the governing

law demonstrates. This clause is designed to address a very narrow set of circumstances to ensure that Tech 7 has the right to allow modifications to the software which Tech 7 will support, but it must be with Tech 7's consent. Nowhere in the SLA does it state what Defendant argues that Tech 7 has no other remedies flowing from a breach by the Licensee. [See Cookson Dep. (transcript not yet completed), and Dickieson Declaration, Paragraph 4 (3)]

**Statement 5:** In an April 21, 1995 memo from Gantt Cookson of Vacation Express to Amnon Gibly of Tech 7, Mr. Cookson expressed his "unhappiness" with Tech 7's Worldspan Toursource product.

**Statement 6:** In a November 15, 1995 memo from Gantt Cookson of Vacation Express to Pamela Luan-Zaehler of Tech 7, Mr. Cookson registered a complaint concerning Tech 7's product, "Charter Load."

**Statement 7:** In a July 10, 1996 memo from Gantt Cookson of Vacation Express to Lyle Hobbs of Tech 7, Mr. Cookson requested a refund for the Toursource product.

**DISPUTE:**   Although these statements are believed to be true, they have no material relevance to the summary judgment motion. The fact that some third party (Vacation Express, Inc.) sent a memo to Tech 7 expressing "unhappiness" does not give Vacation Acquisition any right to use the Tech 7 software product in perpetuity without permission.   [Dickieson Declaration, Paragraph 4 (5,6,7)]

**Statement 8:** A sample letter for the signature of Jeffrey R. Kruse, Executive Vice President of Tech 7, and dated April 10, 1997 stated, "In our last letter we promised a few announcements regarding some of the changes that we are currently making at Tech 7. One of these announcements was to cover the reorganization of our Customer Service department and the fact that we would be adding a new group of account coordinators. The primary objective of this group is to increase Tech 7 customer satisfaction."

**RESPONSE:** There is no conceivable relevance or materiality attaching to this draft letter from 1997 addressed to no one. [Dickieson Declaration, Paragraph 4 (8)]

3

**Statement 9:**    An email from Masood Saidi-Nejat of Tech 7 to Deanna Bernett and Jeff Kruse of Tech 7 dated May 14, 1998 is entitled "VAE – Information for you to know…" and refers to Vacation Express. The document states, among other things, "Y2K Data Plus told them that it will get done sometime soon… Report writer DATA PLUS … Service DATA PLUS support."

**RESPONSE:** Again, this statement lacks relevance or materiality. Tech 7 has worked with Data Plus on hardware issues throughout the 1990's. Data Plus became very knowledgeable about the Tech 7 software by virtue of the fact that the Tech 7 software was often installed on Data Plus hardware. The mere fact that an e-mail mentions that Tech 7 personnel was aware of the fact that Data Plus was providing service on their hardware, cannot be construed into a knowing permanent waiver of any requirement that a customer use Tech 7 for software service. [Dickieson Declaration, Paragraph 4 (9)]

**Statement 10:**    An email from Jeff K. to persons at Tech 7 dated June 8, 1998 states in relevant part, "[j]ust some notes from visit to Vacation Express – Rhoda and I visited this account last Thursday and met with Gantt Cookson, Exec. Dir. They are using Dataplus for service and customization. They originally switched to Dataplus because Toursource had been installed for two years and was not working. Dataplus has had it for another two years and they are just switching to Beta this month. Gantt said that Dataplus service was good at first but now he is no better off. I suggest we send him a current proposal."

**Statement 11:**    In a June 15, 1998 letter from Deanna Bernett, Marketing Executive at Tech 7 to Gantt Cookson of Vacation Express, Ms. Bernett stated, "They confirmed that you are still receiving system support services from Data Plus …" Ms. Bernett than stated, "you might want to look again at our support contract. I have enclosed a Support Services contract for your consideration."

**DISPUTE:**    Again, in Statements 10 and 11, Vacation Acquisition seeks to confuse the issues involved in the summary judgment motion with references to facts involving another entity (Vacation Express, LLC) and its consensual business relationship with Tech 7 – a relationship that Vacation Acquisition does not appear to have with Tech 7. Vacation Acquisition has presented no evidence that Tech 7 waived any rights with respect to Vacation Acquisition's use

of the Tech 7 software – in fact, Vacation Acquisition never requested any such waiver, and kept

its use of the software system secret from Tech 7. [Dickieson Declaration, Paragraph 4 (10, 11)]

**Statement 12:**     Vacation Express, Inc. was purchased by My Travel, PLC, a United
               Kingdom-based company, in 1998 and made part of MyTravel subsidiary,
               North American Leisure Group (NALG). Vacation Express continued to use
               the Tech 7 software.

**DISPUTE:**    This "fact" was recited in the Plaintiff's Complaint. Discovery into this subject

has now revealed that the transaction was an asset purchase and the assets were likely purchased

from Vacation Express, LLC, not Vacation Express, Inc, with most of the assets of Vacation

Express being purchased by an entity called VE Holdings, Inc.. Vacation Express, LLC. also

sold its name, so that the purchasing entity was able to continue to do business as Vacation

Express, but that fact does not negate the legal issue that the transfer of assets to My Travel, PLC

had specific legal consequences to the Licensing Agreement. The Defendant's use of this so-

called "undisputed" statement is to distort the chain of ownership of the stock or assets of

Vacation Express, Inc. – an entity which no longer existed as of the date of this transer. [See

Cookson Dep. (transcript not yet completed) and Dickieson Declaration, Paragraph 4 (12)]

**Statement 13:**     NALG did not ask Tech 7 to transfer the software license acquired by
               Vacation Express with the signing of the SLA.

**DISPUTE:**    This statement is disputed. Various documents produced in discovery indicate

that personnel at Tech 7 were aware of and may have consented to the transfer of the Tech 7

software to NALG, which was at that time doing business with Tech 7's corporate parent. No

similar knowledge and possible consent has been shown with respect to subsequent purchases of

the Vacation Express businesses. [See Cookson Dep. (transcript not yet completed), Dickieson

Declaration, Paragraph 4 (13)]

**Statement 14:**    An October 6, 2000 "Analysis/Consultation Proposal" from Logibro/Tech 7 Systems to Vacation Express was presented by Tech 7 as part of a three day on-site analysis by Masood Saidi-Nejat of Tech 7 whose purpose was to "determine what customizations need to be moved over from VACATION EXPRESS's current SpeedRes version to the new version 10.0" The Tech 7 proposal stated further, "[t]his proposal when accepted by an authorized agent of VACATION EXPRESS and returned to Logibro/Tech 7 Systems, will become an addendum to the Sales and Licensing Agreement between VACATION EXPRESS and Tech 7 Systems." Attached to the proposal is an expense report in the name of Masood Saidi-Nejat for a three day on site analysis at Vacation Express.

**DISPUTE:**    Although this statement is partially true, it has no material bearing on the relationship between Tech 7 and Vacation Acquisition. This proposal was for an analysis of the VE Holdings, Inc. system to determine which customizations should be moved over to the new version and how much they would cost. It appeared that the new entity, VE Holdings, Inc. - that was operating under the name Vacation Express - was considering retaining Tech 7 to provide a new software system (version 10.0). A Tech 7 employee provided them with a proposal for such work. [Dickieson Declaration, Paragraph 4 (14)]

**Statement 16:**    In an April 9, 1999 letter from Jeff Kruse of Tech 7 to Kevin Hernandez of Vacation Express, Kruse stated: "TECH 7 hereby wishes to remind all its customers, including customers who did not enter into a Support and Maintenance Agreement with TECH 7, about some of our previous communications on the subject." See Cutler Decl, Exh. 10, p. 1. Mr. Kruse stated further, "[p]lease remember that any modifications, for Year 2000 purposes or otherwise, to the original licensed SPEEDRES software and system, made by anyone other than TECH 7 effectively terminates any warranty remaining on your system."

**DISPUTE:**    This "fact" is true, as it is undisputed that the April 9, 1999 letter contained the statements of Jeff Kruse. However, the significance of these facts is greatly disputed, as the Defendant asserts erroneously that these statements prove that loss of warranty is the only remedy available to Tech 7 with respect to any user of the software system. Moreover, since

Vacation Acquisitions appears to be using the Tech 7 software system not as a licensed user, but as an unauthorized infringer, the acts taken by Tech 7 with respect to licensed users do not in any way preclude Tech 7 from enforcing its rights against a party without any contractual rights to use the software.  [Dickieson Declaration, Paragraph 4 (16)]

In sum, it is clear that the entire framework of facts advanced by the Defendant are disputed as either incorrect statements or disputed as to the interpretation of what such facts actually mean.

August 23, 2008                          Respectfully submitted,

                                         SCHERTLER & ONORATO, LLP

                                         _____/s/_____
                                         David H. Dickieson, D.C. Bar #321778
                                         601 Pennsylvania Avenue, NW
                                         North Building, 9th Floor
                                         Washington, DC 20004
                                         Telephone: (202) 628-4199
                                         Facsimile: (202) 628-4177
                                         ddickieson@schertlerlaw.com

                                         *Counsel for Tech 7 Systems, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Opposition to Motion for Summary Judgment was, this 23rd day of August, 2008, served via electronic means upon the following counsel:

Jeffrey I. Zuckerman
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
1200 New Hampshire Avenue, NW, Suite 430
Washington, DC 20036
Telephone: (202) 452-7373
Facsimile: (202) 452-7333
jzuckerman@curtis.com
jzuckesq@mail.com

Gary L. Cutler
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 696-6069
Facsimile: (212) 697-1559
gcutler@curtis.com

Priya Swaminathan, Esq.
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, NY 10178
Telephone: (212) 696-8873
Facsimile: (917) 368-8873
pswaminathan@curtis.com


                              /s/
                              David H. Dickieson